## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROBERT S. DAVIDSON, d/b/a PlasterTech,<br><br>                     Plaintiff<br>   v.<br><br>THE UNITED STATES,<br>                    Defendant. | 13-942 C<br>Judge Eric G. Bruggink |

## PLAINTIFF'S POST-TRIAL BRIEF

James J. Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
Todd L. Bice, Esq., Bar No. 4534
TLB@pisanellibice.com
Debra L. Spinelli, Esq., Bar No. 9695
DLS@pisanellibice.com
Dustun H. Holmes, Esq., Bar No. 12776
DHH@pisanellibice.com
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada   89101
Telephone:  702.214.2100
Facsimile:  702.214.2101

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................ *i*

**TABLE OF AUTHORITIES** ....................................................................................... *iii*

**I.   SUMMARY OF ARGUMENT** ........................................................................... 1

**II.   ISSUES PRESENTED** ......................................................................................... 1

**III. PROPOSED FINDINGS OF FACT** .................................................................... 2

    **A. Davidson Develops his Unique Sculpting Ability Over Decades in the Plastering Business** ............................................................................................ 2

    **B. Mr. Davidson Is Hired to Sculpt a "Lady Liberty" Statue for New York New York's Casino** ..................................................................................................... 3

    **C. The USPS, Recognizing the Aesthetic Power of Davidson's Statue, Selects It for Use on a 2010 "Forever" Stamp** ......................................................................... 8

    **D. The USPS Accelerates the Issuance Date of the Lady Liberty Stamp due to the Dwindling Supplies of the Liberty Bell Stamp** ................................................. 9

    **E. The USPS Publicly and Internally Acknowledge It Would Have Used Davidson's Image Anyway** ................................................................................................... 11

    **F. The USPS Continues to Infringe to Maximize its Profits** ............................. 14

    **G. The USPS Capitalizes on the Attractiveness of Davidsons Creation** ........... 15

**IV. ARGUMENT** ........................................................................................................ 22

    **A. Davidson Possesses an Enforceable Copyright in the Las Vegas Lady Liberty Statue** ................................................................................................................. 22

    **B. The USPS Infringed on Davidson's Copyright** .............................................. 24

    **C. The USPS's use of Davidson's Statue was not Fair use** ................................ 25

        *1. Purpose and character of use* ..................................................................... 26

        *2. Nature of the copyrighted work* .................................................................. 27

        *3. Amount and substantiality of the portion used* .......................................... 29

        *4. Market impact* ............................................................................................. 29

**D.** **Davidson is Entitled to the Fair Market Value of a License Covering the USPS's Infringement** ................................................................................................30

1. *The evidence supports a running royalty rate* ........................................................32

2. *Alternatively, the Court could apply a mixed approach* ........................................34

3. *The USPS's own subsequent admissions prove the fair market value of license* ..36

4. *Davidson is entitled to delay compensation at a statutory rate* .............................37

**V. CONCLUSION** ................................................................................................38

**CERTIFICATE OF SERVICE** ............................................................................39

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)........................................... 27

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ........................................................... 27

*Boeing Co. v. United States*, 86 Fed. Cl. 303 (2009)............................................................. 31, 36

*Brunswick Corp. v. United States*, 36 Fed. Cl. 204 (1996), aff'd, 152 F.3d 946 (Fed. Cir. 1998) 31

*Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) .. 25, 26, 28, 29

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ................................................ 25, 27, 29

*Cellular Accessories for Less, Inc. v. Trinitas LLC*, 65 F. Supp. 3d 909 (C.D. Cal. 2014).......... 24

*Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905 ........................................................ 22, 23

*Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982) ............................... 23

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211 (9th Cir. 1997)...................................................................................................................................... 22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ...................................................................................................................................... 21

*Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988)................ 31, 35

*General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983).. 36

*Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970) .... 31

*Harper & Row, 471 U.S. at 564, 105 S.Ct. 2218*......................................................................... 29

*Hart v. Sampley*, Civ. A. No. 91-3068, 1992 WL 336496, at *2 (D.D.C. June 24, 1992) ........... 28

*Hitkansut LLC v. United States*, 130 Fed. Cl. 353 (2017) ........................................................ 37

*ITT Corp. v. United States*, 17 Cl. Ct. 199 (1989) ....................................................................... 31

*Keeling v. Hars*, 809 F.3d 43 (2d Cir. 2015) ............................................................. 23

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ......................... 36

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996)............................................. 31

*Mazer v. Stein*, 347 U.S. 201214 (1954)................................................................. 22, 28

*Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F. Supp. 429 (W.D. N.Y.

    1978)...................................................................................................................... 29

*Narell v. Freeman*, 872 F.2d 907 (9th Cir.1989) ......................................................... 24

*Norse v. Henry Holt & Co.*, 991 F.2d 563 (9th Cir. 1993) .......................................... 24

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369 (S.D.N.Y. 2015) .......... 36

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014) ................................ 22

*Radji v. Khakbaz*, 607 F. Supp. 1296 (D.D.C. 1985)................................................... 24

*Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148 (9th Cir. 2012) ........................ 24

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) ............................................................ 24

*Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513 (7th Cir. 2009)............................ 23

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed.

    1449 (1933) ........................................................................................................... 35

*Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366 (2d Cir. 1993) ......... 29

**Statutes**

17 U.S.C. § 103(a) ...................................................................................................... 22

17 U.S.C. § 107.................................................................................................... 27, 29

17 U.S.C. § 107(1) ...................................................................................................... 25

17 U.S.C. § 401............................................................................................................ 28

## I.      SUMMARY OF ARGUMENT

The re-imagined Lady Liberty statue standing on the Las Vegas strip is the artistic creation of one person: Robert S. Davidson. Davidson was granted and exercised his wide artistic license in creating a more delicate, modern, feminine, and fresh-faced statue. Unremarkably, it was Davidson's artistic vision that caught the eye of the USPS. From thousands of possible candidates, the USPS selected a *close-up photograph of the head and crown* of Davidson's creation for the new "forever" stamps.

But while the USPS has reaped the benefits from its use of Davidson's creative work, it has been completely dismissive of any obligation to honor his rights. Originally, the USPS claimed that it "unknowingly" selected Davidson's Statue, but it loved the image so much, it would have selected it anyways. That attitude changed only after Davidson sought compensation for the theft and unauthorized commercialization of his intellectual property. Only then did the USPS reversed course, questioned his artistic abilities, and proclaiming that it would have never used the image depicting Davidson's Statue.

The evidence presented at trial supports the following findings: (1) Davidson has an enforceable copyright in his creation, (2) the USPS infringed upon Davidson's copyright, (3) the USPS's use was not fair under any stretch of the imagination, and (4) Davidson is entitled to the fair market value of a license covering the USPS's infringing use as discussed herein.

## II.     ISSUES PRESENTED

1.      Does Plaintiff Robert Davidson possess a valid enforceable copyright interest in the Las Vegas Lady Liberty Statute (the "Las Vegas Statue," "Davidson's Statue," or the "Statue")?

2.      Did the USPS infringe Davidson's copyright through actual copying and reproduction without his authorization?

3.      If the Court finds that Davidson has proven a *prima facie* case of copyright infringement, the issue then becomes whether the USPS has proven its infringement constitutes fair use?

4.      If the Court finds that the USPS use of Davidson's copyright was not fair use, then what is the fair market value of a license for the full scope of the USPS's infringing use of Davidson's copyright?

## III.    PROPOSED FINDINGS OF FACT

### A.    Davidson Develops his Unique Sculpting Ability Over Decades in the Plastering Business.

1.      Davidson's unique sculpting ability was developed over several decades dating back to the early 1970's when he began working at a plastering company in Las Vegas, Nevada known as Valley Plastering. *See* Tr. 52:3-53:20 (Davidson).

2.      Davidson worked his way up from water boy to Executive Vice President and along the way developed an enjoyment of sculpting unique features out of the plastering material used during the construction process. *Id*. at 53:21-56:21; 61:3-13.

3.      Davidson left Valley Plastering in 1987 to start his own business as a sole proprietorship doing business as PlasterTech. *Id*. at 57:5-23.

4.      Initially, his work focused upon the exterior plastering of custom homes, but quickly shifted into sculpting interior custom artwork out of plaster. *Id*. at 57:24-59:24. For example, in 1992 Davidson sculpted a custom lion fireplace, which would ultimately grace the cover of Southwest Passages Magazine. *Id*. at 61:14-66:24; PTX 4.

5.      As Davidson testified at trial the process he used in creating the lion fireplace was very similar to the sculpting process he would end up using to create the Lady of Liberty Statue. *See* Tr. 63:11-66:7 (Davidson).

2

6.      Around the time he completed this sculptor, and as Davidson started gravitating towards more artistic ventures, like the lion fireplace, Davidson made an agreement with a company known as Ford Contracting ("Ford") for a general buyout. *Id*. at 60:1-24.

7.      Under this arrangement Davidson kept the licensing of his sole proprietorship, but facilitated Ford in the transition. *Id*.

8.      During this transition Ford was involved in the construction of the Luxor Hotel & Casino, an Egyptian themed hotel and casino being built in Las Vegas, Nevada. *Id*. at 67:4-70:8.

9.      One of the main attractions being built was a large sphinx that would sit in front of the glass pyramid hotel and casino. *Id*. at 70:10-21. After the original contractor could not complete the project, Davidson was tasked with sculpting the face of the sphinx to complete the project. *Id*. at 70:18-73:1.

10.      To sculpt the massive face of the sphinx, Davidson used a partial maquette created by an artist that was modeled after the architect for the project. *Id*. at 73:17-79:3.

11.      After obtaining rough dimensions, Davidson used rasps and hot wands (created by his brother) to carve the polystyrene foam into the sculpted face, which would then be coated with plaster. *Id*.  This process took nearly three months with Davidson making all the final decisions on how the face would be sculpted and finishing details. *Id*. 79:2-5; 82:18-23; PTX 233-1-2.

**B.      Mr. Davidson Is Hired to Sculpt a "Lady Liberty" Statue for New York New York's Casino.**

12.      In or around July of 1995, after completion of the Great Sphinx of Giza head at the Luxor Hotel, Jeff Whittle of the Recreation Development Company ("RDC"), knowing of Davidson unique sculpting ability, sought out Davidson to sculpt the exterior finishing of a statue inspired by the Manhattan Statue that stands in New York Harbor. *See* Stip. Fact, ¶9; Tr. 90:11-93:14 (Davidson).

3

13.      Davidson was informed that his work would stand outside on the Las Vegas strip in front of a new casino and hotel being built known as the New York-New York Hotel & Casino. *See* Stip Fact, ¶5; Tr. 91:8-16 (Davidson).

14.      Davidson was excited about the project and based upon his discussion with RDC was informed that he would be doing all the exterior design, sculpting, and coating of the Statue. *Id*. 92:12-93:21.

15.      On September 26, 1995, Davidson submitted a proposal to RDC. *See* Stip. Fact, ¶10; JTX 8. On October 26, 1995, RDC sent a letter formally accepting Davidson's proposal dated September 26, 1995. *See* Stip. Fact, ¶11; JTX 9.

16.      Prior to receiving this formal notice, Davidson had already received verbal approval to proceed with the project. *See* Stip. Fact, ¶11.

17.      Although Davidson was given loose guidelines regarding the statute's height, weight, width and depth, he was given a creative license to recreate his vision of the statue. *See* Tr. 99:8-25; 129:20-131:6 (Davidson).

18.      Indeed, although RDC had agreed to provide Davidson with a scaled model of the statue, it never supplied one. *See* Tr. 96:23-97:13 (Davidson); JTX 8.

19.      Likewise, even though RDC initially represented that it would send Davidson back to New York and rent a Helicopter to take pictures of the Statue of Liberty, this too never took place. *See* Tr. 94:14-95:20 (Davidson).

20.      Instead, RDC provided Davidson with a handful of pictures taken from the base of Statue of Liberty and 12-inch high curio that was largely useless. *Id*.[1]

---

[1]      Indeed, Davidson had never even seen the New York Statue of Liberty in person until years after his creation. *See* Tr. 94:5-13 (Davidson).

21.     Davidson exercised his creative license and built his own maquette to create his statue. *See* Tr. 94:14-95-8; 129:20-131:6; 232:3-233:15 (Davidson).

22.     Davidson used rough dimensioning drawings of the general shape of the statue to serve as guidance, but these drawings were far from critical and provided little detail. See Tr. 100:13-103:14, 114:13-20 (Davidson); PTX 236.

23.     Moreover, Davidson created his own dimensioning graph of his vision for the Statue's face. Tr. 107:9-108:7; PTX 236_013.

24.     Davidson used the rough dimensioning drawings to cut ½ inch thick cross-sectional foam stacked upon each other that provided a general shape of the maquette. *See* Tr. 108:14-115:16; PTX 234-83-6; PTX 234-47-50; PTX 234-56-57.

25.     From there Davidson would sculpt the finer details. *See* Tr. 114:13-120:15; PTX 234-40, 234-41, and 234-65. He used the same material that he would ultimately use in sculpting the statue. *Id*. Davidson applied a white cement mixed with acrylic over the foam, which he would then manipulate and sand to sculpt the details of his creation. *Id*.

26.     Davidson would sculpt the maquette at night and during the day he would take the maquette to begin sculpting the actual statue. For this process, Davidson used a dimensioning jig to transpose the dimensions from his maquette onto the larger statue. *See* Tr. 120:8-125:6 (Davidson); PTX 233-216-217.

27.     As Davidson testified at trial, once these dimensions where transposed onto the larger foam sectional pieces of the statue, he would use hand saws, hot-wands, files and rasps to carve the foam to provide the overall shape and form of the statue. *See* Tr. 132:8-161:24 (Davidson); PTX 234-17; PTX 234-33-34.

28.     Yet, although this process provided the overall shape and form, the finer details where done by Davidson through the use of hand rasps, something similar to sandpaper. *See* Tr. 149:20-151:7; 160:5-20 (Davidson). Davidson provided the following testimony in explaining the process as it relates to the sculpting of the statue's face:

> Q. How do you sculpt a 12-foot face and head?
>
> A. Well, still the same procedure. We've got our dimensioning jig here and we take points off of that face and write those on a graph, which I actually have one of those here.  And then we go through with that pointer and establish those points and then go through with the hot wands and connect that and rough out the shape of that face.  Then it comes to the point where I go in with those fine hand rasps.  You can see there's another hot wire that's stuck into her chin.  Then I go in with those rasps and start to rasp it down. That's when the face starts to get some life to it and it really starts to speak to you and kind of tells you which way it's got to go.  And it tells you if you do it wrong.  It really does.  You just start getting to that point to where you are satisfied with the results and you just stop.

*See* Tr. 160:5-21 (Davidson).

29.     After sculpting the foam, Davidson applied multiple layers of colored cementitious coating and mesh, permitting him to manipulate the statue into the desired look and finish. *See* Tr. 170:10-172:11 (Davidson).

30.     Davidson explained that in creating his statue it was never his intent to exactly replicate the Manhattan Statue of Liberty. *See* Tr. 162:17-163:3; 170:6-171:5; 174:13-175:24 (Davidson). Rather, as Mr. Davidson, he intended to create something "new and different." *See* Tr. 344:1-10 (Davidson).

31.     Obliviously, his statue had to be a representative of the Statue of Liberty to a certain extent, but he was given artistic license to recreate his own vision of the Statue of Liberty for the new hotel in Las Vegas. *See* Tr. 162:17-163:3; 163:22-166:18; 168:3-176:24 (Davidson).

32.     Davidson envisioned his statue having a more modern, contemporary, softer, and feminine look. *Id.*

33.     In particular, in sculpting the facial features of the statue, Davidson drew inspiration from his mother-in-law. *See* Tr. 163:4-11 (Davidson).

34.     On October 4, 1996, Davidson completed his sculpture and he dedicated his accomplishment to his mother-in-law, who had passed away during the creative process, by affixing a plaque to the crown of the statute. *See* Tr. 176:25-181:24 (Davidson); PTX 233-296; PTX 233-297; Stip. Fact at ¶¶12-13.

35.     As the result of Davidson exercising his artistic license, his statue contained substantial difference from that the Manhattan Statue of Liberty, including:

    a.     *Silhouette:* The LV Statue features a softer, more feminine and realistic silhouette than the NY Statue. The specific, artistic differences embodied in the silhouette of the LV Statue include, but are not limited to: the placement, size, and pattern of the robe folds; the angle, positioning, and length of the upraised arm and hand; and less muscle definition and softer sinews of the upraised arm of the LV Statue.

    b.     *Face:* The LV Statue depicts a more feminine visage than the NY Statue, and lacks the sharp, angular features of the NY Statue. This was by design, as Davidson was inspired by certain facial features of his close female relatives. The specific, artistic differences embodied in the face of the LV Statue include, but are not limited to: a fuller chin; a rounded jawline and neck; a softer and wider mouth in relation to the nose; lifted corners of the mouth to create a friendlier expression; a pronounced cupid's bow shape of the upper lip; a fuller and slightly pouty lower lip; a rounded nose tip, that is flatter, wider, and slightly upturned; larger, more rounded nostrils; a thinner nose bridge; rounded, less prominent ears and ear lobes; pronounced eyebrows, with enhanced definition at the bridge of the nose; a shorter, less pronounced forehead; more defined eyes and eyelids, with the eyes looking more outward and upward; a left eyelid that is slightly higher and has a tighter radius than the right eye; lower eyelid furrows that are rounder and softer; and texture, placement, and detailing of the hair across the forehead and above the ears, creating a tidy, well-groomed appearance.

    c.     *Crown:* The crown of the LV Statue displays a facade depicting viewing windows because, unlike the NY Statue, the crown of the LV Statue does not include an observation deck.

*See* Tr. 173:17-174:21 (Davidson); JTX 7.

C.     **The USPS, Recognizing the Aesthetic Power of Davidson's Statue, Selects It for Use on a 2010 "Forever" Stamp.**

36.     Although the USPS is an independent establishment of the executive branch of the Government of the United States, it is not a non-profit organization and generated nearly sixty to seventy billion in revenue year after year from 2008 to present. *See* Stip. Fact at ¶2; Tr. 649:1-19 (Stratton).

37.     In fact, if it was in the private sector, the USPS would be a top Fortune 500 company in size. *See* Tr. 1003:1-23 (Gicker).

38.     In 2007, the USPS introduced the first Forever Stamp, bearing an image of the Liberty Bell. A Forever stamp is a stamp that will always be equal in value to the current price for postage for a one-ounce, First-Class mail piece. Stip. Fact at ¶15.

39.     The USPS first warmed to the aesthetic appeal of Davidson's statue in 2008, when it considered redesigning its "forever" stamp. *See* Tr. 677:2-17 (McCaffery).

40.     Terry McCaffery, USPS's Manager of Stamp Development (an entire department within the USPS dedicated to the development of stamps) and USPS employee for forty years, was tasked with selecting an image of the Statue of Liberty and flag for use on the new stamp. *See* Tr. 656:11-657:2, 637:14-678:5, 738:11-739:5 (McCaffery).

41.     According to the USPS, the American public was growing tired of the Liberty Bell design and customers were looking for a new Forever stamp design. *See* Tr. 735:7-736:24 (McCaffery); Tr. 847:22-848:3 (Gicker).

42.     Since the USPS had already issued 20-24 stamps featuring the Statue of Liberty, McCaffery was looking for something "different and unique." *See* Tr. 736:14-765:21 (McCaffery).

43.     McCaffery reached out to the USPS vendor who provided access information to the stock imaging websites. *See* Tr. 677:18-24 (McCaffery).

44. After viewing thousands of images, he settled on three finalists: one depicting Davidson's statue, and the other two depicting the Manhattan statue. *See* Tr. 765:24-772:25 (McCaffery); PTX 29.

45. At the time he selected the stamp, McCaffery believed he had selected an image of the Manhattan statue. *See* Tr. 773:2-6 (McCaffery).

46. However, McCaffery later acknowledged that there were differences between Davidson's statue and the two other "finalist" images. *See* Tr. 773:10-21 (McCaffery).[2]

47. Likewise, USPS's key personnel later acknowledged that "it's quite apparent" that the image was not of New York Statue of Liberty and that the one McCaffery selected "was very different from anything [USPS had] done before." PTX 85.

48. In fact, according the USPS, that was the "appeal" and "there are only so many ways to continue to reinterpret an iconic image." PTX 37.

49. After receiving the photograph of Davidson's statute, McCaffery acknowledged that no changes were made to the image other than slightly cropping as part of the design process. *See* Tr. 672:4-24 (McCaffery).

**D.     The USPS Accelerates the Issuance Date of the Lady Liberty Stamp due to the Dwindling Supplies of the Liberty Bell Stamp.**

50. In 2008, McCaffery initially submitted the designs as single stand-alone stamps to the Citizens' Stamp Advisory Committee ("CSAC") for approval. *See* Tr. 678:12-686:7 (McCaffery); PTX 31; PTX 37.

---

[2]     Interestingly, the USPS never disclosed nor produced at the time of trial the other two Statue of Liberty images that McCaffery selected.

51.     The designs would subsequently be approved by CSAC and the Postmaster General, but as acknowledged by the USPS these approvals came before the rights to imagery had been purchased. *See* Tr. 963:6-964:13 (Gicker).

52.     It was not until 2010 that the USPS assigned a year for the release of the stamps. *See* Tr. 828:13-23 (Gicker).

53.     In mid-2010, the Postmaster General made the decision to pair the stamp design depicting Davidson's statue with the flag design for the purpose of issuing the new Forever stamp in January 2011. PTX 62.

54.     The issuance date was subsequently accelerated for a release date of December 1, 2010 because of the dwindling supply of the Liberty Bell stamp. *See* Tr. 828:13-23 (Gicker); Tr. 520:12-19 (Quinn); Tr. 628:14-19 (Stratton).

55.     Indeed, the USPS employee in-charge for the production of stamps, Shawn Quinn, testified that the USPS did not have enough Liberty Bell stamps to support sales. *See* Tr. 520:12-19 (Quinn).

56.     In addition, for internal financial reasons, the USPS needed to use different images on its Forever stamps in order to track changes in the underlying postage rate or price.  The long run of the Liberty Bell stamp was causing issues and becoming problematic for the USPS finance department. *See* Tr. 960:20-961:12 (Gicker).

57.     In order to avoid this dire situation, the USPS accelerated the issuance of the stamp. In May/June of 2010, the Postal Service licensed an image by Raimund Linke from Getty Images depicting the face of Davidson's Statue, as well as part of its crown.  *See* Stip. Fact ¶18; PXT 57; *See* Tr. 963:6-964:24 (Gicker).

58.     At no time did USPS seek, let alone acquire, Davidson's authorization or permission to use an image of his work.  *See* Stip. Fact ¶ 21.

59.     Less than six months later, the USPS began issuing the "forever" stamps with Davidson's statue (the "Lady Liberty Stamp") *se tenant* (paired) with a stamp featuring an image of the United States flag (the "Flag Stamp") on or about December 1, 2010. *See* Stip. Fact ¶¶19-20.

60.     As Gicker testified at trial, during this time the USPS had no alternative patriotic images in its bank that would have been able to replace the image depicting Davidson's statue. *See* Tr. 963:9-964:24 (Gicker).

61.     Moreover, Quinn confirmed that once the stamp designs were sent to printers it would not have been realistic to stop production as "it takes a lot of time and effort to produce billions of stamps and distribute billions of stamps across the country….to ramp that up and do that again, in short fashion would be – we would run out of stamps…" *See* Tr. 532:4-9 (Quinn).

62.     The USPS issued the Lady Liberty/Flag stamp in three formats: (1) coils of 100 stamps, (2) single-sided booklets containing 18 stamps, and (3) double-sided booklets containing 20 stamps. *See* Tr. 505:1-17 (Quinn).

63.     In every single format produced the USPS intentionally decided to use the image of Mr. Davidson's Statue on the cover of the packaging material. *See* Tr. 1522:23-1525:17 (Piazza); DX 503 at Figure 2, Figure 7, and Figure 8; PTX 66; PTX 68.

**E.      The USPS Publicly and Internally Acknowledge It Would Have Used Davidson's Image Anyway.**

64.      Little over three months later, on March 18, 2011, the USPS first became aware that the image on its forever stamp depicted Davidson's statue, not the Manhattan statue. PTX 37; *see* Stip. Fact ¶22.

65.     Initially, the USPS's agents acted as if nothing was wrong: on March 18, 2011, Sidney Brown, a PhotoAssist employee, emailed one of his coworkers, stating that "Maybe we don't change either of these" because the image "is meant to symbolize the Statute of Liberty – not be of it."  PTX 82.

66.     Yet, on the following day - March 19, 2011 - the Postmaster General received another email notifying the USPS of the differences between Davidson's statue and that of the Manhattan statue. PTX 243; PTX 245.

67.     This information was forwarded to USPS's Manager of Stamp Development, Layne Owens, who was part of the management team responded to the information. PTX 245.

68.     Based upon this information Owens admitted in a March 20, 2011 internal communication that "it's quite apparent," the image was a photograph of Davidson's Statue and not of the original. PTX 85.

69.     Less than three days later, on March 21, 2011,  internally, the USPS confirmed with the photographer that the image was in fact the statue in Las Vegas – Davidson's statute. PTX 37. Indeed, in a March 23, 2011 memorandum to the Postmaster General, it was advised that the USPS was investigating "the terms of the contractual relationship between New York New York casino…and *the artist who created the face reproduced on the stamp*." PTX 95 (emphasis added).

70.     Despite this knowledge, the USPS internal mantra was that they would have used the image depicting Davidson' statue anyways. As Owens explained on March 21, 2010, "[h]ad we known the origin of the photograph, we would have attributed the photograph as having been taken of the statue in Las Vegas; *however, we would still have used this photo*." PTX 37.

71.     Owens internally informed other upper-management that "one [McCaffery] selected was very different from anything we've done before. That was it's appeal…there are only so many ways to continue to re-interpret an iconic image." *Id*.

72.     On the same date, Owens sent an email to Roy Betts, the USPS's Senior Public Relations Representative, providing the USPS position to use in statements to the media. PTX 244; *See* Tr. 449:21-454:22 (Betts).

73.     As Owens informed Betts, the USPS "can confirm that the photograph is of the replica – not the original. That said, we still love the stamp design and would have selected this photograph anyway. We were looking for a different treatment of this icon that has been on 23 different stamps." PTX 244.

74.     Betts subsequently told the public through various news outlets, among other things, that "we still love the stamp design and ***would have selected this photograph anyway***." *See* Tr. 420:12-421:22 (Betts); PTX 109; PTX 110 ("We love this treatment of Lady Liberty. We wanted to do something differently."); PTX 121; PTX 131; PTX 133.

75.     Betts would subsequently state in an email to other USPS employees, "there is no error on the stamp," and this same position would be reiterated as provided to the public in news outlets indicating that "[t]here's no error on the stamp, so we're not recalling them." PTX 108; PTX 121.

76.     As Betts would confirm at trial, nobody in the USPS ever informed him to retract or correct these statements. *See* Tr. 421:14-19 (Betts).

77.     Around the same time, in April 2011, Sylvia Harris, a CSAC member, explained the choice of image in financial terms, indicating that it would be "good for stamp sales!," and that "I had an extreme expensive and difficult time winning the rights to use a similar view of the

REAL Liberty for the ACLU logo a number of years ago.  So, I can imagine why we ended up with this image."  PTX 118.

78.     Then on April 14, 2011, Owens advised members of CSAC that the USPS has "no plans to remove these stamps designs, and they will continue to be our workhorse stamps until supplies are exhausted." PTX 104. As Owens explained, the image of Davidson's statute was "a bold graphic" and was "very popular." *Id*.

79.     In response to a May 2011 Congressional inquiry, Owens indicated the only error USPS regretted was that it "incorrectly attributed the photograph to being of the Statute of Liberty on Liberty Island." PTX 151.  Owens explained that "the due diligence and research process was not followed, and we did not verify with the licensing agency the source of this photograph." *Id*.

80.     Yet, because the USPS had "sold more than billion of these stamps and has finished printing enough stamps to last through the next rate change and has spent more than $8 million in printing costs," it elected to continue to infringe Davidson's rights. *Id*.

**F.     The USPS Continues to Infringe to Maximize its Profits.**

81.     Consistent with their position that they would have used a depiction of Davidson's statue in any event, USPS did not pull the liberty stamps from sale or recall those it had issued. Around the same time, Quinn confirmed internally that nearly 4.4 billion stamps at an approximate cost of $7.9 million had printed and sent to the field as of April 2011, with additional 6.1 billion stamps at an approximate cost of $10.4 million anticipated to be produced later in the fiscal year. PTX 134; *See* Tr. 527:20-535:3 (Quinn).

82.     A few months later, in June 2011, Quinn's superior at the USPS, Charles Delaney, confirmed that as of June 2011 a total of 10.5 billion stamps had been produced, and nearly 4.4.

billion had been shipped to the field, with the remaining 6.1 billion to be shipped before the end of the calendar year. PTX 148; *See* Tr. 535:6-536:25 (Quinn).

83.     In addition, the USPS has admitted that in September 2011, it issued at least 1.125 billion additional stamps. *See* Tr. 539:3-540:9 (Quinn).

84.     As Quinn explained at trial the reason why the USPS made the decision not to stop distributing the stamp was because they had already been printed and it would have been impossible to produce another billion stamps to meet demand in short order. *See* Tr. 529:1-532:9, 540:6-546:17 (Quinn).

85.     Indeed, Quinn indicated that the USPS would have risked running out of stamps if they stopped distribution. *Id*. at 532:4-9.

86.     The USPS retired the Lady Liberty Stamp and Flag Stamp pair in January 2014. Stip. Fact ¶25.

87.     But despite these facts, and although the USPS has now admitted that Davidson's name appears on the face of the copyrights, it has never sought to obtain Davidson's authorization nor provided any sort of attribution to Davidson.  *See* Stip. Fact ¶21; Tr. 997:16-20 (Gicker).

**G.     The USPS Capitalizes on the Attractiveness of Davidson's Creation.**

88.     The USPS has sold over 4.9 billion stamp images of Davidson's statue and has collected over $2.1 billion from just its sales, which does not include other stamp sales USPS achieved by exploiting the image of Davidson's Statue. *See* Stip. Fact ¶¶26-28.

89.     Specifically, as of December 31, 2015, the USSP had collected $2,190,414,155 from its sale of 4,948,761,166 Lady Liberty Stamps. Likewise, as of December 31, 2015, the USPS had collected $2,190,414,155 from its sale of 4,948,761 Flag Stamps paired with the Lady Liberty Stamp. *See* PTX 212.

90.    The number of Lady Liberty Stamps sold, per year, were:

| Year | Quantity |
|------|----------|
| 2010 | 92,273,370 |
| 2011 | 3,044,223,258 |
| 2012 | 1,791,350,576 |
| 2013 | 21,515,963 |
| 2014 | 90,586 |
| | |
| Refunds | (692,587) |
| **Total Sales** | **4,948,761,166** |

*See* Stip. Fact ¶26.

91.    The same number of Flag Stamps were sold, per year, as the number of Lady Liberty Stamps noted above. *See* Stip. Fact ¶27.

92.    The USPS differentiates between stamps used for mailing and stamps not used for mailing. The USPS hires an outside firm known as Synovate that calculates a percentage of stamps that will not be used for mailing through what is known as a retention/breakage rate. *See* Tr. 549:19-551:19 (Quinn).

93.    The retention/breakage rate essentially represents pure profit for the USPS because the stamps will not be redeemed for service as they were either lost, destroyed, or retained by customers and/or collectors. *Id.*

94.    As Quinn explained, the higher the retention/breakage rate for a stamp the greater the benefit to the USPS. *See* Tr. 578:22-579:4, 581:2-582:5 (Quinn).

16

95.    Synovate provides quarterly surveys on the retention/breakage rate for stamps to stamp services who uses this information to determine what stamps are appealing to consumers. *See* Tr. 610:6-615:21 (Quinn).

96.    Towards the end of the fiscal year in 2011, Quinn, in his position at the USPS created a spreadsheet indicating the estimated retention rate for the Lady Liberty/Flag Stamp was nearly 4.69%, with nearly $75 million in retention profit in 2011 alone. *See* Tr. 552:1-558:13, 575:11-578:19 (Quinn); PTX 154; PTX 154A.

97.    In February 2016, the USPS verified in responses to interrogatories that estimated retention/breakage rate for the Lady Liberty Stamp and Flag Stamp is 3.24%. *See* Stip. Fact ¶29; Tr. 632:9-633:19 (Stratton); PTX. 212.

98.    This rate is relied upon by the USPS in its financial statements. *See* Tr. 632:9-633:19 (Stratton).

99.    At trial, the USPS attempted to have its expert, Dr. Bruce Isaacson, provide a purported lower retention/breakage rate than relied upon for the USPS's financial statements. Yet, when pressed on his analysis, he was forced to concede that his survey actually resulted in a retention/breakage rate (solely related to retention amongst collectors) closer to 10%. *See* Tr. 13:49:23-1356:14 (Isaacson).

100.    Of the $2,190,414,155 the USPS has collected from the sale of the Lady Liberty Stamp, the USPS estimates that $70,969,419 of these sales are not projected to be redeemed for services as they have been retained by collectors or have been lost or destroyed, *i.e.* pure profit for the USPS. PTX 212. The same amount has been estimated for the U.S. flag stamp paired with the Lady Liberty Stamp. *Id*.

101.    Despite being dismissive of Davidson's copyright protection, the USPS in fact claims copyright protection in the Lady Liberty Stamp and would seek a royalty if somebody attempted to use it for commercial purposes. *See* Tr. 844:12-25 (Gicker).

102.    Indeed, the USPS out-licenses its own intellectual property, including images on stamps, to third-parties for a royalty rate ranging from 3% to 8%. *See*, *e.g.*, PTX 157; PTX 158; and PTX 195.

103.    As Amity Kirby, the USPS's Senior Licensing Specialist, explained back in 2006 the USPS had an internal policy of charging a royalty rate of 8% and today it is 10% for out-licensing. *See* Tr. 1059:21-1061:9 (Kirby).

104.    At trial, Plaintiff's expert on valuation of intellectual property, Jim Timmins, opined that the fair market value of a license for mail use stamps relating to the Lady Liberty Stamp is a running royalty rate of 1.50% and the fair market value of a license relating to the Lady Liberty Stamp not redeemed for service, *i.e.* the retention/breakage stamps, is a running royalty of 5.00%. *See* Tr. 1233:10-1234:11, 1241:10-1242:10 (Timmins).

105.    Likewise, Mr. Timmins opined that the fair market value of a license for mail use stamps relating to the conveyed Flag Stamp is a running royalty rate of .75% and the fair market value of a license relating to the conveyed Flag Stamp not redeemed for service, *i.e.* the retention/breakage stamps, is a running royalty of 2.50%. *See* Tr. 1248:10-1252:3 (Timmins).

106.    Lastly, Mr. Timmins opined that the fair market value of a license for philatelic products is a running royalty rate of 10%. *See* Tr. 1252:4-1254:12 (Timmins).

107.    In arriving at his opinion, Mr. Timmins' explained, that he first set several non-economic terms of the hypothetical negotiation, such as the timing of the negotiations, duration, exclusivity, and territory covering the license. *See* Tr. 1175:9-1185:22 (Timmins).

18

108.    The date of the hypothetical negotiation would have been in June of 2010 when the USPS made the decision to utilize the infringing image. *See* Tr. 1175:15-1176:15 (Timmins).

109.    As Mr. Timmins explained, at this point in time the USPS had essentially painted itself into a corner as it had already went through its internal process to have the imaging of the stamp approved with no reasonable alternatives available to meet the impending issuance deadline. *See* Tr. 1177:2-1183:1 (Timmins).

110.    After setting forth these non-economic terms, Mr. Timmins conducted extensive research on the comparable licenses in the market place for artwork like that of Mr. Davidson's sculpture. *See* Tr. 1202:10-1207:9, 1211:21-1220:20, 1229:17-1230:3 (Timmins).

111.    Mr. Timmins testified that comparable artwork ranged with royalty rates from low of 2.5% to a high of 10.0%, with a mean of 6.5%, a median of 7.0%, a bottom quartile of 4.0%, and a top quartile of 8.5%. *See* Tr. 1211:6-1221:1 (Timmins).

112.    The USPS's expert, Christopher Bokhart, agreed that the marketplace for artwork indicates typical royalty rates in the range from 6% to 10%. *See* Tr. 1684:5-13 (Bokhart).

113.    Mr. Timmins likewise considered the USPS out-licensing history which he testified was more indicative of the market place for artwork. *See* Tr. 1222:3-19 (Timmins).

114.    Similarly, Mr. Timmins explained that the USPS's position of a $5,000.00 flat fee was not indicative of the market place. *See* Tr. 1207:1-9 (Timmins).

115.    Moreover, Mr. Timmins explained it was likewise not indicative of the parties' respective bargaining power at the time of the entering into the hypothetical negotiation. *See* Tr. 1213:21-1214:5, 1224:17-1228:25 (Timmins).

116.     Both experts at trial agreed the hypothetical negotiation between the parties would have been based upon no attribution being given to Mr. Davidson for the use of his copyright. *See* Tr. 1209:13-25 (Timmins); Tr. 1671:11-1672:20 (Bokhart).

117.     Yet, as Mr. Timmins explained he was unaware of any situation where a party took a nominal flat fee license and received no attribution at the same time. *See* Tr. 1210:1-15 (Timmins).

118.     Mr. Timmins also considered Davidson's lack of previous licensing of his copyright, but explained that this fact would not preclude an application of a royalty rate. Instead, it would only place Davidson in a weaker negotiating position and lower the royalty rate, which he accounted for in his opinion. *See* Tr. 1261:6-1262:8 (Timmins).

119.     With respect to the USPS's position that it would have been unwillingly to enter into a running royalty rate, Mr. Timmins explained at trial that this proposition failed for two reasons. First, even after becoming aware that the image was of Davidson's Statue, the USPS decided to continue to print and sale the stamp, which indicates from an economic perspective it was not concerned about a running royalty rate. Second, Mr. Timmins explained that the USPS did have a history based upon the Court's decision in *Gaylord* of entering into running royalty rates for artwork on stamps.  *See* Tr. 1237:18-1238:16, 1422:12-1423:18 (Timmins).

120.     Based upon his analysis, Mr. Timmins' concluded that under a hypothetical, arm's-length negotiation between the parties, Davidson is entitled to the following royalty rates and amounts based upon the sales figures of the Lady Liberty Stamp and conveyed Flag Stamp:

**Lady Liberty Stamp**

|  | Total | Mail Use | Breakage |
|---|---|---|---|
| Sales | $2,190,414,155 | $2,119,444,736 | $70,969,419 |

| | | | |
|---|---|---|---|
| Royalty Rate | | 1.50% | 5.00% |
| Royalty Amount | | $31,791,671 | $3,548,471 |

**Convoyed U.S. Flag Stamp**

| | Total | Mail Use | Breakage |
|---|---|---|---|
| Sales | $2,190,414,155 | $2,119,444,736 | $70,969,419 |
| Royalty Rate | | 0.75% | 2.50% |
| Royalty Amount | | $15,895,836 | $1,774,235 |

**Philatelic Products**

| | |
|---|---|
| | |
| Sales | $29,515 |
| Royalty Rate | 10.0% |
| Royalty Amount | $2,952 |

*See* Tr. 1192:20-1193:6, 1248:10-1254:12, 1258:10-1260:11 (Timmins).

121.    Yet, as Mr. Timmins explained, if the confines of the hypothetical negotiation where to change, in that the parties where to negotiate only upon the revenue source related to stamps not used for mailing, then the above royalty rates would increase and, if strictly negotiating on stamps retained by collectors it would be closer to a 50/50 split. *See* Tr. 1264:8-25, 1446:8-1449:5 (Timmins).

122.    Davidson is also entitled to pre-judgment interest at the statutory rate for any damages awarded.

123.    On November 27, 2013, Davidson sued the USPS for copyright infringement. Stip. Fact ¶30.

## IV. ARGUMENT

### A. Davidson Possesses an Enforceable Copyright in the Las Vegas Lady Liberty Statue.

The Copyright Act protects "pictoral, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). Such works "include work of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned." *Id.* at § 101. Additionally, copyright protection can only be had for "original works of authorship." *Id.* at § 102(b). As a constitutional and statutory matter, "[t]he sine qua non of copyright is originality." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

This "originality" requirement is not rigid. Instead, originality in this context "means only that the work was independently created by the author…and that it possesses at least some minimal degree of creativity." *Id.* at 345, 111 S.Ct. at 1282. The Supreme Court emphasized in Feist that "the ***requisite level of creativity is extremely low***; even a slight amount will suffice." *Id.* The Court also explained that "[o]riginality does not signify novelty; a work may be original even though it closely resembles other works." *Id.* (emphasis added). What is required is "independent creation plus a modicum of creativity." *Id.* at 346, 111 S.Ct. 1282; *see also Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (citing cases, and characterizing the originality test as "'modest,' 'minimal,' and as establishing a 'low threshold.'"). The wide latitude permitted in the originality inquiry is perhaps best explained by the U.S. Supreme Court's acknowledgment that "[i]ndividual perception of the beautiful is too varied a power to permit a narrow or rigid concept of art." *Mazer v. Stein*, 347 U.S. 201, 214 (1954).

Importantly, copyright law is designed to protect artistic *expressions*, not mere *ideas*. The law precludes protection for "any idea . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Id.* at 102(b). Stated more conclusively, "Copyright

protection extends only to the expression of an idea – not to the underlying idea itself." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1354 (Fed. Cir. 2014). Consequently, a creation which reflects application of the same idea in a different medium is not protectable, because the copyright law is not designed to reward "manufacturing skill." *See Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1222 (9th Cir. 1997) (citing *Durham*, 630 F.2d at 911).

Since the focus of copyright protection is on the *expression* of an original idea, an individual work need not be wholly original to be copyrightable. *See* 17 U.S.C. § 103(a).  Instead, protection may also be extended to "derivative" works, *i.e.*, those "based upon one or more preexisting works." *Id.* at § 101.  Protection for derivative works is qualified.  "The copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.  The copyright in such work is independent of, and does not affect or enlarge . . . any copyright protection in the preexisting material." *Id.* at § 103(b).  And since the focus of copyright protection for derivative works is on originality of expression, other courts of appeal have found it irrelevant whether the work which inspired the derivate creation is itself subject to copyright protection, or resides in the public domain. *See Durham Industries, Inc.*, 630 F.2d at 909.

Yet, the "originality required for copyright in a derivative work is the same as that required for copyright in any other work." *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 520 (7th Cir. 2009).  The "key inquiry is whether there is sufficient nontrivial expressive variation in the derivative work to make it distinguishable from the underlying work in some meaningful way." *Id.* at 521; *See also Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34-35 (2d Cir.

1982) (holing that minor changes in an illustration of Paddington Bear were sufficiently nontrivial because they combined to give Paddington a "different, cleaner look.").[3]

Here, the evidence unquestionably establishes that Davidson's Statue contains sufficient non-trivial differences that make it distinguishable from Lady of Liberty in New York. In this case, a plain comparison of the two statues reveals that Davidson's statue includes sufficient non-trivial differences. *See* PTX 243.    The stamp's creator, McCaffery, acknowledged differences in Davidson's sculpture, and other key personnel admitted that Davidson's Statue contains noticeable differences. *See* Tr. 773:10-21 (McCaffery); PTX 85; PTX 37.

Plainly, the evidence submitted at trial shows that Davidson did more than merely recreate the Manhattan Statue of Liberty in a new medium - he designed and created an original delicate, modern, feminine statue. *See* Tr. 162:17-163:3, 163:22-168:18, 170:6-171:5, 173:17-174:21, 174:13-175:25 (Davidson); JTX 7. Indeed, it is those softer more attractive features, particularly in the face that drew the USPS to this image and its use in creation of the stamp.  Davidson's sculpture contains distinct non-trivial differences, and Davidson is entitled to copyright protection of the original features of his work.

**B.    The USPS Infringed on Davidson's Copyright.**

Since Davidson has enforceable intellectual property rights in his Lady Liberty statue, the next issue is whether the USPS infringed on those rights.  It is undisputed that the image USPS used on its "forever" stamp depicted Davidson's statue. In fact, the present case is about USPS use of a photograph of Davidson's Statue, not a copy-cat of his creation. Thus, by definition, USPS infringing image is an actual copy of Davidson's work.

---

[3]    *Eden Toys* is superseded by rule on other grounds as stated in *Keeling v. Hars*, 809 F.3d 43 (2d Cir. 2015).

Here, USPS has admitted and direct evidence establishes – nearly 4.9 billion times over – actual copying of Mr. Davidson's copyright. *See, e.g., Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1154 (9th Cir. 2012); *Norse v. Henry Holt & Co.*, 991 F.2d 563, 566 (9th Cir. 1993); *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir.1989); *Cellular Accessories for Less, Inc. v. Trinitas LLC*, 65 F. Supp. 3d 909, 916 (C.D. Cal. 2014); *Radji v. Khakbaz,* 607 F. Supp. 1296, 1300 (D.D.C. 1985)(rejecting application of substantial similarity test where defendant admitted that the Iran Times articles were composed entirely of translated quoted passages from plaintiff's book reprinted in the Sunday Times); *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (three-dimensional copy of a two-dimensional work is direct evidence of copying).

Here, there can be no serious debate that the USPS infringed upon his rights through reproduction without his consent. *See Gaylord*, 595 F.3d at 1371-72.

### C.        The USPS's use of Davidson's Statue was not Fair use.

Fair use is determined by evaluating "(1) the purpose and character of the use, including whether the use is of a commercial nature . . .; (2) the nature of the copyrighted work; (3) the amount and substantiality of the work used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.  This equitable test requires courts to engage in a fact-specific inquiry, wherein "[e]ach factor is to be explored, and the results weighed together, in light of the purposes of copyright." *Gaylord*, 595 F.3d at 1372 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)).

As discussed below, a weighing of each factor along with the evidence presented at trial dictates a finding that the fair use defense does not shelter the USPS conduct here where it effectively copied and pasted an image of Davidson's creation onto a stamp, made a significant

profit without compensating Davidson, and continued to infringe after learning of its supposedly mistaken usage.

### 1.    *Purpose and character of use.*

The heart of the fair use inquiry lies in the first statutory factor, identified as "the purpose and character of the use, including whether the use is of a commercial nature . . ." 17 U.S.C. § 107(1); *Campbell*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500. As *Campbell* instructs:

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message ..., in other words, whether and to what extent the new work is "transformative." Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. ***Such [transformative] works thus lie at the heart of the fair use doctrine's*** guarantee of breathing space....

*Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 (emphasis added) (alteration in original) (citations omitted). In *Gaylord*, the federal circuit reasoned that a use's purpose and character could be ascertained by considering whether the use can "transformative" properties; *i.e.*, "whether the new work merely supersede[s] the objects of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Gaylord*, 595 F.3d at 1372.

In *Gaylord*, the Federal Circuit acknowledged that that the USPS had added snow to the sculptures in question, and mutated the color of the image to give it a "surreal character." *Id.* at 1373-74.  Nevertheless, the Court concluded that the statues themselves also contributed to the surreal character depicted on the stamp, and that balancing Gaylord's original contribution against the USPS's attempted transformation tilted in favor of finding that the purpose and character of the use was not fair use.  *See id.*

26

In this case, the USPS's treatment of Davidson's sculpture cannot fairly be said to be "transformative" in any sense: it depicts a frontal view of almost all of Davidson's statue's face (where many of Mr. Davidson's protectable modifications occur), *without any alterations*. See PTX 66; PTX 68; Tr. 672:4-24 (McCaffery). A simple comparison of the image depicted on the stamp, and the finalize statue itself, shows that the USPS made no attempt to "transform" the character of the image at all.  Moreover, as McCaffery testified the USPS made no changes to the image depicting Davidson's statue. *Id.* USPS did not supplant or add anything new to Davidson's creation. It simply copied and pasted an image of Davidson's creation onto a stamp because Davidson's creation was fresh and more attractive.

Section 107 also instructs the Court to take into account whether the use is made for commercial or non-commercial purposes, with commercial use weighing against a fair use finding. *See* 17 U.S.C. § 107; *Gaylord*, 595 F.3d at 1374.  Here, the USPS's use was unquestionably commercial, as it sold stamps and philatelic items bearing the image.  The evidence shows that the USPS received over $4 billion from its sale and it estimates nearly $140 million of those sales are pure profit. The USPS's use is the quintessential definition of commercial use. This fact was even conceded by the USPS's own expert at the time of trial. *See* Tr. 1636:11-18 (Bokhart).

Because the USPS did not attempt to transform the image and used it towards a commercial end, the first factor strongly weighs against fair use.

### 2**.** *Nature of the copyrighted work.*

The second factor of the fair use analysis acknowledges that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Gaylord*, 595 F.3d at 1374 (quoting *Campbell*, 510 U.S. at 586).  Works "closer to the core" are those which are "creative in nature."

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001) (citing *Campbell*, 510 U.S. at 586).  For this analysis, a court must evaluate the work's (1) expressive or creative qualities, and (2) "whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Gaylord*, 595 F.3d at 1374 (quoting *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006)).

As noted above, courts should give wide latitude to the creative process because "[i]ndividual perception of the beautiful is too varied a power to permit a narrow or rigid concept of art." *Mazer*, 347 U.S. at 214.  There is no question that a statue is a work inherently creative in nature. *See Gaylord*, 595 F.3d at 1374.  Additionally, and as already demonstrated, those aspects of Davidson's statue which creatively modified from the original were those which the USPS copied.

Moreover, derivative works are explicitly included in the subject matter of copyright as defined by the Copyright Act. As discussed above, Davidson's creation clearly contains sufficient non-trivial differences to meet the originality requirement. It is this originality in Davidson's Statue that makes it protectable and falls "within the core of the copyright's protective purpose." *Campbell*, 510 U.S. at 586, 114 S.Ct. at 1164.  There is no question that the differences in Mr. Davidson's Statue is a work inherently creative in nature. The first factor is satisfied.

As to the second factor, Davidson's copyright registration states that his work was first published in 1996 – more than a decade before the USPS appropriated the image.    To disabuse all notion of the statue's authorship, Davidson affixed a plaque to the statute, dedicating the statue to his late mother-in-law, along with the phrase "Sculpting Completed October 4, 1996 Robert Spencer Davidson." *See* Tr. 176:25-181:24 (Davidson); PTX 233-296; PTX 233-297. And even if the Court disregards Davidson's actual registration and the plain evidence from the placard, other

courts have found that "a copyright notice is not required for a work on display as it is not published within the meaning of the Copyright Code." *Hart v. Sampley*, Civ. A. No. 91-3068, 1992 WL 336496, at *2 (D.D.C. June 24, 1992) (citing 17 U.S.C. § 401). Indeed, there are few more obvious "publications" in the Las Vegas skyline than Davidson's 150-foot tall statue.

The second factor weighs against a finding of fair use.

### 3.   *Amount and substantiality of the portion used.*

The third factor addresses whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying." *Gaylord*, 595 F.3d at 1375 (citing *Campbell*, 510 U.S. at 587).

Here, the USPS used a great majority of the statue's face and crown, which captures a substantial portion of Davidson's protectable creative modifications to the Manhattan statue – including the fuller lips, rounded eyes, and more feminine visage. There is no dispute that USPS used a material and substantial portion of Davidson's creation. *See*, *e.g.*, *Harper & Row, 471 U.S. at 564–66, 105 S.Ct. 2218* (use of quotations constituting 300 words of President Ford's entire memoirs amounted to copying of "the heart of the book" that weighed against fair use)*; Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F. Supp. 429 (W.D. N.Y. 1978)(infringement can be found even where only a small part of a work is copied so long as the part taken is material and substantial). The third factor weighs in favor of finding no fair use.

### 4.   *Market impact.*

The fourth factor considers the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This factor considers "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market." *Gaylord*, 595 F.3d at 1375 (quoting *Campbell*, 510 U.S.

at 590).  Market impact takes into account "not only the primary market for the copyrighted work, but the current and potential market for derivative works."  *Id.* (quoting *Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993)).

Davidson concedes the market impact factor slightly tilts in the USPS favor. Yet, this was also the case in *Gaylord*, and it did not change the Court's ultimate conclusion that a holistic, equitable evaluation of all four factors showed the absence of fair use.  Accordingly, as the *Gaylord* Court stated, "[e]ven though the stamp did not harm the market for derivative works, ***allowing the government to commercially exploit a creative and expressive work will not advance the purposes of copyright in this case***." *Gaylord*, 595 F.3d at 1376 (emphasis added).

In sum, and similar to the result reached in the *Gaylord* case, the Court's fact-specific, equitable inquiry of the relevant factors under the copyright laws should lead it to conclude that the USPS took an image from a noteworthy, distinctive, and publicly displayed statue, effectively copied and pasted it onto a stamp design, and used the design to make an enormous amount of money without compensating Davidson for the same. Indeed, the inference of no fair use is even stronger here than in *Gaylord* because the USPS took no steps whatsoever to alter Davidson's image before placing it on the open market. The USPS's conduct and intended use is not the type of pattern with the fair use defense was designed to protect, and the Court should find it no defense here.

### D.     Davidson is Entitled to the Fair Market Value of a License Covering the USPS's Infringement.

As Davidson does not claim lost sales, lost opportunities to license, or diminution in the value of the copyright, the Court must base his damages on "the fair market value of a license" covering the USPS's use. *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012). "The value of this license should be calculated based on a hypothetical, arms-length negotiation between

the parties." *Id.* "[T]he trial court must look at the evidence presented by both sides to determine the fair market value of a license to which the parties would have agreed." *Id.*

The determination of a fair market value of license is factual matter left to the trial court's discretion. *Gaylord v. United States*, 777 F.3d 1363, 1369 (Fed. Cir. 2015). But, the USPS "cannot insulate themselves from paying for the damages they caused by resting on their past agreements and by creating internal policies that shield them from paying fair market value for what they took." *Gaylord*, 678 F.3d at 1343. The hypothetical negotiation assumes a "willing buyer and a willing seller" come to an agreement on a reasonable licensing fee. *Id.*

In determining the value of the license, one must assume that the negotiators for the licensor and licensee know all of the factors bearing on the value of the license. *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988). A factor is relevant if it would have tended to affect the price set by hypothetical negotiators. *ITT Corp. v. United States*, 17 Cl. Ct. 199, 230 (1989). The court determines, as a matter of fact, the weight to be given to any factor. *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120–21 (S.D.N.Y. 1970). A court may also consider events which occurred and facts which were known after the original infringement, even if they "could not have been known or predicted by the hypothesized negotiators." *Fromson*, 853 F.2d at 1575. The analysis also "encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began." *Id.*

To supplement the court's analysis of a reasonable royalty in the context of a hypothetical negotiation, the court may rely on the factors provided in *Georgia–Pacific Corp.. See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109–10 (Fed. Cir. 1996). However, the court is not constrained by these factors and need not consider factors that are "inapposite or inconclusive." *Brunswick Corp.*

31

*v. United States*, 36 Fed. Cl. 204, 211-212 (1996), aff'd, 152 F.3d 946 (Fed. Cir. 1998). Ultimately, the court's reasonable royalty analysis is "highly case-specific and fact-specific" and involves "mixed considerations of logic, common sense, justice, policy and precedent." *Boeing Co. v. United States*, 86 Fed. Cl. 303, 311 (2009) (internal quotation marks and citations omitted).

### 1.   *The evidence supports a running royalty rate.*

"Determining a reasonable royalty does not require mathematical exactness, but a reasonable approximation under the circumstances of a given case." *Gaylord*, 777 F.3d at 1368 (quotations omitted). Indeed, "difficulty in quantifying the damages attributable to the infringement should not bar recovery." *Id*. As *Gaylord* instructs, "[t]he hypothetical-negotiation determination must be tied to the particular work at issue and its marketplace value." *Id*.   On this point, *Gaylord* indicates that there is a common economic justifications for using per-unit royalties for measuring the value of use, in that in doing so it ties compensation paid to revealed marketplace success, minimizing under and over-payment risks from lump-sum payments agreed to in advance. *Id*. at 1369.

The USPS's infringement deprived Davidson of the opportunity to negotiate for compensation. Thus, the Court is tasked with determining what would have occurred if Davidson and the USPS had negotiated prior to infringement. The evidence submitted at trial supports Mr. Timmins' running royalty rate approach. The evidence showed that in a hypothetical negotiation the USPS had a strong incentive to enter into a licensing agreement with Davidson. At the time of negotiations, the USPS had already went through its internal process to have the imaging of the stamp approved with no reasonable alternatives available to meet the impending issuance deadline. See Tr. 936:9-964:24 (Gicker). With the supplies of the Liberty Bell soon to be exhausted, the USPS would have been under pressure to come to an agreement. *See* Tr. 828:13-23 (Gicker); Tr.

520:12-19 (Quinn); Tr. 628:14-19 (Stratton). Moreover, the USPS had conducted an extensive search for an image and ended up selecting Davidson's creation precisely because it was something attractive, different and unique. *See* Tr. 765:24-772:25 (McCaffery); PTX 85; PTX 37.  Indeed, the USPS would subsequently concede that the Lady Liberty stamp was very popular. PTX 118. All of this evidence shows that the parties would have entered into a running royalty license.

As for the rate of the royalty, the evidence shows that the market place for comparable artwork ranged with royalty rates from low of 2.5% to a high of 10.0%, with a mean of 6.5%, a median of 7.0%, a bottom quartile of 4.0%, and a top quartile of 8.5%. Moreover, the USPS out-licenses its own intellectual property, including images on stamps, to third-parties for a royalty rate ranging from 3% to 8%. *See*, *e.g.*, PTX 157; PTX 158; and PTX 195. As USPS's employee in charge of licensing explained back in 2006 the USPS had an internal policy of charging a royalty rate of 8% and today it is 10% for out-licensing. *See* Tr. 1059:21-1061:9 (Kirby).

For these reasons, the evidence shows that the fair market value of a license for mail use stamps relating to the Lady Liberty Stamp is a running royalty rate of 1.50% and the fair market value of a license relating to the Lady Liberty Stamp not redeemed for service, *i.e.* the retention/breakage stamps, is a running royalty of 5.00%. *See* Tr. 1233:10-1234:11, 1241:10-1242:10 (Timmins). Likewise, the fair market value of a license for mail use stamps relating to the conveyed Flag Stamp is a running royalty rate of .75% and the fair market value of a license relating to the conveyed Flag Stamp not redeemed for service, i.e. the retention/breakage stamps, is a running royalty of 2.50%. *See* Tr. 1248:10-1252:3 (Timmins). Lastly, the fair market value of a license for philatelic products is a running royalty rate of 10%. *See* Tr. 1252:4-1254:12 (Timmins).

After applying the above-referenced royalty rates to the estimated billions generated and collected by the USPS through the use of Davidson's creation, Davidson sustained total damages in the amount of $53,013,154.

### 2. *Alternatively, the Court could apply a mixed approach.*

Although Davidson maintains the evidence supports a finding of running royalty on the totality of the royalty base (*i.e.* mail use and retention/breakage stamps) at the rates confirmed by Mr. Timmins, the Court may consider, as consistent with *Gaylord,* to apply a mixed approach. In constructing a hypothetical negotiation the *Gaylord* Court broke the analysis into three categories of infringing goods "(1) stamps used to send mail; (2) unused stamps purchased by collectors; and (3) commercial merchandise featuring an image of the stamp." *Id*. at 1344.

"For stamps used as postage, the trial court must determine whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license." *Id*. However, as the Court explained, "[w]hile it is certainly permissible for the court to conclude that a lump sum license might be  appropriate, the court should not arbitrarily cap this award at $5,000 simply because the Postal Service claims it has never paid more to license a copyright for use on a stamp." *Id*. at 1344-1345. Yet, this analysis will differ when considering "sold but unused stamps, including those retained by collectors, which represent nearly pure profit for the Postal Service." *Id*. at 1345. On this category, *Gaylord* intimates that the "court should thus consider whether the evidence supports an ongoing royalty for unused stamps, and at what rate." *Id*.

As to the first category – stamps used to send mail – if the Court is not inclined to grant a running royalty rate on this revenue portion, the evidence would also support a flat-fee (or up-front fee) in excess of one million dollars. The USPS generated nearly 4.2 billion in revenue from the use of Davidson's copyright on stamps sold and used for mail service. Moreover, the evidence

shows that the USPS loved Davidson's creation and preferred to use it. According to the USPS it was looking for something different and unique and there are only so many ways you can reinterpret an icon. Moreover, as discussed above, the USPS had placed itself into a position where it had no reasonable alternatives available. All of this evidence shows the USPS would have been willing to pay a substantial up-front fee in excess of one million dollars on stamps used to send mail.

The next category – unused stamps – that the evidence supports a finding of running royalty rate for this category. As the *Gaylord* case explained, the analysis for unused stamps differ from used stamps because unused stamps "represent nearly pure profit for the Postal Service." *Gaylord*, 678 F.3d at 1345. The evidence shows that the USPS knew that retained/breakage stamps were a source of significant pure profit, and it tracked estimates of that revenue through the use of an outside firm. And Davidson is presumed to know this during the negotiations.

But, as Mr. Timmins testified at trial if the hypothetical negotiation is changed to assume the parties reduced the negotiated royalty base to only unused stamps, then the royalty rate would increase accordingly. For example, if the Court were to only apply a royalty rate to unused stamps, then the fair market value of a license for relating to the Lady Liberty Stamp not redeemed for service would be a running royalty on the high end of the scale, 10.00% or more. Likewise, the fair market value of a license relating to the conveyed Flag Stamp not redeemed for service would be correspondingly increase to 5.00% or more.

Accordingly, if the Court were inclined to apply a mixed approach, then the evidence supports a finding that a flat-fee in excess of one million dollars be applied to mail-use stamps and the above-referenced royalty rate applied to unused stamps. Under this approach, Davidson sustained total damages of at least $11,645,411.

35

**3.**     ***The USPS's own subsequent admissions prove the fair market value of license.***

Pursuant to the so-called "Book of Wisdom," evidence after the date of the hypothetical negotiation may be considered by the Court. *See Fromson*, 853 F.2d at 1575; *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698, 53 S.Ct. 736, 77 L.Ed. 1449 (1933)("[A] different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009). Post-negotiation information is relevant if it helps determine the true value of the license. *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 410 (S.D.N.Y. 2015).

At a minimum, the USPS post-negotiation admissions confirms the fair market value of a license would have exceeded $10 million. As the evidence shows, in response to a Congressional inquiry in May 2011, USPS represented that because it had "spent more than $8 million in printing costs," it made the economic decision to continue to use the stamps until supplies were exhausted. PTX 151. Moreover, internal documents show that the as of April 2011 the USPS had spent nearly $7.9 million to print and distribute approximately 4.4 billion stamps, with additional 6.1 billion stamps at an approximate cost of $10.4 million anticipated to distributed by the end of the year. PTX 148.

Under the so-called "Book of Wisdom," the parties would have known at the time of negotiating that the USPS was willing to pay at a minimum $10.4 million to continue to use Davison's copyright because it was going to cost substantially more if the USPS did not obtain a license from Davidson. Indeed, it would have risked not having enough stamps to meet demand.

Rather, than risk this dire situation and to avoid having to incur additional cost, the parties would have negotiated a license exceeding $10 million for use of Davidson's copyright.

### 4. *Davidson is entitled to delay compensation at a statutory rate.*

Reasonable and entire compensation includes interest for delayed compensation of the royalty. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). "Generally, the interest rate should be fixed as of the date of infringement, with interest then being awarded from that date to the date of judgment." *Boeing*, 86 Fed. Cl. at 322. Here, Davidson is entitled to pre-judgment interest at the rate to be set by the Court after an award of damages. *See Hitkansut LLC v. United States*, 130 Fed. Cl. 353, 394 (2017).

. . .

. . .

. . .

**V.      CONCLUSION**

For the above-mentioned reasons, the Court should find that Davidson has an enforceable copyright, the USPS infringed on the same, has no defense to doing so, and that Davidson is entitled to damages in the amount set forth herein.

DATED this 15th day of December, 2017.

PISANELLI BICE PLLC

By:      /s/ James J. Pisanelli
James J. Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
Todd L. Bice, Esq., Bar No. 4534
TLB@pisanellibice.com
Debra L. Spinelli, Esq., Bar No. 9695
DLS@pisanellibice.com
Dustun H. Holmes, Esq., Bar No. 12776
DHH@pisanellibice.com
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada   89101
Telephone:  702.214.2100
Facsimile:  702.214.2101

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am an employee of Pisanelli Bice PLLC, and that on this 15th

day of December, 2017, I caused to be served through the Court's Electronic Filing System true

and correct copies of the foregoing **PLAINTIFF'S POST-TRIAL BRIEF** to the following:


CHAD A. READLER
Acting Assistant Attorney General

GARY L. HAUSKEN
Director, Intellectual Property Staff

SCOTT BOLDEN
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC  20530

REDDING C. CATES
NAN K. McKENZIE
United States Postal Service
Washington, DC  20260-1101


                    /s/ Shannon Dinkel
                    An employee of Pisanelli Bice PLLC