**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ROBERT S. DAVIDSON, d/b/a PlasterTech,

                              Plaintiff,

      v.

THE UNITED STATES,

                              Defendant.

13-942 C

Senior Judge Eric G. Bruggink

## **DEFENDANT'S POST-TRIAL BRIEF**

CHAD A. READLER
Acting Assistant Attorney General

GARY L. HAUSKEN
Director

SCOTT BOLDEN
Deputy Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Email: Scott.Bolden@USDOJ.gov
Telephone:    (202) 307-0262
Facsimile:     (202) 307-0345

February 9, 2018

Of Counsel:
LEE L. PERLA
ALEX HANNA
Department of Justice

REDDING C. CATES
United States Postal Service

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ................................................................................ 1

COUNTER-STATEMENT OF PROPOSED FINDINGS OF FACT ........................... 2

DISCUSSION ......................................................................................................... 15

I.   DAVIDSON FAILED TO MEET HIS BURDEN TO PROVE INFRINGEMENT ........ 15

   A.   Davidson failed to prove he owns a valid copyright because he failed to
        show that his copy of the Statue of Liberty contains any new protected
        expression .............................................................................................. 15

   B.   Even if a part of the Replica Statue of Liberty might be protectable,
        Davidson failed to prove that the Postal Service copied that part ......... 21

   C.   The Postal Service's use of a partial image of the Replica Statue of Liberty
        on a postage stamp is a noninfringing fair use ...................................... 22

II.  DAVIDSON'S REQUEST FOR COMPENSATION IS CONTRARY TO LAW
     AND UNSUPPORTED BY EVIDENCE IN THE RECORD ......................................... 23

   A.   Davidson provided no evidence that the Postal Service's alleged
        infringement caused him any actual damages ...................................... 25

   B.   Timmins's approach is fundamentally flawed .................................... 28

        1.   Timmins's testimony was not based on sufficient facts, and his
             approach was not reliable .......................................................... 28

        2.   Timmins improperly doubled the royalty base by including non-
             infringing U.S. Flag stamps .................................................... 28

        3.   Timmins's conclusion that Davidson is entitled to a running
             royalty is at odds with the Federal Circuit's guidance in Gaylord ........ 29

        4.   Timmins's analysis of license agreements is erroneous because he
             misidentified the relevant market ............................................. 31

        5.   Timmins failed to apportion ................................................... 33

   C.   Assuming entitlement to actual damages, the Postal Service's lump-sum
        license fee agreements are the best evidence of the market for such images
        on such products .................................................................................... 34

       1.     The Postal Service's lump-sum license agreements are comparable to the hypothetical negotiation ................................................................. 35

       2.     The Postal Service had alternatives to a multi-million dollar demand by Davidson ................................................................................. 36

   D.    A properly constructed hypothetical negotiation would have resulted in a lump-sum license of $10,000 ............................................................... 37

   E.    Should the Court conclude that Davidson is entitled to a running royalty, Davidson's recovery should exclude used stamps ................................. 39

   F.    Assuming infringement, delay compensation is appropriate ............................... 40

CONCLUSION .................................................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**

Bouchat v. Baltimore Ravens Football Club, Inc.,
  346 F.3d 514 (4th Cir. 2003) ............................................................................. 39, 40

Cohen v. United States,
  100 Fed. Cl. 461 (2011) ........................................................................................ 24

Cohen v. United States,
  105 Fed. Cl. 733 (2012) ........................................................................................ 28

Dash v. Mayweather,
  731 F.3d 303 (4th Cir. 2013) ........................................................................... 24, 27

Durham Indus., Inc. v. Tomy Corp.,
  630 F.2d 905 (2d Cir. 1980) .................................................................................. 16

Enm't Research Grp., Inc. v. Genesis Creative Grp., Inc.,
  122 F.3d 1211 (9th Cir. 1997) .......................................................................... 16, 17

Feist Publications, Inc. v. Rural Telephone Service Co.,
  499 U.S. 340 (1991) ..................................................................................... 1, 15, 21, 22

Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,
  772 F.2d 505 (9th Cir. 1985) ................................................................................. 27

Gaylord v. United States,
  595 F.3d 1364 (Fed. Cir. 2010) ........................................................................... 1, 21

Gaylord v. United States,
  678 F.3d 1339 (Fed. Cir. 2012) ..................................................................... *passim*

Gaylord v. United States,
  777 F.3d 1363 (Fed. Cir. 2015) ............................................................................. 35

Hanson v. Alpine Valley Ski Area, Inc.,
  718 F.2d 1075 (Fed. Cir. 1983) ............................................................................. 30

Harper & Row Publ., Inc. v. Nation Enters.,
  471 U.S. 539, 560 (1985) ....................................................................................... 23

Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.,
    43 F. Supp. 3d 644 (E.D. Va. 2014) ...................................................................... 21

Kelly v. Arriba Soft Corp.,
    336 F.3d 811 (9th Cir. 2002) ...............................................................................23

L. Batlin & Son, Inc. v. Snyder,
    536 F.2d 486 (2d Cir. 1976) (*en banc*) ....................................................... 16, 17, 20

LaserDynamics, Inc. v. Quanta Computer, Inc.,
    694 F.3d 51 (Fed. Cir. 2012) .......................................................................... 28, 30

Leesona Corp. v. United States,
    599 F.2d 958 (Ct. Cl. 1979) ................................................................................ 24

Lucent Techs., Inc. v. Gateway, Inc.,
    580 F.3d 1301 (Fed. Cir. 2009) .......................................................................... 27

Matthew Bender & Co. v. West Publi'g Co.,
    158 F.3d 674 (2d Cir. 1998) ............................................................................... 16

Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.,
    528 F.3d 1258 (10th Cir. 2008) .......................................................................... 17

Midland Mortg. Corp. v. Wells Fargo Bank,
    926 F. Supp. 2d. 780 (D. S.C. 2013)................................................................... 19

On Davis v. The Gap, Inc.,
    246 F.3d 152 (2d Cir. 2001) ......................................................................... 24, 25

Oracle Am., Inc. v. Google Inc.,
    750 F.3d 1339 (Fed. Cir. 2014) ..................................................................... 21, 23

ResQNet.com, Inc. v. Lansa,
    594 F.3d 860 (Fed. Cir. 2010) ........................................................................... 27

Rude v. Westcott,
    130 U.S. 152 (1889)........................................................................................... 29

Schrock v. Learning Curve Int'l, Inc.,
    586 F.3d 513 (7th Cir. 2009) ............................................................................. 16

Silverman v. CBS, Inc.,
    870 F.2d 40 (2d Cir. 1989) ................................................................................ 16

Uniloc USA, Inc. v. Microsoft Corp.,
    632 F.3d 1292 (Fed. Cir. 2011) ............................................................. 27

Wechsberg v. United States,
    54 Fed. Cl. 158 (2002) ........................................................................... 24

Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.,
    609 F.3d 1308 (Fed. Cir. 2010) ............................................................. 27

**Statutes**

17 U.S.C. § 102 ........................................................................................ 21

17 U.S.C. § 103 .............................................................................. 1, 16, 21

17 U.S.C. § 107 ........................................................................................ 22

17 U.S.C. § 410 ........................................................................................ 15

17 U.S.C. § 504 .............................................................................. 1, 24, 28

28 U.S.C. § 1498 ....................................................................... 1, 23, 24, 28

**Other Authorities**

Compendium of U.S. Copyright Practices (3d ed.) ...................................... 13

H.R. No. 94-1476 (1976) .......................................................................... 1, 21

Nimmer, THE LAW OF COPYRIGHT (1975) ............................................. 16

Rule 26 of the Rules of the Court of Federal Claims .................................. 32

### DEFENDANT'S POST-TRIAL BRIEF

Defendant, the United States ("the government"), hereby provides its Post-Trial Brief. As described below, Plaintiff Robert S. Davidson d/b/a/ PlasterTech ("Davidson") did not meet his burden of establishing liability, and is not entitled to any damages.

### STATEMENT OF THE ISSUES

To establish copyright infringement pursuant to Section 1498(b) of Title 28, a plaintiff must prove two elements:  "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work **that are original**."  Gaylord v. United States, 595 F.3d 1364, 1372 (Fed. Cir. 2010) ("Gaylord II") (quoting Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991)) (emphasis added).  Davidson's replica of the Statue of Liberty is, at most, a "derivative work" because he intended to copy the original Statue of Liberty.  "The copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."  17 U.S.C. § 103(b); see also H.R. Rep. No. 94-1476, at 57 (1976).  Here, the following issues on liability are presented:

1.     Whether Davidson failed to meet his burden to prove infringement because:  (a) he failed to establish ownership of a valid copyright with no new protectable expression; (b) he failed to establish that the Postal Service copied original elements of the Replica Statue of Liberty; and (c) the Postal Service's use was fair.

If liability is found, the Court may award "reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in [17 U.S.C. § 504(c)]."  28 U.S.C. § 1498(b).  Reasonable and entire compensation is determined in accordance with "actual damages" pursuant to the Copyright Act.  See Gaylord v. United States,

678 F.3d 1339, 1343 (Fed. Cir. 2012) ("<u>Gaylord IV</u>"); 17 U.S.C. § 504(b).  Here, the following issues on compensation are presented:

2.      Assuming liability, whether the Court should deny Davidson's request for compensation because:  (a) he failed to prove entitlement to reasonable compensation in the form of actual damages; (b) assuming entitlement to actual damages, whether the Postal Service's lump-sum license fee agreements properly frame Davidson's actual damages; and (c) assuming entitlement to actual damages in the form of a per-unit royalty, whether Davidson's recovery should exclude used stamps.

<b>COUNTER-STATEMENT OF PROPOSED FINDINGS OF FACT</b>

Davidson's Proposed Findings of Fact ("Plaintiff's Proposed Finding" or "PPF"), <u>see</u> Pl. Br. at 2-21, contains proposed findings that are erroneous and not supported by the record.  In particular, Davidson's proposed findings are fundamentally flawed because:

<i>**First**</i>**, Davidson erroneously relies on inadmissible portions of exhibits admitted for a limited purpose.**  <u>See, e.g.</u>, PPF ¶¶ 63, 66, 77.  In several instances, Davidson attempts to support his proposed findings with inadmissible evidence.  For example, Davidson relies on an inadmissible hearsay statement of Sylvia Harris, a non-testifying third party, despite counsel's representations during trial.  <u>Compare</u> PPF ¶ 77 <u>with</u> Tr. 929:12-30:6.  Similarly, while Davidson proposes a finding based on an admissible aspect of an email, he subsequently contradicts his counsel's trial representations by relying on inadmissible aspects of the same email.  <u>Compare</u> PPF ¶ 66 <u>and</u> Pl. Br. at 24 (citing PTX 243) <u>with</u> Tr. 1129:4-30:19.

<i>**Second**</i>**, Davidson erroneously relies on expert testimony for findings that have no independent basis in the record.**  <u>See generally</u> PPF ¶¶ 104-121.  In particular, Davidson proposes several findings based on the alleged effort of Jim Timmins ("Timmins") to "conduct[] extensive research on . . . comparable licenses," but Davidson **never introduced any** license

-2-

other than the Postal Service's licenses for the use of stamp images on retail goods.   Thus, Davidson's proposed findings and Timmins's testimony are not "based on sufficient facts or data."  FRE 702(b).[1]

Accordingly, the Court should reject Davidson's proposed findings to the extent that they are flawed as described above or not otherwise supported by the record.[2]  The government respectfully submits the following Counter-Statement of Proposed Findings of Fact ("Defendant's Proposed Findings" or "DPF"):

### *Bartholdi's Statue of Liberty*

1.   The original Statue of Liberty stands on Liberty Island in New York Harbor.  It was designed by French sculptor Frederic-Auguste Bartholdi, with assistance from engineer Alexandre-Gustave Eiffel.  The Statue of Liberty was dedicated on October 28, 1886.  See Stip. Fact ¶ 3.

2.    On August 31, 1876, Bartholdi registered his copyright claim in the work – then titled "Statue of American Independence."   See DX 217.   The registration incorporates a photograph of Bartholdi's final study model, see id. at 5, which depicts the statue with a "face [that] really has more of a feminine look to it of a much younger woman," with softer and less angular features as compared to the final Statue of Liberty.  Tr. 282:23-83:16 (Davidson).

3.   The original Statue of Liberty is a well-known icon of the United States and of New York City.  See Tr. 250:11-15 (Davidson).   The original Statue of Liberty is in the public domain.  See Stip. Fact ¶ 4.

---

[1] Davidson misleadingly asserts that the government's expert, Christopher Bokhart ("Bokhart"), generally agreed with Timmins's royalty rates in the "marketplace for artwork," but Bokhart's testimony was directed to the Postal Service's out-licensing agreements for retail goods. Compare PPF ¶ 112 with Tr. 1683:9-84:13.

[2] For example, PPF ¶ 47 incorrectly attributes a quoted phrase to PTX 85, but the exhibit contains no such phrase.

*Davidson and the Replica Statue of Liberty at the NY-NY Hotel*

4.    In 1994, Primadonna Resorts, Inc., and MGM Grand, Inc., formed a joint venture to create a New York City-themed hotel-casino on the corner of Tropicana Avenue and Las Vegas Boulevard in Las Vegas, Nevada – a location on the Las Vegas Strip.  See Stip. Fact ¶ 5.

5.    The hotel-casino's themed concept called for the exterior of the hotel-casino to resemble the New York City skyline, complete with recreations of the Brooklyn Bridge, the Empire State Building, and the Statue of Liberty.  See Stip. Fact ¶ 6; Tr. 257:11-58:6 (Davidson). The hotel-casino was named the "New York-New York Hotel & Casino."  See Stip. Fact ¶ 6.

6.    In 1995, Marnell Corrao Associates ("Marnell") was hired as the general contractor to build the New York-New York Hotel & Casino ("NY-NY Hotel").  See Stip. Fact ¶ 7.  In 1995, Marnell hired Recreation Development Corporation ("RDC") as a subcontractor to create the New York City skyline-inspired exterior of the NY-NY Hotel.  See Stip. Fact ¶ 8.

7.    Robert S. Davidson resides in Las Vegas, Nevada.  See Stip. Fact ¶ 1.  In 1988, Davidson started doing business as PlasterTech, a business that focused on the exterior plastering of custom homes.  See Tr. 57:12-59:4.  During the early 1990s, Davidson began to work with plaster and stucco for themed projects.  See Tr. 60:25-61:13, 67:14-25.  For example, Davidson created the face of a Sphinx outside the Luxor Hotel & Casino, an Egyptian-themed hotel and casino in Las Vegas.  See Tr. 70:10-72:7.

8.    On September 26, 1995, Davidson submitted a proposal to carve and coat the planned replica of the Statue of Liberty at the NY-NY Hotel ("the Replica Statue of Liberty"). See JTX 8; Stip. Fact ¶¶ 9-10.  Subject to the terms of the proposal, Davidson proposed that the work would replicate the Statue of Liberty in New York Harbor and be completed for $385,000, including materials and labor.  See id.; see also Tr. 213:2-7.

9.   On October 26, 1995, RDC sent a letter of "intent to award the exterior finish system of the [NY-NY Hotel] Statue of Liberty to PlasterTech . . . in accordance with [Davidson's] Proposal dated September 26, 1995."  JTX 9; see also Stip. Fact ¶ 11.

10.   Davidson did not have a role in selecting the Statue of Liberty as one of the iconic New York City landmarks copied at the NY-NY Hotel.  See generally Tr. 90:11-91:16.  He did not have a role in placing the statue at the hotel.  See Tr. 256:13-16.  He did not make the final decision with respect to the positioning of the Replica Statue of Liberty.  See Tr. 256:17-24.  He did not have a role in the creation of the pedestal for the replica.  See Tr. 257:3-10.

11.   Davidson understood that the replica's final appearance "had to look like" the original Statue of Liberty and that his replica was intended to play the part of the original in the context of the NY-NY hotel.  Tr. 232:15-20 ("[T]here's no question that I had to create a Statue of Liberty and it had to be appropriate for the New York-New York hotel."); Tr. 306:13-15 ("I mean, **it definitely had to look like the Statue of Liberty**, there's no question about it.") (emphasis added).

12.   Davidson worked to make the Replica Statue of Liberty look like the original Statue of Liberty as closely as he could.  To make a maquette, Davidson glued schematic cross-sections of the original Statue of Liberty to individual layers of foam "and cut that perimeter shape" on each layer.  Tr. 237:2-38:23; see also PTX 236 at 7-12 (cross-sections); PTX 234-47-50, -56-57, -83-86 (assembling the layers); Tr. 102:17-03:24.  He then detailed the maquette, using precise, scale dimensioning drawings and dozens of photographs of the original.  See Tr. 229:1-17; 231:10-16, 239:8-40:17, 243:7-44:14; PTX 236 at 1-6 (dimensioning drawings); PTX 234-1, -40-42 (drawings and photographs of original in frame).  Davidson rejected use of a 12-inch high curio because "it was not representative of the [original] Statue of Liberty."  Tr. 94:22-95:1; see

also Tr. 230:20-31:9 ("You wouldn't look at that and evoke the sense that you would get when you looked at the real Statue of Liberty.").  Davidson put the maquette into a dimensioning jig to fabricate pieces of the full-size replica.  See Tr. 120:16-19.  He again relied upon photographs of the original to detail the full-size replica.  See PTX 233-195, -201, -216.

13.  Davidson purposely copied all of the characteristic features of the original, including, *inter alia*:  an outstretched right hand holding a torch; a tablet in the left hand with "1776" in Roman numerals; a classic Roman stola knotted at the left shoulder; a crown with seven spikes; and broken chains around the ankles while standing flat-footed on the left foot and on the tip of toes for the right foot.  See Tr. 249:7-50:10, 253:12-18; see also Tr. 286:10-88:12.

14.  To finish his work on the Replica Statue of Liberty, Davidson applied a base coat. To give the replica its final appearance, RDC stained and weathered the stucco exterior of the replica.  See Tr. 254:3-12 (Davidson).  Davidson completed the Replica Statue of Liberty on October 4, 1996.  See Stip. Fact ¶ 12.

15.  Despite Davidson's self-serving assertion that RDC gave Davidson artistic license to create the Replica Statue of Liberty, there is no corroborating evidence for his assertion.  See Tr. 233:2-20; see generally JTX 8; JTX 9 (referring only to "The Statue of Liberty at the New York, New York Hotel & Casino").  After the NY-NY Hotel opened, Davidson was interviewed for a local TV news story, but could not recall whether he mentioned that he had artistic license with respect to the replica.  See Tr. 259:20-60:4.  Similarly, Davidson was interviewed for an article with a trade publication named Walls & Ceilings, but could not recall whether he mentioned that he had artistic license with respect to the replica.  See Tr. 268:14-22.[3]

---

[3] The Walls & Ceilings article, if admitted, would have shown that Davidson tried to make the replica as accurate as possible to the original Statue of Liberty.  See Tr. 260:5-68:9, 303:20-05:16; DTX 43 (proposed); see also Dkt. 68-3 ¶ 6 (authenticating).

16.   Davidson's expenses for labor on the Replica Statue of Liberty totaled $115,846.26. <u>See</u> Stip. Fact ¶ 31 (Tr. 569:13-17 (Bice)); DTX 198.  Davidson's expenses for materials on the statue totaled $36,742.03.  <u>See</u> Stip. Fact ¶ 32 (Tr. 569:17-20 (Bice)); DTX 199.  Thus, Davidson earned approximately $250,000 in profit in creating the Replica Statue of Liberty.  <u>See</u> JTX 8; DTX 198; DTX 199; <u>see also</u> Tr. 215:6-9.

17.   The amount Davidson earned for his replica of the Statue of Liberty is consistent with the range of fees he collected for other theming projects – for example, Joan of Arc at the Paris Hotel in Las Vegas, and Dudley Do-Right characters at Universal Studios in Orlando, Florida, <u>see</u> Tr. 83:20-84:12; DTX 310 at 5-7; PTX 234-35 – which generally equaled gross amounts of $350,000 or less, including labor and materials, <u>see</u> Tr. 212:3-7.

18.   Davidson offered no objective proof that he suffered any financial losses resulting from the Lady Liberty Stamp.  Davidson could not identify any actual or potential licenses lost as a result of the Lady Liberty Stamp.  <u>See</u> Tr. 318:23-319:1.  Davidson admitted that he had never licensed – or even contemplated licensing – his asserted copyright in the Replica Statue of Liberty.  <u>See</u> Tr. 319:24-20:25.

19.   Davidson has not generated any licensing revenue for his copyright in the replica. <u>See</u> Stip. Fact ¶ 14.  He never registered a copyright for his work on any other project.  <u>See</u> Tr. 212:8-11.  He never licensed a copyright for his work on any other project.  <u>See</u> Tr. 212:12-14.

### The Postal Service and the Lady Liberty Stamp

20.   The Postal Service's costs have exceeded its revenue since the passage of the Postal Accountability Act in 2006.  <u>See</u> Tr. 647:13-48:3 (Stratton).  Thus, since that time, the Postal Service has operated at a loss.  <u>See</u> Tr. 648:4-18 (Stratton).

21. A postage stamp is akin to evidence of payment for future postal services. See Tr. 634:23-35:3 (Stratton). The Postal Service's Stamp Development group is responsible for the design and development of postage stamps for the Postal Service. See Tr. 656:13-57:17 (McCaffrey). During the past ten years, the Postal Service's Stamp Development group has an annual budget of approximately $3.3 million, with $400,000 budgeted for the purchase of art on an annual basis. See Tr. 900:21-03:21 (Gicker).

22. As of 2010, the Postal Service used, among other stamp designs, a Forever stamp with a Liberty Bell design as a workhorse stamp. See Tr. 637:17-22 (Stratton); Tr. 687:8-11, 691:1-7, 758:3-12 (McCaffrey); Tr. 958:22-24. A Forever stamp is a stamp that will always be equal in value to the current price for postage for a one-ounce, First-Class mail piece. See Stip. Fact ¶ 15; Tr. 637:23-38:2 (Stratton). The Liberty Bell Forever stamp design remained, and still remains, legal tender for the payment of postage. See Stip. Fact ¶ 15.

23. A workhorse stamp is a stamp issued in high quantities that is intended for use in "everyday mailings." Tr. 636:10-18 (Stratton); see also Tr. 520:20-25, 531:12-25, 548:18-49:4 (Quinn); Tr. 875:19-76:24 (Gicker). A commemorative stamp is a stamp issued in much lower quantities that is also intended for use for everyday mail, but features a topic of interest to the public and collectors. See Tr. 637:3-16 (Stratton); see also Tr. 875:19-76:24 (Gicker).

24. In 2010, the Postal Service decided to introduce one or more stamp designs with a patriotic image to replace the Liberty Bell workhorse Forever stamp. See Stip. Fact ¶ 16.

25. Prior to 2010, the Postal Service had issued more than 20 stamps featuring images and drawings of the original Statue of Liberty, including stamps issued in 2001 and 2005. See Stip. Fact ¶ 17; DTX 196 (showing prior Statue of Liberty stamps). With respect to the 2001

Statue of Liberty stamp, the Postal Service negotiated use of the photograph of the Statue of Liberty for a one-time payment of $2,000.  <u>See</u> DTX 191 at USPS 12512-14.

26.   On May 18, 2010, the Postal Service licensed a photograph titled "Statue of Liberty" by Raimund Linke from Getty Images ("the Linke Photo").   <u>See</u> Stip. Fact ¶ 18; PTX 57. Linke's photograph, however, depicted a portion of the Replica Statue of Liberty:  primarily the face of the statue, as well as part of the statue's crown.  <u>See id.</u>  The Postal Service paid Getty Images a one-time payment of $1,500 for a three-year, non-exclusive license to print the photograph more than one million times.  <u>See</u> PTX 57.

27.   Terry McCaffery ("McCaffrey"), the Postal Service official who selected the Linke Photo, picked the photo out of thousands of photographs offered by stock photo websites for possible use on a patriotic icon stamp.  <u>See</u> Tr. 766:6-22.  A patriotic icon stamp is a stamp that features the image of a well-known patriotic icon such as the Liberty Bell, the original Statute of Liberty, or the American Buffalo.  <u>See</u> Tr. 676:6-24 (McCaffrey).  McCaffery believed Linke had captured a unique and different photograph of the original Statue of Liberty.  <u>See</u> Tr. 801:20-02:25.  He believed the Linke Photo would be recognizable as the face and head of the original Statue of Liberty at stamp size.  <u>See id.</u>; Tr. 765:8-23.  If McCaffery had known that Linke photographed Davidson's replica rather than the real Statute of Liberty, McCaffery would not have selected the photo for use on a patriotic icon stamp.  <u>See</u> Tr. 800:6-8 ("We never would have issued that stamp if we had known it was the Lady – the Las Vegas replica."); Tr. 805:1-10; <u>see also</u> JTX 13 at 317:1-18:1 (Brown).

28.   Davidson admitted that it is difficult to compare the features of three-dimensional objects in two-dimensional photographs, unless the photographs "are shot from exactly the same

angle with the same photographic equipment."  Tr. 306:18-08:3; <u>see also</u> Tr. 130:1-7; 169:24-70:2, 231:21-32:2.

29.  Davidson had no role in selecting the background, angle, lighting, depth of field, shading, composition, and framing of the Linke Photo.  <u>See</u> Tr. 310:17-11:6 (Davidson).

30.  The Postal Service decided to incorporate the Linke Photo into a stamp image ("the Lady Liberty Stamp").  <u>See</u> Stip. Fact ¶ 19.  The Postal Service mistakenly believed that the Linke Photo depicted the original Statue of Liberty.  <u>See</u> PTX 85 ("[W]e didn't realize it was a photo from a replica.").  The Postal Service prepared to issue the Lady Liberty Stamp *se tenant* (paired) with a stamp featuring an image of a United States flag ("the U.S. Flag Stamp").  <u>See id.</u> Both of these stamps were Forever workhorse stamps, that is, each stamp alone was sufficient, full payment for mailing one-ounce, First-Class Mail.  <u>See id.</u>; Stip. Fact ¶ 15.

31.  The Postal Service paid Ron Watts a one-time payment of $1,200 for a license to use his image for the U.S. Flag Stamp.  <u>See</u> DTX 94.  The U.S. Flag Stamp does not feature any content substantially similar to a copyright asserted by Davidson.  <u>See</u> Tr. 312:8-11 (Davidson). Consumer demand for the U.S. Flag Stamp was not driven by any protectable expression asserted by Davidson.  <u>See, e.g.</u>, Tr. 608:12-21, 609:11-16 (Quinn); Tr. 691:8-19 (McCaffrey) (no economic reason to pair); Tr. 748:13-18 (McCaffrey) (no drive to pair, other than subject matter); Tr. 846:1-7 (Gicker) ("the American people want a flag stamp available at all times").

32.  The Postal Service routinely negotiates licenses for images on stamps for a lump-sum license fee between $0 and approximately $5,000, and often in the range of $1,000 to $2,000.[4]  Through these licenses, the Postal Service receives the right to use an image on stamps

---

[4] <u>See</u> Tr. 751:17-54:10 (McCaffrey); JTX 13 at 120:12-21:13, 200:22-01:22, 212:21-13:13, 217:4-15, 220:13-22:14 (Brown); JTX 12 at 76:16-77:9, 81:16-82:2, 84:18-85:19, 163:14-64:15;

(whether used or unused) and philatelic products.  See generally id.  Rights-holders also benefit by the unique honor and public visibility of having their works featured on postage stamps.  See, e.g., Tr. 908:23-09:3 (Gicker); JTX 13 at 217:4-15 (Brown) (testifying that "[m]ost people are ecstatic to be, have their work featured on postage stamps").

33.   The Postal Service has never agreed to pay a running royalty to a rights-holder based on the face value of the postage.  See Tr. 850:6-9, 907:9-23 (Gicker); JTX 13 at 212:4-13:13 (Brown); JTX 12 at 85:16-87:8 (Handwerger).   In addition, there is a substantial market of photos and art available for the Postal Service to license for lump-sum payments.  See JTX 13 at 111:11-12:1 (Brown) (stating that the industry has increasingly changed to offer images "for a one-time flat-fee payment"); see also JTX 12 at 76:16-77:9 (Handwerger) (stating that $1,000 was the largest lump sum license negotiated for an image on behalf of non-Postal Service clients).  This is especially true for photographs of patriotic icons because stock photo houses offer a large selection of those types of images.  See Tr. 868:6-69:6, 980:5-16 (Gicker).

34.   In the situations where the Postal Service cannot obtain the right to use an image from all necessary rights-holders with a mutually satisfactory license, the Postal Service does not issue the stamp.  See Tr. 783:16-22 (McCaffrey); JTX 12 at 84:5-17 (Brown) (polar bear stamp), 85:20-87:8 (testifying that an ongoing royalty on images for stamps was a "non-starter" for the Postal Service).  In those situations, the Postal Service will seek different subject matter or obtain alternative art for a stamp issue.  See id.; Tr. 909:4-14 (Gicker).

35.   The Postal Service has also used freelance photographers to obtain photographs for use on a stamp.  See Tr. 761:12-63:13 (McCaffrey) ("Q. ... [S]o if you wanted a picture of the Brooklyn Bridge, [the photographer] would be hired to do the original photograph?  A. Yes.");

---

181:13-83:14 (Handwerger); see also PTX 57; DTX 28, 46, 48, 49, 50, 58, 59, 68, 74, 90, 94, 129, 191.

Tr. 904:23-06:13 (Gicker).   Pursuant to negotiated contracts, the Postal Service pays the freelance photographers a one-time fee of up to $5,000 per stamp design.  See id.

36.  On December 1, 2010, the Postal Service issued the Lady Liberty Stamp and U.S. Flag Stamp pair for sale to the public.  See Stip. Fact ¶ 20.  Despite millions of sales over more than three months, neither any Postal Service employee nor any member of the general public recognized the image on the Lady Liberty Stamp as anything other than the original Statue of Liberty.  Compare id., DPF ¶ 42 with DPF ¶¶ 37-38.

37.  On March 18, 2011, Sunipix, a stock photo agency, notified the Postal Service that the image on the Lady Liberty Stamp depicted a portion of the Replica Statue of Liberty, rather than the Statue of Liberty in New York City.  See Stip. Fact ¶ 22.

38.  Davidson first learned of the accused infringing activity in March 2011, when his wife purchased stamps for the purpose of sending mail for PlasterTech.  See Tr. 269:2-70:5. Davidson felt a sense of pride to have an image of the Replica Statue of Liberty featured on a stamp.  See Tr. 270:11-13.  Shortly thereafter, a Postal Service employee contacted Davidson in an effort to write an article about Davidson's work on the replica.  See Tr. 270:14-71:8. Davidson never asserted at that time that he believed that the Lady Liberty Stamp infringed his copyright in the Replica Statue of Liberty.  See Tr. 271:19-25; see also DX 118.  Davidson, however, began consulting with an attorney.  See Tr. 273:11-23.

39.  On January 16, 2012, Davidson filed an application with the United States Copyright Office to register a copyright for "Las Vegas Lady Liberty."  See Stip. Fact ¶ 23.  In response, the Copyright Office issued Registration No. VAu 1-090-876 with an effective date of registration of January 16, 2012.  See Stip. Fact ¶ 23; JTX 1.  The Copyright Office used the "VAu" registration number prefix to reflect Davidson's claim for an unpublished work of the

visual arts.  <u>See</u> Copyright Compendium, Third Ed. § 2306.4.  The Copyright Office excluded the original Statue of Liberty from Davidson's copyright claim.  <u>See</u> JTX 1.

40.  On November 15, 2013, Davidson filed an application with the United States Copyright Office to register a copyright for "Las Vegas Lady Liberty Statue" on behalf of "PlasterTech, a sole proprietorship of Robert Davidson."  <u>See</u> Stip. Fact ¶ 24.  In response, the Copyright Office issued Registration No. VA 1-882-070 with an effective date of registration of November 15, 2013.  <u>See</u> <u>id.</u>; JTX 2.  The Copyright Office excluded the original Statue of Liberty from Davidson's copyright claim, as well as the 2-D artwork and sculpture claimed in Registration No. VAu 1-090-876.  <u>See</u> JTX 2.

41.  The Postal Service discontinued sales of the Lady Liberty Stamp and U.S. Flag Stamp pair in January 2014.  <u>See</u> Stip. Fact ¶ 25.

42.  The number of Lady Liberty Stamps sold by year were:  92,273,370 (2010); 3,044,223,258 (2011); 1,791,350,576 (2012); 21,515,963 (2013); 90,586 (2014).  <u>See</u> Stip. Fact ¶ 26.  With 692,587 in refunds, the total sold was 4,948,761,166.  <u>See</u> <u>id.</u>  As of December 31, 2015, the Postal Service had collected $2,190,414,155 from the sale of Lady Liberty Stamps. <u>See</u> Stip. Fact ¶ 28.

43.  The Postal Service also sold philatelic products that incorporated the Lady Liberty Stamp and U.S. Flag Stamp.  Some of these philatelic products also incorporated other stamps. Excluding Postal Service comprehensive guides and yearbooks, the Postal Service received approximately $29,515 in revenue and $4,954 in profit from these sales.  <u>See</u> PTX 215 at 3-6; <u>see also</u> PPF ¶ 120 (asserting a royalty base of $29,515 for the philatelic products).

44.  The Lady Liberty Stamp is a workhorse stamp, and the breakage rate (a calculation of stamps that will not be redeemed for services) for all workhorse stamps is 3.24%, including

the 2011 workhorse stamps.  See Stip. Fact ¶ 29.  Breakage represents an estimate of all stamps that will never be used on a mail piece, including those collected, destroyed, and lost.  See Tr. 627:17-22, 640:10-21 (Stratton); see also Tr. 577:7-78:3 (Quinn).

45.  Collectors collect stamps for different reasons, including those who attempt to collect all stamps:  (1) within particular countries and time periods; (2) within particular topics or themes; and (3) with production and design errors.  See Tr. 1508:14-09:5, 1511:13-12:12, 1513:24-14:21, 1516:21-18:16 (Piazza).

46.  In a survey of consumers, only 3.6% of respondents who purchased the Lady Liberty stamp intended to keep or collect any unused Lady Liberty stamps.  See Tr. 1297:14-98:12 1319:8-20:1 (Isaacson).  Only 43.5% of respondents selected the image as the most important reason for retaining the stamp.  See Tr. 1324:3-13 (Isaacson).

47.  The Postal Service licenses its own intellectual property, including stamp images, to third-parties for use on a variety of retail goods for different royalty rates.  See generally PPF ¶ 102 (citing PTX 157, 158, 195).  The negotiated royalty depends on several factors, including, the proposed product, the print run, size of the stamp image, and image placement.  See 1089:23-90:19 (Kirby); see also Tr. 1066:15-23, 1116:3-6, Tr. 1120:21-21:11 (Kirby).

48.  In the wake of the terrorist attacks of September 11, 2001, the Postal Service quickly produced a "United We Stand" definitive stamp.  See Tr. 877:24-79:24 (Gicker).  The stamp featured an image of the U.S. flag and was designed by Terrence McCaffrey.  See JTX 11.  The Postal Service issued the stamp on October 24, 2001, with a total intended print quantity of 2.25 billion stamps.  See id.

49.  Assuming infringement, the date of the hypothetical negotiation would have been June of 2010.  See PPF ¶ 108; Tr. 1582:2-10 (Bokhart).

50.  During trial, Davidson offered no direct evidence on:  (1) which specific features of the replica, if any, were his original expression; and (2) which specific features of the Lady Liberty Stamp, if any, resulted from his original expression.

## DISCUSSION

## I.    DAVIDSON FAILED TO MEET HIS BURDEN TO PROVE INFRINGEMENT

Davidson failed to meet his burden to prove infringement for three reasons.  First, Davidson failed to show he owned a valid copyright in any original material not preexisting in works created by others.  That matters.  Davidson's Replica Statue of Liberty is a derivative work based on preexisting material that years ago passed into the public domain.  Davidson had to prove that his replica contained original material not embodied in preexisting material in the public domain.  On that specific question, Davidson failed to meet his burden.

Second, and relatedly, Davidson failed to prove that the Postal Service copied original aspects of his work.  Davidson identified no original elements from his copy of the Statue of Liberty copied by the Postal Service when it reduced the Linke Photo to stamp size for the Lady Liberty Stamp.  Thus, Davidson cannot establish liability.

Third, the Postal Service's use of a photograph of a portion of a replica of an iconic public domain statue was fair and noninfringing.

### A.    Davidson failed to prove he owns a valid copyright because he failed to show that his copy of the Statue of Liberty contains any new protected expression

The Court must decide if Davidson owns a valid copyright.[5]  The Court should look at the objective proof and decide if Davidson's Replica Statue of Liberty contains the requisite level of originality to merit copyright protection.  See Feist, 499 U.S. at 345.  "The *sine qua non* of copyright is originality."  Id.  That means that Davidson must show that he "independently

---

[5] Davidson is not entitled to a presumption of validity.  See 17 U.S.C. § 410(c); Dkt. 85 at 1.

created" all of the purportedly original features of his work and that such features embody "some minimal degree of creativity."  Id.  This requirement remains regardless of the medium in which he worked.  See L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 489-90 (2d Cir. 1976) (*en banc*) ("'the one pervading element prerequisite to copyright protection regardless of the form of the work' is the requirement of originality" (quoting 1 Nimmer, THE LAW OF COPYRIGHT § 10, at 32 (1975))), cert. denied, 429 U.S. 857 (1976).

When, as here, the plaintiff seeks damages for infringement of a "derivative work," the plaintiff faces a burden to show originality distinguishable from the expression in the original work.  Federal copyright law affords derivative works copyright protection "only for original" aspects of the derivative work.  Silverman v. CBS, Inc., 870 F.2d 40, 49 (2d Cir. 1989).  The plaintiff must both identify "nontrivial expressive variation in the derivative work" and also show any such differences represent the plaintiff's creative contributions "distinguishable from the underlying work in some meaningful way."  Schrock v. Learning Curve Int'l, Inc., 586 F.3d 513, 521 (7th Cir. 2009).  Merely proving that differences "which are not conceptually separable" exist between the plaintiff's derivative work and the preexisting work is not enough to prove originality.  See Enm't Research Grp., Inc. v. Genesis Creative Grp., Inc., 122 F.3d 1211, 1222 (9th Cir. 1997); see also 17 U.S.C. § 103(b); Matthew Bender & Co. v. West Publi'g Co., 158 F.3d 674, 682 (2d Cir. 1998) (holding that merely showing differences existed between the plaintiff's copy and the original did not show ownership of a valid copyright); Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 910 (2d Cir. 1980) (same).

Instead, the plaintiff has an affirmative burden to prove that, as between the plaintiff's derivative work and the preexisting material, nontrivial expressive variations exist.  See Schrock, 586 F.3d at 521; Enm't Research Grp., 122 F.3d at 1223.  The plaintiff's burden becomes

particularly acute when, as here, the plaintiff's derivative work is "instantly identifiable as [an] embodiment[] of the underlying [work] in yet another form." Enm't Research Grp., 122 F.3d at 1223.[6]  Under such circumstances, "no reasonable juror could conclude there are any non-trivial artistic differences between the underlying [work] and the [derivative work]." Id.  Any other holding "would simply put a weapon for harassment in the hands of mischievous copiers." Batlin, 536 F.2d at 486.

The same holds when the plaintiff intended to copy a preexisting work.  Federal copyright law does not protect imprecise copies merely because they failed to copy every detail of the preexisting work accurately.  As the Tenth Circuit held in Meshwerks, when a person intends to copy another work, any failures to make a faithful copy are not retroactively transformed into the originality that deserves copyright protection.  See Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc., 528 F.3d 1258, 1268-69 (10th Cir. 2008).

Here, Davidson offered no objective evidence that he ever set out to create an original work.  He asserted that RDC gave him artistic license, but there is no contemporaneous evidence reflecting his self-serving assertion.  See DPF ¶ 15.  Davidson's contract with RDC does not reflect that Davidson was afforded any artistic license; he was simply hired to work on a scaled replica with specific dimensions, specific materials, a budget, and a timeframe for completion. See JTX 8, 9.  Davidson's assertion is contradicted by his concessions that the replica had to look like the original.  See, e.g., Tr. 232:15-20 ("[T]here's no question that I had to create a Statue of Liberty and it had to be appropriate for the New York-New York hotel."); Tr. 306:2-15 ("[I]t definitely had to look like the Statue of Liberty, there's no question about it.").

---

[6] Davidson appears to agree.  See Pl. Br. at 23 ("[A] creation which reflects application of the same idea in a different medium is not protectable, because the copyright law is not designed to reward 'manufacturing skill.'") (quoting Enm't Research Grp., 122 F.3d at 1222).

Davidson's construction of the replica reflects his intentional effort to copy the original Statue of Liberty as accurately as possible. To make a maquette, Davidson glued schematic cross-sections of the original Statue of Liberty to individual layers of foam "and cut that perimeter shape" on each layer. See DPF ¶ 12. He then detailed the maquette, using precise, scale dimensioning drawings and dozens of photographs of the original. See id. Davidson purposely copied all of the characteristic features of the original. See DPF ¶ 13. Davidson specifically rejected using a 12-inch high curio for reference because "it was not representative of the [original] Statue of Liberty." Tr. 94:22-95:1; see also Tr. 230:20-31:9 ("You wouldn't look at that and evoke the sense that you would get when you looked at the real Statue of Liberty."). After completion of the maquette, Davidson constructed the full-size replica, again relying upon photographs of the original. See DPF ¶ 12 (citing PTX 233-195, -201, -216 (photographs of original in frame)).



**Figure 1.** In PTX 234-41, Davidson constructs the maquette based on schematics of the original (emphasis added). In PTX 233-195, Davidson constructs the replica's face based on large photos of the original's face (emphasis added). See also PTX 233-201, -216 (photographs of original in frame).

As a result of his focus on the original to manufacture of the replica, Davidson ultimately admitted that he could not identify **any** specific expressive variations over the original:

> THE COURT: When you were working from the maquette to file on the head, did you have somewhere a picture of the original face or some way to refer back to photographs of the actual statue?
>
> THE WITNESS: Well, you know, we definitely -- **I definitely had to look at pictures of the original statue. There was no ifs, ands or buts about that.** . . . **Sure, I looked at pictures of the face. And I can't tell you exactly what the differences are.** I just -- I did what I felt was appropriate. I did what I thought was a little more modern, a little more feminine. **And to be honest, I can't tell you all the details**, that the nose is turned up a little bit more, the eyebrows are higher or lower. **I can't tell you that based on what the real statue looks like.**

Tr. 169:8-25 (Davidson) (emphasis added).  In his post-trial brief, Davidson vaguely asserts that "a plain comparison of the two statues reveals . . . non-trivial differences," but this assertion is supported only with inadmissible evidence.  <u>See</u> Pl. Br. at 24 (citing PTX 243).

Indeed, other than Davidson's erroneous reliance on inadmissible aspects of PTX 243, Davidson prohibited the Court from performing "a plain comparison" by failing to cite to any other admissible photographs of the original Statue of Liberty.  Davidson's counsel previously recognized that Davidson bore the burden of establishing copyrightable distinctions over the original, but failed to introduce and cite, as represented, "photographs . . . of the original Statue of Liberty."  Dkt. 83 at 72:8-73:12 (Bice); <u>see also</u> <u>id.</u> at 67:14-21 (Bice).

Davidson's different counsel have repeatedly purported to assert their own perceptions on variations over the original, but Davidson expressly disavowed these litigation-asserted[7] differences when he admitted that they were an unintended "byproduct" of his design:

> Q. Now, Mr. Davidson, when you were making the face, **did you do all of these things [asserted in Joint Exhibit 7] to differentiate your work from the original or is this just a byproduct of your design?**
>
> A. **This is definitely a byproduct of my design. <u>I never had any intentions</u> of having more defined eyes and eyelids or a pronounced cupid's bow shape of an upper lip. I really don't even know what that means, to be honest.**

---

[7] Davidson's counsel's assertions to the Copyright Office were made in anticipation of this litigation.  <u>See</u> JTX 7 at 10, 21, 23, 28.  In addition, statements by counsel are not evidence.  <u>See</u> <u>Midland Mortg. Corp. v. Wells Fargo Bank</u>, 926 F. Supp. 2d. 780, 793 (D. S.C. 2013).

Tr. 173:17-74:21 (Davidson) (emphasis added) compare with PPF ¶ 35, Pl. Br. at 24 (citing

disavowed JTX 7) and Pl. Br. at 29 (citing disavowed characteristics).   Davidson's trial

testimony that any differences were unintended byproducts of his design is in complete accord

with his earlier suggestion that any specific differences "were attributable to the fact that the

[original] statue was made from copper, which was manipulated with hammers," Dkt. 67 at 3,

distinct from the styrofoam and fiberglass used to create the replica, see id. at 1.  Differences that

resulted from unintended byproducts are not protectable.  See, e.g., Batlin, 536 F.2d at 491-92.

Having failed to identify any specific expressive variations over the original, Davidson

resorts to distinguishing his replica with broad adjectives, such as "softer" and "feminine."  PPF

¶ 32; Pl. Br. at 24.  Davidson's subjective characterizations are no more than unprotectable ideas.

Davidson's ideas are also unoriginal.  When presented with Bartholdi's final study model during

trial, Davidson conceded that the model contained the same broad ideas:

| | |
|---|---|
| Q. [D]id you say earlier that you had considered some photos from Bartholdi's time that you had gotten from the library?<br><br>A. Sure. ...  And I can't remember those images at this time, but this one [DTX 217], ... **it's definitely a lot more feminine** -- completely different from the actual full-size statue.<br><br>...<br><br>Q. And looking back at this picture, I think you just commented that it appears more feminine to you than the original?<br><br>A. **It does to me. ...  The face really has more of a feminine look to it of a much younger woman**....<br><br>Q. Would you agree that the face appears **softer** and less angular than the original statue?<br><br>A. **It does in this photo.**<br><br>Tr. at 282:4-83:12 (emphasis added). | <br><br>DTX 217 at 5 (Reg. No. 9939-G). |

Davidson is not entitled to protection for the mere idea of a "softer" and more "feminine" Statue of Liberty.  See Oracle Am., Inc. v. Google Inc., 750 F.3d 1339, 1354 (Fed. Cir. 2014) ("Copyright protection extends only to the expression of an idea – not to the underlying idea itself."); 17 U.S.C. § 102(b); see also Pl. Br. at 22 ("Importantly, copyright law is designed to protect artistic *expressions*, not mere *ideas*.") (emphasis in original).  But even if a "softer" and "more feminine" Statue of Liberty was protectable, the Copyright Office **expressly excluded** those elements from Davidson's copyright claims because they were original to Bartholdi.  See JTX 1 (excluding Reg. No. 9939-G); JTX 2 (same); JTX 3 (same).

Thus, having failed to meet his burden to identify any specific expressive variations in the replica, Davidson cannot demonstrate that the Replica Statue of Liberty deserves copyright protection for broad ideas originally incorporated in Bartholdi's works.

### B.   Even if a part of the Replica Statue of Liberty might be protectable, Davidson failed to prove that the Postal Service copied that part

Even assuming, *arguendo*, that some part of Davidson's copy of the Statute of Liberty might be protected by federal copyright law, Davidson failed to prove that the Postal Service copied the protected part.  That should be dispositive here.  To establish liability, Davidson must prove that the Postal Service, in its stamp, copied "constituent elements of [Davidson's] work that are original." Gaylord II, 595 F.3d at 1372 (quoting Feist, 499 U.S. at 361).  "In the context of a copyright infringement claim, whether the copied elements of a work are protected is particularly important because 'the mere fact that a work is copyrighted does not mean that every element of the work may be protected.'" Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 43 F. Supp. 3d 644, 659 (E.D. Va. 2014) aff'd, 790 F.3d 532 (4th Cir. 2015) (quoting Feist, 499 U.S. at 348); see also 17 U.S.C. § 103(b) (extending copyright protection for only the "material contributed by the derivative work's author"); H.R. Rep. No. 94-1476, at 57

(explaining that 17 U.S.C. § 103(b) protects only "those parts of the [derivative] work that do not employ the preexisting work").

This specific analysis required by copyright law is especially important in this case, where Davidson repeatedly and wrongly pretended that he may prove infringement by merely showing that the Postal Service used the Linke Photo without further analysis.  See Pl. Br. at 24-25.  Instead, Davidson must prove the second Feist prong:  that the Postal Service copied constituent elements of the replica that are original.  See Feist, 499 U.S. at 361.

As discussed above, Davidson cannot do so because he cannot establish that **any** elements of the replica are protectable expression.  See *supra* Section I.A.  The second Feist prong has a narrower focus than the first Feist prong – it is squarely focused on what was actually copied into the accused infringing work.

Furthermore, the evidence demonstrates that any differences copied in the stamp were objectively insignificant.  The public and the Postal Service failed to perceive any differences for months, despite hundreds of millions of copies in circulation.  The Postal Service issued the Lady Liberty Stamp and U.S. Flag Stamp pair for sale to the public on December 1, 2010.  See Stip. Fact ¶ 20.  During the remaining month of 2010, the Postal Service sold more than 92 million Lady Liberty stamps.  See Stip. Fact ¶ 26.  Hundreds of millions more stamps were sold before Sunipix notified the Postal Service that the image on the stamp depicted a portion of the replica.  See id.; Stip. Fact ¶ 22.  Accordingly, because Davidson improperly assumes that evidence of copying obviates his need to demonstrate infringement, his argument fails.

### C.	The Postal Service's use of a partial image of the Replica Statue of Liberty on a postage stamp is a noninfringing fair use

Based on the same facts cited above, the Postal Service's use of a partial image of the replica was fair pursuant to the factors identified in 17 U.S.C. § 107.  The first factor favors fair

use because, as a workhorse stamp, the vast majority of the revenues to the Postal Service represent payment of postage for the universal required service of mail delivery (not as payment for the art shown on the stamp).  See DPF ¶ 44.  Next, Davidson's work replicates an iconic public domain statue, see DPF ¶¶ 1-3, 10-13, and Davidson failed to point to the original features of the replica as discussed above in regard to copyrightability and infringement, see DPF ¶ 50, *supra* Section I.A-B.  At best Davidson has a very "thin" copyright that so closely resembles the original statue that the Postal Service and the public did not know that the stamp image came from a photo of a replica at all.  For these reasons the second and third fair use factors weigh in favor of the Postal Service.  Finally, the fourth and most important factor[8] favors fair use because there was no market impact resulting from the Postal Service's use, as Davidson has repeatedly conceded.  See Dkt. 67 at 22-23; 83 at 95-96; 128 at 35.  Additionally, he offers no facts that he has been harmed or will be harmed in any way with respect to any potential market.  He has never sought to exploit, monetize, or license his claimed work, other than in connection with this litigation.  Ultimately, the Postal Service's use is akin to the use found to be fair in Kelly v. Arriba Soft Corp., 336 F.3d 811, 818-22 (9th Cir. 2002) (holding that the use of images in a search engine database was fair).

## II.   DAVIDSON'S REQUEST FOR COMPENSATION IS CONTRARY TO LAW AND UNSUPPORTED BY EVIDENCE IN THE RECORD

Even assuming, *arguendo*, that Davidson established liability, Davidson failed to prove that he is entitled to $53,013,154 (or any of his post-trial alternative damage claims).  See Pl. Br. at 34; see also id. at 34-37.  A plaintiff may only recover "his reasonable and entire compensation as damages" for copyright infringement pursuant to 28 U.S.C. § 1498(b).  "Reasonable and entire compensation" is akin to just compensation, and "the proper measure . . .

---

[8] See Oracle Am., 750 F.3d at 1376 (citing Harper & Row Publ., Inc. v. Nation Enters., 471 U.S. 539, 566 (1985)).

is what the owner has lost, not what the taker has gained." Gaylord IV, 678 F.3d at 1342-43 (quoting Leesona Corp. v. United States, 599 F.2d 958, 969 (Ct. Cl. 1979)).  Pursuant to Section 1498(b), a plaintiff who establishes liability has lost "what is essentially a compulsory, non-exclusive license on the plaintiff's copyright."  Gaylord IV, 678 F.3d at 1343.  Finally, "the methods used to determine 'actual damages' under the copyright damages statute, 17 U.S.C. § 504, are appropriate for measuring the copyright owner's loss" of such a license.  Id.

Davidson failed to meet his burden of proving entitlement to, and the quantum of, just compensation for his loss of a non-exclusive license.  See Cohen v. United States, 100 Fed. Cl. 461, 478-79 (2011); Wechsberg v. United States, 54 Fed. Cl. 158, 166 (2002) ("A recovery of 'reasonable and entire compensation' [under 28 U.S.C. § 1498(b)] suggests that the burden of proof lies with Plaintiff.").  While a plaintiff can recover "actual damages based on 'the fair market value of a license covering the defendant's use,'" Gaylord IV, 678 F.3d at 1343 (citing On Davis v. The Gap, Inc., 246 F.3d 152, 167 (2d Cir. 2001)), "the amount of damages sought cannot be based on 'undue speculation.'"  Dash v. Mayweather, 731 F.3d 303, 313 (4th Cir. 2013) (citing On Davis, 246 F.3d at 166).

Lacking objective evidence, Davidson improperly attempted to satisfy the burden of proof by relying on an unduly speculative expert opinion.  The Court should reject Davidson's attempt and award no more than minimum statutory damages – $750.  Even if the Court were to hold that Davidson presented non-speculative evidence of a fair market value of a non-exclusive copyright license for the Replica Statue of Liberty, the weight of the evidence demonstrated that a properly-constructed hypothetical negotiation would have yielded an agreement whereby the Postal Service would have paid Davidson a lump-sum royalty of $10,000 to license the replica

for use on a postage stamp.  Finally, should the Court conclude that Davidson is entitled to a per-stamp royalty, the Court should bar recovery of a royalty for stamps used to send mail.

> **A.**   **Davidson provided no evidence that the Postal Service's alleged infringement caused him <u>any</u> actual damages**

The Court should deny Davidson's request for compensation because he failed to meet his burden of proving any fair market value for a nonexclusive license to use the Replica Statue of Liberty.  In <u>Gaylord IV</u>, the Federal Circuit held that reasonable compensation could be based upon "the fair market value of a license covering the defendant's use . . . calculated based on a hypothetical, arms-length negotiation **between the parties**."   <u>Gaylord IV</u>, 678 F.3d at 1343 (citations omitted) (emphasis added).  The Federal Circuit relied heavily on the Second Circuit's <u>On Davis</u> decision in reaching its conclusion.  <u>See</u> <u>id.</u> (quoting <u>On Davis</u>, 246 F.3d at 164, 172). Critically, in both <u>Gaylord IV</u> and <u>On Davis</u>, the respective plaintiffs met their burdens with evidence about **each parties' circumstances** and **past practices**, including evidence of their own **past licenses**.  <u>See</u> <u>Gaylord IV</u>, 678 F.3d at 1343-44 ("Mr. Gaylord presented evidence that he typically agreed to a royalty rate of 8-10% in past agreements licensing his work for use on various collectibles."); <u>On Davis</u>, 246 F.3d at 161 ("In addition to his evidence of numerous instances in which rock music stars wore [Davis's copyrighted] eyewear . . . Davis testified that on one occasion he was paid a royalty of $50 for the publication by Vibe magazine of a photo of the deceased musician Sun Ra wearing Davis's eyewear.").

In this case, Davidson failed to produce **any** non-speculative evidence that could support a fair market value for a nonexclusive license to use the Replica Statue of Liberty.  He testified that he never licensed – and never contemplated licensing – his asserted copyright in the replica. <u>See</u> Tr. 319:24-20:25.  He concedes that he "has not generated any licensing revenue for his copyright in the Statue."  Stip. Fact ¶ 14.  He could not identify any potential licenses that he lost

as a result of the Postal Service's actions.  <u>See</u> Tr. 318:23-319:1.  His counsel conceded, as a matter of law, that the Lady Liberty Stamp did not adversely affect Davidson.  <u>See</u> Dkt. 83 at 95:22-96:6; Dkt. 67 at 22-23.

Davidson's assertion that he was damaged by the alleged lack of attribution is similarly mistaken.  <u>See</u> PPF ¶¶ 87, 116-17.  First, he never sought attribution as part of his agreement with RDC, <u>see</u> JTX 8, 9, or, apparently, in connection with any of his other work.  Second, he made no effort to exploit any copyright in the replica.  <u>See</u> DPF ¶¶ 18-19.  Third, Davidson never sought attribution after use of the replica was discovered by the Postal Service and the public.  <u>See, e.g.</u>, DPF ¶¶ 37-38.  Davidson discovered the Postal Service's accidental use of an image of the replica at roughly the same time the Postal Service did, but made no effort to seek attribution.  <u>See id.</u>  Subsequently, a Postal Service employee contacted Davidson in an effort to write an article about Davidson's work on the replica, but Davidson failed to pursue the opportunity.  <u>See id.</u>  Fourth, Davidson has not cited any business opportunities he pursued during 2010-2011 for which attribution would have been helpful.  Thus, Davidson provided no evidence that attribution had any value to him.  <u>See also</u> Tr. 1602:11-03:19 (Bokhart) ("So the value of the attribution, then, based on his actual experience, indicates that it wasn't important.").  Finally, and relatedly, Davidson provided no evidence of the value of attribution, even if the Court assumes that Davidson sought and was denied attribution.

Ultimately, Davidson offered only his expert's *ipse dixit* in support of his claim for compensation.  <u>See generally</u> PPF ¶¶ 104-121.  Davidson, however, cannot rely solely on a speculative expert report to support a fair market value for a nonexclusive license to use the Replica Statue of Liberty.  For example, in <u>Dash v. Mayweather</u>, the Fourth Circuit held that an offer of speculative expert testimony, without more, could not support a copyright owner's claim

to actual damages.  731 F.3d at 312-26; see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 513-14 (9th Cir. 1985) (affirming a refusal to award actual damages where plaintiffs relied on speculative opinion testimony).  In Dash, the plaintiff attempted to establish a fair market value for his musical work with an expert report that cited "license fees paid to other artists for the use of their songs" at the same venue.  731 F.3d at 315.  The Fourth Circuit held, inter alia, that the cited licenses were not comparable to the accused use.  See id. at 319.[9]  As a result, the court held "that Dash's evidence is too speculative to support his actual damages claim."  Id. at 319-20.  Similarly, the licenses cited by Timmins are not comparable to the accused use (as well as incomparable to the parties and the relative circumstances of the case).

Davidson's post-trial alternative damage claims for approximately $10 million are similarly speculative and erroneous.  For example, Davidson's arbitrary adjustment of a royalty rate for unused stamps to "the high end" of an unsupported "scale" demonstrates that his royalty figures have no basis in the objective evidence.  See Pl. Br. at 35.  Similarly, Davidson's assertion that the parties to the hypothetical negotiation would have assumed infringement and negotiated a royalty based upon the Postal Service's sunk costs ten months after the negotiation is legally erroneous.  See Pl. Br. at 36.  Accordingly, the Court should deny Davidson's request for compensation because he failed to meet his burden of proving any fair market value for a nonexclusive license to use the Replica Statue of Liberty.  As a result, assuming liability, Davidson's recovery should be limited to "the minimum statutory damages as set forth in section

---

[9] In the context of patent damages, the Federal Circuit has repeatedly held that a plaintiff cannot support its claim of a reasonable royalty by relying on license agreements that are "radically different from the hypothetical agreement under consideration."  Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327-32 (Fed. Cir. 2009); see also Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1316-17 (Fed. Cir. 2011); ResQNet.com, Inc. v. Lansa, 594 F.3d 860, 870-72 (Fed. Cir. 2010); Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1319-21 (Fed. Cir. 2010).

504(c) of title 17": $750.  28 U.S.C. § 1498(b); 17 U.S.C. § 504(c); <u>see also</u> <u>Cohen v. United</u>

<u>States</u>, 105 Fed. Cl. 733, 750-59 (2012), <u>aff'd</u> 528 Fed. App'x 996 (*per curiam*).

> **B.      Timmins's approach is fundamentally flawed**

The Court should give no weight to – or should disregard as a matter of law – the deeply

flawed opinions of Davidson's damages expert.  Timmins's approach was unreliable for at least

five critical reasons.

> ### 1.      *Timmins's testimony was not based on sufficient facts, and his approach was not reliable*

Timmins's testimony was not based on sufficient facts, and his approach was not reliable.

For purposes of his opinion, Timmins allegedly reviewed:  (1) licensing publications; (2) full-

text license agreements; and (3) abstracts of license agreements.  <u>See generally</u> Tr. 1202:21-

03:14 (Timmins).   Other than the Postal Service's full-text out-licenses, however, Davidson

introduced **none** of those sources in the record, precluding the Court and the government from

directly evaluating the comparability of the sources.  <u>See</u> <u>LaserDynamics, Inc. v. Quanta</u>

<u>Computer, Inc.</u>, 694 F.3d 51, 79-81 (Fed. Cir. 2012) ("When relying on licenses to prove a

reasonable royalty, alleging a loose or vague comparability . . . does not suffice.").  Timmins's

selection of these sources was also highly suspect.[10]

> ### 2.      *Timmins improperly doubled the royalty base by including non-infringing U.S. Flag stamps*

Timmins improperly doubled the royalty base by including the U.S. Flag Stamp that was

sold as a *se tenant* pair with the Lady Liberty Stamp.  <u>See</u> PPF ¶¶ 105, 120; Pl. Br. at 33, 35.

There is no evidence that Davidson's copyrights drove consumer demand for the U.S. Flag

Stamp.  <u>See</u> DPF ¶ 31; <u>LaserDynamics</u>, 694 F.3d at 67-68 (requiring that patent owners "prove

---

[10] <u>See</u> Tr. 1398:18-00:8 (admitting that he reviewed only two full-text agreements other than the Postal Service out-licenses); Tr. 1408:25-09:20, Tr. 1411:11-13:4 (admitting that the license abstracts he selected were the result of **one** search term:  "reasonable royalty").

that the patented feature drives demand for the entire product" before incorporating non-infringing components into the royalty base).   Timmins had no opinion on whether consumers used the U.S. Flag Stamp to send mail because of Davidson's copyrights.   See Tr. 1378:25-79:3; see also Tr. 1379:22-24 (agreeing that an image of Davidson's work did not drive the price set for the U.S. Flag Stamp), Tr. 1331:4-7.   Timmins admitted that the Postal Service provided mailing services without requiring both the U.S. Flag Stamp and the Lady Liberty Stamp.   See Tr. 1428:18-29:21.   A Postal Service witness testified that there was no economic reason to pair the two stamps, see Tr. 691:8-19 (McCaffrey), and that there was no drive to pair stamps in general, other than for subject matter purposes, see Tr. 748:13-18 (McCaffrey).[11]   Accordingly, Timmins's attempt to expand the royalty base to the non-infringing U.S. Flag Stamp fails as a matter of law and fact.[12]

### 3.   Timmins's conclusion that Davidson is entitled to a running royalty is at odds with the Federal Circuit's guidance in Gaylord

Timmins dubiously relied on the result in Gaylord, see Tr. 1422:12-23:18, while erroneously ignoring the specific facts and principles that led to the result, see Tr. 1424:2-25:14. The Supreme Court and the Federal Circuit have repeatedly warned that trial courts should generally avoid framing hypothetical negotiations with litigation settlements and judgments.   See Rude v. Westcott, 130 U.S. 152, 164 (1889) ("It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot . . . determin[e] the damages sustained by the owners of the patent in other cases of infringement."); LaserDynamics, 694 F.3d at 77 (noting

---

[11] In addition, the Postal Service has an understanding that the public wants to have flag stamps in circulation.   See Tr. 608:5-09:16 (Quinn); Tr. 846:1-7 (Gicker) ("the American people want a flag stamp available at all times").

[12] Davidson also provided no evidence that the Postal Service's alleged use of the Lady Liberty Stamp image on the "cover[s] of the packaging material" drove sales of the U.S. Flag Stamp. See PPF ¶ 63.   A Postal Service witness testified that the stamp booklets were sold unfolded, see Tr. 510:1-12:10 (Quinn), and there is no indication that customers purchase workhorse stamps because of their covers, see, e.g., Tr. 269:2-70:5 (Davidson).

the court's "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages"); see also Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79 (Fed. Cir. 1983).  Timmins admitted that:  (1) he had never relied on a judgment to structure a hypothetical negotiation until this case; and (2) he did not consider judgments to be arm's length transactions.  See Tr. 1426:8-15.

In concluding that Davidson was entitled to a running royalty, Timmins also ignored the Federal Circuit's guidance in Gaylord IV in determining whether a running royalty was appropriate in the first place.  With respect to stamps used for postage, Timmins admitted that he had no opinions regarding the critical fact issues highlighted by the Federal Circuit:

| The Federal Circuit's guidance: | Timmins's testimony: |
|---|---|
| "**For stamps used as postage**, the trial court must determine whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license.  For example, the court may consider evidence regarding **whether people used the stamp at issue specifically because it featured an image of The Column or whether the stamp's value is primarily attributable to its ability to send mail rather than to the image it depicts**." | Q. [L]et's talk about the buying public.  Do you have any opinion as to whether consumers used the Lady Liberty stamp to send mail because of Davidson's copyright?<br><br>A. **I do not.**<br><br>...<br><br>Q. What is, in your opinion, the primary driver of demand for stamps used to send mail?<br><br>A. **The ability to send mail**, the postage value of the stamp. |
| Gaylord IV, 678 F.3d at 1344 (emphasis added). | Tr. at 1378:20-79:7 (emphasis added); see also Tr. 1379:20-21 ("Yeah, I don't think that Mr. Davidson's image drove the price that was set for the Lady Liberty Stamp.") |

Similarly, with respect to retained stamps, Timmins admitted that he had no opinions regarding the critical fact issues highlighted by the Federal Circuit:

| The Federal Circuit's guidance: | Timmins's testimony: |
|---|---|
| The analysis likely will differ for the value attributable to the Postal Service's use of Mr. Gaylord's work on the estimated $5.4 million of sold but unused stamps, including those retained by collectors, which represent nearly pure profit for the Postal Service. **It may be pertinent to examine whether the number of unused stamps is greater for this stamp than for the average stamp issued by the Postal Service. Collectors may retain stamps for any number of reasons, including a preference for the image itself or a desire to obtain a particular stamp to complete a collection.** The court should thus consider whether the evidence supports an ongoing royalty for unused stamps, and at what rate. **We, however, do not rule out the possibility that a one–time, paid-up license accurately reflects the fair market value of a license for both the used and unused stamps.** Gaylord IV, 678 F.3d at 1345 (emphasis added). | Q. With respect to unused stamps . . . do you have any opinion as to whether the Lady Liberty stamp was retained more than other similar workhorse stamps? <br><br> A. **I do not have that opinion.** <br><br> Q. Did you attempt to compare the retention of the Lady Liberty stamp with the retention of any other stamp? <br><br> A. Beyond looking at the statistics from the U.S. Postal Service for -- that were provided, no, **I did not**. <br><br> Q. Did you attempt to calculate the profit margin of the Lady Liberty stamp? <br><br> A. **I did not.** <br><br> ... <br><br> Q. For stamps that were retained, do you have any opinion as to why they were retained? <br><br> A. Other than knowing that there are collectors who want to retain stamps for collection, no, **I do not.** <br><br> Tr. 1379:25-81:11 (emphasis added); <u>see also</u> Tr. 1376:21-77:4 (no opinion on whether Davidson's copyright created demand for the Lady Liberty Stamp); <u>compare with</u> Tr. 1520:24-21:20 (Piazza) ("I determined that the demand among stamp collectors for [the Lady Liberty Stamp] was neither greater nor less than any other stamp of its class at roughly the same period of time."). |

Accordingly, the Court should reject Timmins's testimony to the extent it misapplies the fundamental principles of the <u>Gaylord</u> decision.

### 4. *Timmins's analysis of license agreements is erroneous because he misidentified the relevant market*

Timmins improperly relied on license agreements that were not comparable to the hypothetical negotiation in this case. To do so, Timmins misidentified the relevant market. Timmins broadly asserted that the relevant market was for licenses of copyrighted art on a wide

variety of disposable retail products, such as postcards and wrapping paper.  See Tr. 1385:18-86:19.  Yet Timmins ignored testimony that the relevant market is defined by the **specific** product at issue.  For example, the Postal Service's licensing specialist testified that the Postal Service's licensing of its intellectual property depended on the proposed product.  See Tr. 1089:23-90:19 (Kirby); see also Tr. 1066:15-23, 1116:3-6.  The Federal Circuit also suggested that a focus on the hypothetically licensed product at issue was critical in Gaylord IV.  See Gaylord IV, 678 F.3d at 1344 ("The trial court's analysis . . . may lead it to conclude that different license fees are appropriate for the three categories of infringing goods.").

By misconstruing the relevant market, Timmins purported to construct a **hypothetical** license for the use of artwork on stamps while ignoring all **actual** licenses for the use of artwork on stamps.  Timmins' approach is legally erroneous.  See Gaylord IV, 678 F.3d at 1343 ("It is incorrect in a hypothetical negotiation . . . to limit [an] analysis to only one side of the negotiating table.").  The Postal Service's past agreements are important benchmarks to determining its expectations and its initial position in a hypothetical negotiation with Davidson.[13]

The evidence further illuminates the fundamental errors at the heart of Timmins's approach.  Timmins relied upon a license negotiated by Andy Warhol's estate for the use of art on wine labels, see Tr. 1214:6-20, but rejected licenses negotiated between the estate and the Postal Service for the use of art on stamps as "not representative of the market."  Tr. 1416:3-8; DTX 28, 48.  Timmins relied upon a license abstract for "imagery from the Woodstock Music Festival on a variety of items," Tr. 1413:5-11, but rejected a license for the same imagery for the

---

[13] Timmins testified that he "did consider" the Postal Service's in-license agreements for stamp images, but concluded that the licenses were "not helpful because [they were] not indicative of an arm's length transaction."  Tr. 1203:15-24.  Nevertheless, Timmins admitted that he could not recall looking at any in-license agreement other than the Lady Liberty Stamp license (which he failed to cite in his expert report).  See Tr. 1388:14-89:8; RCFC 26(a)(2)(B)(ii) (requiring disclosure of "facts or data considered" by the expert).

Postal Service's stamps, see Tr. 1413:19-14:9.  Finally, Timmins relied upon license abstracts for Norman Rockwell-related art on metal wall decorations, see Tr. 1414:10-15:1, but rejected a license for the use of art on stamps because he did not "think that this [was] a market transaction," Tr. 1415:2-16:2.  Each of the licenses rejected by Timmins demonstrated that in-license agreements for stamps differ significantly with in-license agreements for other goods.[14]

### 5.      *Timmins failed to apportion*

The Court should give little weight to Timmins's calculations because he failed to apportion damages in at least three significant respects.  First, he improperly assumes that Davidson is entitled to a royalty on all unused stamps, even though many stamps are retained for reasons that have nothing to do with Davidson's asserted copyright.  See Tr. 577:7-78:3 (Quinn) (testifying that the breakage calculation, particularly for workhorse stamps, includes stamps that are unused because they are lost or forgotten); Tr. 627:17-22, 640:10-21 (Stratton) (testifying that breakage represents an estimate of all stamps that will never be used on a mail piece, including those collected, destroyed, and lost).  By basing his calculations on the stipulated breakage estimate, Timmins improperly inflates his damages calculations.  See, e.g., PPF ¶ 104.

Second, with respect to the stamps that were collected by collectors, Timmins failed to apportion the stamps that were collected for the image on the stamp, as opposed to those collected for other reasons.  The Federal Circuit observed that "[c]ollectors may retain stamps for any number of reasons, including a preference for the image itself or a desire to obtain a particular stamp to complete a collection," Gaylord IV, 678 F.3d at 1345.  Daniel Piazza, an expert in the history of postage stamps and stamp collecting, testified that collectors collect

---

[14] Timmins also admitted that he did not explore other sources for other potentially-comparable license agreements.  See Tr. 1387:10-24 (did not review licenses for stamps in other countries); Tr. 1389:16-23 (did not review stock photo websites for this case); Tr. 1393:22-97:5 (did not review gift card and currency licenses).

stamps for different reasons, including those who attempt to categorically collect all stamps: from particular countries and time periods[15]; with particular topics or themes[16]; or with production and design errors.[17]   Timmins, however, failed to account for this.   See also Tr. 1325:17-26:3 (Isaacson) (testifying that a survey indicated that demand for the image is "much, much lower than the . . . breakage estimates").

Third, with respect to the stamps that were collected for their image, Timmins failed to apportion the stamps that were collected for Davidson's specific contributions to the image, as opposed to Bartholdi's and Linke's contributions.   See Tr. 1438:6-11.   Davidson has expressly conceded that the Replica Statue of Liberty "represents what other courts have recognized as a classic example of a derivative work."   Dkt. 68 at 14 (citation omitted).   Despite this unambiguous concession that the replica is derived from the original Statue of Liberty, Timmins simply ignored the contributions of Bartholdi and Linke in his analysis.   In light of Timmins's fundamental errors, the Court should disregard his testimony.

**C.     Assuming entitlement to actual damages, the Postal Service's lump-sum license fee agreements are the best evidence of the market for such images on such products**

Even if the Court holds that Davidson established entitlement to actual damages, his assertion that he is entitled to $53 million in compensation is meritless.   See Pl. Br. at 34.[18] Davidson's claim to $53 million repeatedly contradicts the Federal Circuit's guidance in Gaylord IV.   In particular, Gaylord IV held that a court should determine the fair market value of a license "based on a hypothetical, arms-length negotiation between the parties" "under the

---

[15] See Tr. 1508:14-09:5 (United States stamps); Tr. 1511:13-19 (modern stamps); 1511:20-12:12 (classic period stamps).

[16] See Tr. 1513:24-14:21.

[17] See Tr. 1516:21-18:16.

[18] Davidson alternatively asserts that he is entitled to actual "damages of at least $11,645,411," Pl. Br. at 35, but the Court should reject Davidson's alternative request for the same reasons discussed above.

circumstances of a given case" by: (1) weighing the non-speculative evidence "presented by both sides to determine the fair market value of a license"; and (2) "determin[ing] whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license." Gaylord IV, 678 F.3d at 1343-44. Furthermore, the Federal Circuit subsequently reaffirmed that the availability of noninfringing alternatives is "an important constraint in a hypothetical negotiation." Gaylord v. United States, 777 F.3d 1363, 1370 (Fed. Cir. 2015) ("Gaylord VI").

### 1. The Postal Service's lump-sum license agreements are comparable to the hypothetical negotiation

The government presented evidence that is reliable to determining the fair market value of a nonexclusive license for an image to be used on a stamp. See generally DPF ¶ 32. The Postal Service and rights-holders routinely negotiate licenses for images on stamps for a lump-sum license fee between $0 and $5,000. See supra fn. 4. In general, rights-holders eagerly negotiate these licenses, because the rights-holders directly benefit by the unique honor and public visibility of having their works featured on postage stamps. See Tr. 908:23-09:3 (Gicker); JTX 13 at 217:4-15 (Brown). The Postal Service has never agreed to pay a running royalty to the rights-holder based on the face value of the postage. See DPF ¶ 33; see also JTX 13 at 318:2-6 (Brown) (testifying that the Postal Service does not take anticipated stamp revenues into account when negotiating licenses for stamp images).

The evidence includes many arm's-length license agreements between the Postal Service and artists (and their representatives) for the images used for, inter alia, the Lady Liberty Stamp, the U.S. Flag Stamp, and the Liberty Bell stamp. See Appendix. Contrary to Timmins's unfounded assertions, these agreements represent arm's-length transactions with terms directly comparable to the hypothetical license at issue in this case. See generally Tr. 1627:24-32 (Bokhart) (reviewing several hundred licensing agreements). These agreements represent the

Postal Service's established licensing history of obtaining the right to use art on stamps, and they represent the Postal Service's expectations upon engaging in a hypothetical negotiation.

### 2. The Postal Service had alternatives to a multi-million dollar demand by Davidson

While the construct of a hypothetical negotiation requires a reasonable compromise between a willing seller and a willing buyer,[19] it is not reasonable to conclude, as Davidson does, that the Postal Service would have ultimately agreed to a royalty that was more than 10,000x greater than other licenses it negotiated with sophisticated rights-holders. The Postal Service operates at a loss and could neither afford to pay such a high licensing rate from its own funds,[20] nor explain why it would pay that much for a small part of a work derivative of the public-domain Statute of Liberty. Instead, the Postal Service could have licensed alternative images of the original Statue of Liberty for the stamp in line with its past agreements, or chosen a different subject.

The Postal Service would have had many different image options if faced with a multi-million dollar demand for an image of the Replica Statue of Liberty in June 2010. As of that time, the Postal Service had already issued more than 20 stamps featuring images and drawings of the original Statue of Liberty. See DPF ¶ 25. Since the original Statue of Liberty is in the public domain, see Stip. Fact ¶ 4, the Postal Service could have simply selected a different photograph of the original from a stock photo website, see DPF ¶¶ 27, 33; Tr. 1719:24-21:6 (Bokhart), or it could have used one of its freelance photographers to take the photo, see DPF ¶ 35. Alternatively, it could have selected a different patriotic icon.

---

[19] See, e.g., Gaylord IV, 678 F.3d at 1345 (recognizing that a hypothetical negotiation could "result in a higher ongoing royalty than the rate earned by [the parties] under past agreements").
[20] See DPF ¶¶ 20-21.

Moreover, the Postal Service had actually sought alternatives in the past when faced with unacceptable demands.  <u>See</u> DPF ¶ 34.  In one notable instance, a photographer of a polar bear demanded $10,000 for a license, and the Postal Service chose to "do something else."  JTX 12 at 84:1-12 (Handwerger).

Davidson does not contest that:  (1) the Postal Service had alternative image options; and (2) the Postal Service had actually sought and used alternatives when faced with demands much smaller than Davidson's.  Instead, Davidson asserts that the Postal Service would have had "no reasonable alternatives available" because there would not have been enough time to switch to a different stamp before the holiday season of 2010.  PPF ¶ 109; Pl. Br. at 32, 35.  The evidence, however, does not support that assertion.  In particular, the Liberty Bell Forever stamp continued to sell through this time period, <u>see</u> Tr. 521:3-22:5 (Quinn), could have been reprinted by the Postal Service, <u>see</u> <u>id.</u>, and the Postal Service issued a holiday Evergreen Forever stamp in workhorse quantities during the holiday season of 2010, <u>see</u> Tr. 642:15-23 (Stratton).  Alternatively, the Postal Service could have printed "several billion copies" of the U.S. Flag Stamp by itself "in fairly prompt order."  Tr. 523:13-24:19 (Quinn).  In addition, the Postal Service had quickly issued other stamps – it issued a "United We Stand" flag stamp in very large quantities within six weeks of the terrorist attacks of September 11, 2011.  <u>See</u> DPF ¶ 48.

### D.   A properly constructed hypothetical negotiation would have resulted in a lump-sum license of $10,000

The Court should reject the hypothetical proposed by Davidson and Timmins:  that the Postal Service would have capitulated to an unprecedented multi-million dollar demand from an artist of a derivative work of a national icon who had never licensed his work.  Davidson's proposed hypothetical is not even a negotiation, because it fails to account for the parties'

respective initial expectations, financial resources, and bargaining strengths in June 2010 (the agreed-upon date of the hypothetical negotiation).

With respect to the parties' initial expectations, the record provides ample support for the Postal Service's expectation that it wanted – and nearly always obtained – rights to an image for a lump-sum fee of $5,000 or less.  And, the record provides no support for Davidson's assertion that he could have sought multi-million dollar royalties.  He had never licensed the replica – or any other work – at that time and had never obtained royalties, let alone ones of that magnitude.

With respect to the parties' financial resources, the record demonstrates that Postal Service would not have agreed to a multi-million dollar royalty.  The Postal Service's Stamp Development group has an annual budget of $400,000 for the purchase of art.  See Tr. 900:21-03:21 (Gicker).  The Postal Service, as a whole, has operated at a loss for nearly a decade.  See DPF ¶ 20.  The record also provides no objective evidence that Davidson would have insisted on receiving a multi-million dollar royalty.  He had created the Replica Statue of Liberty for approximately $250,000 in profit, similar to his other themed work.  See DPF ¶¶ 16, 17.

Finally, with respect to the parties' respective bargaining positions, the record demonstrates that the Postal Service had other available options if Davidson had rejected the Postal Service's lump-sum proposals.  To the contrary, if the Postal Service had rejected Davidson's running royalty rate proposals in the hypothetical construct, Davidson would have had no alternative options in the negotiation, other than reducing his demand.  Thus, if the Court holds that Davidson is entitled to recover actual damages, the Court should conclude that a lump-sum payment of $10,000 reflects the upper limit of a properly constructed hypothetical negotiation for the use of the Replica Statue of Liberty in a workhorse stamp – whether used or retained.  See Gaylord IV, 678 F.3d at 1345 (recognizing "the possibility that a one-time, paid-up

license accurately reflects the fair market value of a license for both the used and unused stamps"); see also Tr. 1655:21-57:17 (Bokhart).  A $10,000 lump-sum license would have been roughly double the amount that the Postal Service had historically negotiated with sophisticated rights-holders, and an amount that the owner of the polar bear image sought, but did not receive.

### E.   Should the Court conclude that Davidson is entitled to a running royalty, Davidson's recovery should exclude used stamps

As in Gaylord, Davidson asserts that he is entitled to a per-unit royalty on three categories of allegedly infringing goods:  "(1) stamps used to send mail; (2) unused stamps purchased by collectors; and (3) commercial merchandise featuring an image of the stamp." Gaylord IV, 678 F.3d at 1344; see PPF ¶ 120.  As discussed above, if the Court concludes that Davidson is entitled to actual damages, a lump-sum payment of $10,000 accurately reflects the fair market value of a nonexclusive license for all accused uses.  Should the Court conclude, however, that Davidson is entitled to a per-unit royalty on some of the allegedly infringing goods, Davidson should be precluded from recovering such a royalty on stamps that are used as postage.  The Federal Circuit suggested that such a royalty could be appropriate where the plaintiff submits evidence of causation, meaning proof that "people used the stamp at issue specifically because it featured an image of [the asserted work]."  Gaylord IV, 678 F.3d at 1344-45.  The Federal Circuit's suggestion mirrors the approach taken by the Fourth Circuit when a plaintiff asserted entitlement to damages for the alleged use of his copyrighted logo by the Baltimore Ravens for several revenue-generating activities:

> We conclude that the Defendants could properly be awarded summary judgment with respect to any given revenue stream if either (1) there exists no conceivable connection between the infringement and those revenues; or (2) despite the existence of a conceivable connection, Bouchat offered only speculation as to the existence of a causal link between the infringement and the revenues.

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522-23 (4th Cir. 2003). Davidson has not offered any non-speculative causation evidence for any of the three different categories of allegedly infringing goods in this case, see supra Section II.B.3, and the Court should reject his unsupported claim.

### F.      Assuming infringement, delay compensation is appropriate

In his brief, Davidson generally asserts entitlement to "pre-judgment interest at the rate to be set by the Court." Pl. Br. at 37. Yet, despite bearing the burden of proof on this fact issue, see Gaylord IV, 678 F.3d at 1345; see also Gargoyles, Inc. v. United States, 37 Fed. Cl. 95, 109 (1997), Davidson failed to propose a calculation of delay compensation at trial. See Tr. 1381:12-21 (Timmins).   Accordingly, any delay compensation should be based on an appropriate Treasury bill rate.   See Gargoyles, 37 Fed. Cl. at 109; Tr. 1657:18-58:13 (Bokhart).   Assuming liability, delay compensation should be calculated from a date three years before the filing of this suit, and should be based on an appropriate Treasury bill rate.   See Tr. 1657:18-58:20 (Bokhart).

### CONCLUSION

In view of the foregoing, Davidson has not met his burden of establishing liability.   In particular, he failed to identify anything original in his replica of a national icon, and failed to identify any original elements copied in the accused stamp.   The Postal Service's use of a photograph of a portion of a replica of an iconic public domain statue was also fair and noninfringing.   But assuming liability, Davidson is not entitled to any damages because he improperly relied on an unduly speculative expert to advance a multi-million dollar claim for a copyright that has no objective fair market value.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

GARY L. HAUSKEN
Director


                                        s/Scott Bolden
February 9, 2018                        SCOTT BOLDEN
                                        Deputy Director
Of Counsel:                             Commercial Litigation Branch
LEE L. PERLA                            Civil Division
ALEX HANNA                              Department of Justice
Department of Justice                   Washington, DC  20530
                                        Email: Scott.Bolden@USDOJ.gov
REDDING C. CATES                        Telephone:    (202) 307-0262
United States Postal Service            Facsimile:    (202) 307-0345

**APPENDIX**
**SUMMARY OF LICENSE AGREEMENTS IN EVIDENCE**

**A.**   **Davidson's Licenses of Intellectual Property Owned by Others (Davidson's In-Licenses)**

   None.

**B.**   **Davidson's Licenses of His Asserted Intellectual Property to Others (Davidson's Out-Licenses)**

   None.

**C.**   **Postal Service's Licenses of Intellectual Property Owned by Others (Postal Service's In-Licenses)**

| Record | Date | Licensor / Licensee | Licensed Work / Goods Produced Subject to Royalty | Agreement Title / Summary of Terms / Total Royalties Paid |
|---|---|---|---|---|
| PTX 57; see also DTX 90 | May 25, 2010 | Getty Images<br><br>**Postal Service** | Copyright: Linke "Statue of Liberty"<br><br>Postage stamp, philatelic products, other products | Getty Images ... Image and Footage License Agreement (with Addendum<br><br>Image used to create a stamp image<br><br>**Total Royalties:  $1500** |
| DTX 94 | July 6, 2010 | Ron Watts<br><br>**Postal Service** | Copyright: Photograph of American Flag<br><br>Postage stamp, philatelic products, other products | Photo Philatelic Agreement<br><br>Image used to create a stamp image<br><br>**Total Royalties:  $1200** |
| DTX 191 at USPS 12512-14 | June 22, 2000 | Paul Hardy (through Stock Market)<br><br>**Postal Service** | Copyright: Photograph "Statue of Liberty, New York City, New York, USA"<br><br>Postage stamp, philatelic products, other products | Agreement ... Regarding Photograph to be Used as Stamp Art<br><br>Image used to create a stamp image<br><br>**Total Royalties:  $2000** |
| DTX 59 | Dec. 31, 2001 | John T. Engeman<br><br>**Postal Service** | Copyright: "Liberty Bell"<br><br>Any and all media | USPS Stamp Design Art Contract<br><br>Artwork specifically commissioned and assigned to the Postal Service; image used to create a stamp image<br><br>**Total Royalties:  $3000** |
| DTX 46 at USPS 91776-81; | June 18, 1998 | The Curtis Publishing Co. | Copyright: Front cover of Saturday Evening Post | Celebrate the Century Philatelic Agreement |

| | | | | |
|---|---|---|---|---|
| see also DTX 49 | | **Postal Service** | (11/2/1946)<br><br>Postage stamp, philatelic products, other products | Image used to create a stamp image<br><br>**Total Royalties:  $0** |
| DTX 48; see also DTX 28 | Aug. 2, 2000 | Artists Rights Society<br><br>**Postal Service** | Copyright:<br>Andy Warhol's *Self Portrait* 1964<br><br>Postage stamp, philatelic products, other products | Philatelic Agreement<br><br>Image used to create a stamp image<br><br>**Total Royalties:  $0** |
| DTX 50 | Oct. 10, 2000 | Billy Name (through OvoWorks)<br><br>**Postal Service** | Copyright:<br>*Andy with self portrait* 1967<br><br>Postage stamp, philatelic products, other products | Agreement ... for Photograph to be Used as Selvage Sheet for Postage Stamps<br><br>Image used to create one or more selvage images<br><br>**Total Royalties:  $2000** |
| DTX 74; see also DTX 129 | May 29, 2007 | Landov LLC<br><br>**Postal Service** | Copyright:<br>Photograph of Eric Sevareid<br><br>Postage stamp, philatelic products | Photo Philatelic Agreement<br><br>Image used to create a stamp image<br><br>**Total Royalties:  $4000** |

### D.    Postal Service's Licenses of Its Intellectual Property to Others (Postal Service's Out-Licenses)

| Record | Date | Licensor / Licensee | Licensed Work / Goods Produced Subject to Royalty | Agreement Title / Summary of Terms / Total Royalties Paid |
|---|---|---|---|---|
| PTX 157 | Aug. 1, 2012 | **Postal Service**<br><br>The Vintage Sign Company | Trademarks and Copyrights:<br>Select/Approved Postal Service logos and stamp images<br><br>Metal decorative signs | License Agreement<br><br>Licensed IP used for metal decorative signs<br><br>**Total Royalties:  8% of net sales** |
| PTX 158 | Aug. 1, 2012 | **Postal Service**<br><br>White Mountain Puzzles Inc. | Trademarks and Copyrights:<br>Select/Approved Postal Service logos and stamp images<br><br>Puzzles | License Agreement<br><br>Licensed IP used for puzzles<br><br>**Total Royalties:  5% of net sales for wholly controlled IP; 3% for jointly controlled IP** |
| PTX 195 | Jan. 1, 2015 | **Postal Service**<br><br>MBI, Inc. | Trademarks and Copyrights:<br>Select/Approved Postal Service logos and stamp images<br><br>Gold foil replicas of USPS stamp designs | License Agreement<br><br>Licensed IP used for gold foil replicas of USPS stamp designs<br><br>**Total Royalties:  5% of net sales** |