## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| ROBERT S. DAVIDSON, d/b/a PlasterTech,<br><br>                    Plaintiff<br>     v.<br><br>THE UNITED STATES,<br>                 Defendant. | 13-942 C<br>Judge Eric G. Bruggink |

## PLAINTIFF'S REPLY BRIEF

James J. Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
Todd L. Bice, Esq., Bar No. 4534
TLB@pisanellibice.com
Debra L. Spinelli, Esq., Bar No. 9695
DLS@pisanellibice.com
Dustun H. Holmes, Esq., Bar No. 12776
DHH@pisanellibice.com
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada   89101
Telephone:  702.214.2100
Facsimile:  702.214.2101

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................... *i*

**TABLE OF AUTHORITIES** ............................................................................................ *ii*

**I.**    **INTRODUCTION** ................................................................................................1

**II.**    **ARGUMENT** ....................................................................................................8

      **A.**    **Mr. Davidson is Entitled to Protection, the USPS Infringed, and its Use was Not Fair** ......................................................................8

      **B.**    **The USPS's Position on Damages Ignores the Law and the Evidence** ...........

**III.**    **CONCLUSION** ................................................................................................17

**CERTIFICATE OF SERVICE** ........................................................................................18

## TABLE OF AUTHORITIES

**Cases**

*Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 797 (8th Cir. 2003) ..................................... 15

*Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 (Fed. Cir. 2014) .............................. 14

*Bouchat v. Baltimore Ravens Football Club*, *Inc*., 346 F.3d 514, 523 (4th Cir. 2003) ............... 15

*Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir.2001) ............................................................ 8

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282,

  113 L.Ed.2d 358 (1991) ...................................................................................................... 2, 4

*Gaylord v. United States*, 777 F.3d 1363, 1372 (Fed. Cir. 2015)......................................... passim

*Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116,

  1136 (S.D.N.Y.1970) ............................................................................................................ 16

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999)................................................... 9

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012) ............... 15

*Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 520 (7th Cir. 2009)..................................... 2

## I.    INTRODUCTION

The United States Postal Service ("USPS") offers very little to the substantive issues the Court must decide. This Court knows the extensive evidence presented at trial. That evidence confirmed that Mr. Davidson has an enforceable copyright in his creation, the USPS infringed, and the USPS's use was not fair. That leaves the amount of damages for determination.  And on that front, the USPS fails to offer any argument that is remotely compelling.

According to the USPS, despite exploiting Mr. Davidson's intellectual property, generating nearly $4 billion in revenue, and receiving nearly $140 million in pure profit, Mr. Davidson is entitled to no more than $10,000. The USPS does not believe it should be held accountable as similar infringers would be in the marketplace. Rather, the USPS claims that its monopoly grants it a license to steal from copyright holders. Fortunately for Mr. Davidson, the law provides that he is entitled to the fair market value of a license covering the USPS's infringing use. The USPS proposal is not tied to the fair market value. Instead, it rests on the untenable proposition that the USPS purportedly controls the market and thus it should never have to pay more than an artificial amount it prefers.  Of course, if that were actually the law, the USPS could simply steal anyone's copyright and claim that it has predetermined that the maximum price it will pay is never more than $10,000.  That is the same untenable position that the USPS took in *Gaylord***Error! Bookmark not defined.**.

But under the actual law, Mr. Davidson has ample enough evidence to support the fair market value of a license covering the USPS's infringing use, and the USPS cannot simply ignore that evidence in favor of its own proposed alternative, one where the USPS simply sets the price that everyone must accept regardless of the actual marketplace.

## II.   ARGUMENT

### A.   Mr. Davidson is Entitled to Protection, the USPS Infringed, and its Use was Not Fair.

#### 1.   *Mr. Davidson's creation is entitled to copyright protection.*

The evidence confirms that Mr. Davidson's Statue contains sufficient non-trivial differences that make it distinguishable from Lady of Liberty in New York. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)( As a constitutional and statutory matter, "[t]he sine qua non of copyright is originality" and emphasizing the "requisite level of creativity is extremely low, even the slight amount will suffice."); *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 520 (7th Cir. 2009)(the "originality required for copyright in a derivative work is the same as that required for copyright in any other work.").

After all, USPS's key personnel have all admitted that Mr. Davidson's Statue contains noticeable differences. *See* Tr. 773:10-21 (McCaffery); PTX 85; PTX 37. Indeed, according to the USPS "it's quite apparent" that the image of Mr. Davidson Statue was not of the New York Statue of Liberty as Mr. Davidson's Statue was "very different from anything [the USPS] had done before." PTX 85; PTX 37; PTX 110; PTX 244.  Despite these admissions, the USPS now contends for *litigation* purposes that Mr. Davidson has failed to prove he is entitled to copyright protection.

Contrary to the USPS's insinuation, the record is replete with "objective evidence" showing Mr. Davidson set out to create an original work of authorship, including the USPS' pre-litigation admissions.   As Mr. Davidson testified at trial, he was responsible for the exterior design, sculpting, and coating of the Statue. Tr. 93:1-22 (Davidson). Indeed, while the USPS points to the proposal Mr. Davidson submitted to RDC for the purported notion that "he was simply hired to work on a scaled replica," neither the word "replica" nor any reference to Mr. Davidson creating

an "exact replica" of the Statue of Liberty exist in the proposal. *See* JTX 8. Moreover, Mr. Davidson was never provided a scaled model to replicate. *See* JTX 8; Tr. 96:23-97:17 (Davidson). Instead, Mr. Davidson exercised his creative license and built his own maquette. *See* Tr. 94:14-95-8; 129:20-131:6; 232:3-233:15 (Davidson).  The maquette, in and of itself, is objective evidence supporting Mr. Davidson's testimony.

Likewise, Mr. Davidson created his own dimensioning graph of his vision for the Statue's face. Tr. 107:9-108:7; PTX 236_013. Again, objective evidence supporting Mr. Davidson's testimony that he "wasn't trying to duplicate something else." Tr. 130:17-131:6 (Davidson). Indeed, in sculpting the facial features of the statue, Mr. Davidson drew inspiration from his mother-in-law. Tr. 163:4-11 (Davidson). Confirming his intent, Mr. Davidson affixed a plaque to the crown of the statue dedicating his creation to his mother-in-law, who passed away during the creative process. *See* Tr. 176:25-181:24 (Davidson); PTX 233-296; PTX 233-297; Stip. Fact at ¶¶12-13.  The USPS simply cannot ignore this objective evidence because it is contrary to its interests.

Nor is Mr. Davidson's assertion "contradicted" by his own testimony, as suggested by the USPS. Mr. Davidson explained that his statue had to be a representative of the Statue of Liberty to a certain extent, but that he was also given artistic license to recreate his own vision of the Statue of Liberty for the new hotel in Las Vegas. *See* Tr. 162:17-163:3; 163:22-166:18; 168:3-176:24 (Davidson). In fact, as Mr. Davidson explained it would have been impossible for him to recreate the Statue of Liberty. *See* Tr. 232:21-25 ("I can't recreate it. You know, I can't be accurate. I can give the feel of the Statue of Liberty, but I can't recreate it."). Because Mr. Davidson set out to create his own interpretation, and an entirely different face, he acknowledged he could not explain all the difference:

THE COURT:  When you were working from the maquette to file on the head, did you have somewhere a picture of the original face or some way to refer back to photographs of the actual statue?

THE WITNESS:  Well, you know, we definitely -- I definitely had to look at pictures of the original statue.  There was no ifs, ands or buts about that.  But after the go-around that we had with the feet and I couldn't get the information, we made the decision that I just had to move forward and do what I thought was appropriate.  Sure, I looked at pictures of the face. And I can't tell you exactly what the differences are. I just -- I did what I felt was appropriate.  I did what I thought was a little more modern, a little more feminine.  And to be honest, I can't tell you all the details, that the nose is turned up a little bit more, the eyebrows are higher or lower.  I can't tell you that based on what the real statue looks like.  Unless I held the pictures side by side or overlapping or something, it's hard for me to describe those.  I can tell you what mine looks like, but I can't tell you all those little 4 nuances or different areas of the real statue.

BY MR. BICE:

Q.  Well, Mr. Davidson, getting to that point, so did you have a picture of the real statue and then decide that you were going to tweak the nose or tweak the eyes or tweak the mouth or any of that?

A.  No, I never, ever -- this was an entirely different face.  It just took on a life of its own, to be honest.  I wasn't going to try and make the eyes further apart or nose bigger or smaller.  It all had to be in proportion and it all had to fit in the general feel and size of the maquette that I had and then do the fine-tuning when it was in full scale

Tr. 169:8-170:16 (Davidson). That is the the quintessential definition of originality. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

Mr. Davidson's original contributions, specifically to the face of his creation, are visible from a comparison to the Statue of Liberty.[1] Contrary to the USPS's assertion, Mr. Davidson has not "prohibited" the Court from performing a comparison.[2] Indeed, as the Court will recall during

---

[1]    The USPS also forgets that Mr. Keller, a supervisory park ranger for the National Park Service, who was purportedly intimately familiar with the Statue of Liberty could instantly tell Mr. Davidson's Statue was not the Statue of Liberty by simply looking at an image. *See* Tr. 1470:21-1471:5 (Keller)(showing him PTX 233_312).

[2]    The USPS makes much ado over Mr. Davidson's citation to PTX 243. Mr. Davidson was not citing to this exhibit for the inadmissible portions. Moreover, it was agreed this exhibit could be used to show the USPS had knowledge of the difference, then subsequently admitted it would have used Mr. Davidson's creation anyways.

trail, Mr. Davidson provided the following testimony on the distinctions between the face of the Statue of Liberty and his creation:





| PTX 231_17 (cropped for purposes of briefing) | PTX 233_17 (cropped for purposes of briefing) |
|---|---|

Q. Can you tell the difference between the two statues, Mr. Davidson?

A. Well, there's a lot of difference. I mean, I could see a lot more, I guess, if I overlaid things. But to me, looking at this, definitely the face is a little more angular. The nose is more angular on the statue in New York. The bottom lip has definitely got a different shape to it. It had more of a defined angle over her eyebrows, I guess, coming in above her eyes. Definitely a harder chin line. The chin looks to be a little more pronounced to me possibly. Possibly higher cheekbones on the real statue. We've got a difference in the shape of the ears.

*See* Tr. 186:21-187:8 (Davidson)

Nor did Mr. Davidson "disavow" the explanations of the copyrightable differences submitted with his copyright applications. Instead, as the testimony reflects, Mr. Davidson explained he set out to do something different and the result was an entirely different face. *See* Tr. 173:1-175:24 (Davidson). The USPS attempts to distort Mr. Davidson's testimony is unavailing. Indeed, Mr. Davidson expressly disputed that any difference in the appearance of the statues was simply the result of the type of material used in his creation:

Q. And as a result of those different materials, did you know the appearance would be different?

A. No. The materials had nothing to do with the appearance. I mean, you are going to have a different seam and look because of the way copper works, copper sheets. But the proportions of it, the finish isn't going to make – the type of material used isn't going to make a dramatic change in the appearance of the sculpture.

Tr. 227:5-24 (Davidson). The difference in the appearance between the two Statues is the result of

Mr. Davidson's artistic vision.

### 2. The USPS infringed upon Mr. Davidson's rights.

The USPS' sole defense to actually copying and reproducing Mr. Davidson's work is based

upon the purported idea that Mr. Davidson "cannot establish that any elements of the [his Statue]

are protectable expression." ECF No. 131, Pg. 22, ¶2. Yet, as discussed above, the evidence

submitted at trial clearly shows the portions of Mr. Davidson's Statue copied by the USPS without

any alterations, *i.e.* the face/head and crown portion of the Statue, contains sufficient non-trivial

differences warranting protection. *See Supra* Section II.A.1.

Nor is there any support in the law or fact for the USPS contention "that any differences

copied in the stamp were objectively insignificant." ECF No. 131, Pg. 22, ¶3. As an initial matter,

it is entirely unclear what the USPS is referring to when it states any differences copied in the

stamp is "objectively insignificant." There is no dispute that there is no differences between

Mr. Davidson's Statue and the infringing stamp image. After all, it is an unaltered photograph of

Mr. Davidson's Statue. Indeed, as the evidence showed at trial, the infringing stamp image looked

identical to a picture Mr. Davidson took of his Statue back in 1996. *See* Tr. 188:5-192:11

(Davidson); *See also* PTX 233_312_313 compared with PTX 241.

Moreover, the USPS fails to provide any law from anywhere supporting some unknown

"objectively insignificant" standard. Nonetheless, the USPS pre-litigation admissions concede that

"it's quite apparent," the image was a photograph of Davidson's Statue and not of the original.

6

PTX 85, PTX 244. Indeed, the USPS has admitted that these difference were precisely the appeal of Mr. Davidson's Statue. As stated in their own words, the image USPS "selected was very different from anything we've done before. That was its appeal . . . there are only so many ways to continue to re-interpret an iconic image." PTX 37.  That USPS must ignore its previous admissions is telling.

### 3.      The USPS' use was not fair.

Mr. Davidson will not belabor the point in reply on the USPS' purported fair use defense. The USPS has fallen woefully short in proving its use was fair and the great weight of the evidence submitted at trial disproves any notion of fair use.

*First*, in reply, the USPS concedes, by omission, that there was nothing transformative about its use of Mr. Davidson's Statue. It simply copied and pasted an image of Mr. Davidson's creation onto a stamp because Mr. Davidson's creation is more appealing and attractive – a fact repeatedly conceded by the USPS prior to litigation. Likewise, the USPS does not dispute that its own expert conceded at trial that its use was for commercial purposes. *See* Tr. 1636:11-18 (Bokhart).

*Second*, the USPS seems to suggest that the second and third factors tilt in its favor because Mr. Davidson's work is not creative in nature. Yet, its prior admissions show otherwise. Recall, the USPS has admitted and told nearly anybody who inquired – the press, the public, the Postmaster General, and Congress – that they loved Mr. Davidson's reinterpretation of the Statue of Liberty so much so that they would have selected it anyway, and its appeal was that it was different. *See* PTX 85, PTX 37, PTX 244, Tr. 420:12-421:22 (Betts); PTX 109; PTX 110 ("We love this treatment of Lady Liberty. We wanted to do something differently."); PTX 121; PTX 131; PTX 133, PTX 104, PTX 151.

As the USPS has already confirmed, Mr. Davidson's artistic work is inherently creative in nature and the use of a great majority of his work's protectable creative modifications for commercial purposes does nothing to further the goal of copyright.

**B.     The USPS's Position on Damages Ignores the Law and the Evidence.**

*1.     Mr. Davidson damages are not "unduly speculative."*

Despite capitalizing on the attractiveness of Mr. Davidson's design to the tune of nearly $140 million in pure profit, the USPS proclaims Mr. Davidson is entitled to "no more than . . . $750," or alternatively "a lump-sum payment of $10,000," because Mr. Davidson's damages are purportedly "unduly speculative."   Yet, contrary to the USPS's position, Mr. Davidson's lack of a licensing history does not foreclose his damages claim. *See Dash v. Mayweather*, 731 F.3d 303, 325 (4th Cir. 2013)(evidence of prior licensing is not required); *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014). As the *Oracle* Court explained:

> For example, posit a songwriter who has consistently refused to license her work for use in advertising. A fast-food chain nonetheless uses one of her songs in a nationwide television campaign. If the rule were as SAP proposes, the songwriter could not recover hypothetical-license damages for the infringement even if she could demonstrate that other songwriters charge $200,000 to license comparable songs for such use.

*Oracle Corp.*, 765 F.3d at 1087–88. Otherwise, first-time licensors would never be able to recover. As the law provides, "between leaving the victim of the illegal taking with nothing, and charging the illegal taker with the reasonable cost of what he took, the latter . . . is the preferable solution." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir.2001). Moreover, the USPS' own expert agreed, testifying at trial that Mr. Davidson's lack of licensing history does not mean he is not entitled to compensation or a running royalty rate. *See* Tr. 1768:6-14 (Bokhart).

Nor is Mr. Timmins' opinion on damages speculative.  It is based upon sufficient facts and data. As courts have noted, it is typical for parties to rely upon expert testimony when dealing with

a hypothetical negotiation. *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010), aff'd, 564 U.S. 91, 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011). As Mr. Timmins' testified regarding his opinions, he relied upon trade publications, full text agreements, data on licensing agreements from a database typically used in  the industry, the USPS's licensing agreements, the *Gaylord* decision, and his more than thirty-five years of experience of actually negotiating licensing agreements.[3] *See* Tr. 1384:6-17 (Timmins).

Based upon this information, Mr. Timmins testified that comparable artwork ranged with royalty rates from low of 2.5% to a high of 10.0%, with a mean of 6.5%, a median of 7.0%, a bottom quartile of 4.0%, and a top quartile of 8.5%. *See* Tr. 1211:6-1221:1 (Timmins). The USPS does not dispute that these rates reflect the comparable licensing rates in the market place for artwork. Nor could it, since its own expert agreed. *See* Tr. 1684:5-13 (Bokhart). Instead, it claims these licensing agreements and data are not comparable to the "accused use." But as discussed below, the USPS's attempts to define the market place as its own past licensing agreements is simply not the law. *See Infra* Section II.B.2.

The USPS also proclaims Mr. Timmins' reliance upon *Gaylord* is unjustified. Yet, courts have permitted such reliance to establish a reasonable royalty damage under certain circumstances. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 871-872 (Fed. Cir. 2010). Moreover, given the unique facts at issue, the Court's decision awarding a running royalty rate in *Gaylord* is certainly relevant to rebut the USPS's position that it never enters into such arrangements. The USPS's argument that Mr. Timmins' failed to "apportion" is equally unconvincing. The USPS cites

---

[3]     As the Court knows, Rule 702 permits an expert to draw conclusions based primarily on experience. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")

no case law to support the notion that Mr. Davidson must prove the impossible, *i.e.* at the time of a hypothetical negotiation a specific percentage of individuals were going to retain the stamp simply because Mr. Davidson's creation. The Gaylord Court also rejected the USPS attempts to apply apportionment in that case. *See Gaylord v. United States*, 777 F.3d 1363, 1372 (Fed. Cir. 2015). The image containing Mr. Davidson's Statue presumably was selected with the ultimate goal of increasing the value to the USPS in the form of profit, sales, and/or its image. That is the premise the parties would have negotiated at the time of a hypothetical negotiation.

Ironically, although the USPS concedes in one portion of its brief that attribution is the reason rights-holders "eagerly" enter into a lump-sum license (*see* ECF No. 131, Pg. 35, ¶2), it maintains that Mr. Davidson's "alleged lack of attribution is similarly mistaken." (*Id*. at Pg. 32, ¶2). In any event, the evidence submitted at trial shows all agreed attribution has a significant value. Moreover, it is entirely impossible for Mr. Davidson to prove a negative as the USPS insinuates. Having been denied the lack of attribution for use of his creation, there is no way for Mr. Davidson to prove the value other than that it would have been factor leading to a running royalty rate at the time of a hypothetical negotiation.

### 2.    *The party misidentifying the "market" is the USPS.*

The USPS also complains that Mr. Davidson's damages analysis as presented by Mr. Timmins "misidentifies the relevant market." According to the USPS the relevant market is only artwork on stamps, *i.e.* the USPS.  Conveniently then, the USPS never has to pay any royalty greater than the amount it wants to pay, because it is the only buyer in that narrowly-defined market.   Recall, this is the very position relied upon by the USPS's expert, Mr. Bokhart.[4]

---

[4]    Mr. Bokhart admitted at trial that he only had one real negotiation experience outside of litigation nearly twenty years ago. Tr. 1562:17-1563:24 (Bokhart).

Tr. 1635:4-11 (Bokhart).  But, Mr. Bokhart agreed that in the real-world marketplace for artwork, typical royalty rates range from 6% to 10%. *See* Tr. 1684:5-13 (Bokhart). Yet, despite this acknowledgment, Mr. Bokhart admitted he simply ignored these real-world-market-based rates. Tr. 1700:7-10 (Bokhart). Accepting the USPS' position, he simply proclaims that the only relevant market is the USPS itself.  The flaw in this approach is obvious.

As in *Gaylord*, USPS "cannot insulate themselves from paying for the damages they caused by resting on their past agreements and by creating internal policies that shield them from paying fair market value for what they took." *Gaylord*, 678 F.3d at 1343-44**Error! Bookmark not defined.** (internal quotations omitted). Yet, if the Court were to agree with the USPS's position, then the result would be exactly what the *Gaylord* Court found to be inappropriate. Specifically, the *Gaylord* Court reject the USPS's position, finding the relevant market was not limited to artwork for the USPS on stamps. In fact, in remanding to the lower court for reconsideration the Court found that licensing agreements for artwork in the marketplace is an important consideration. *Id.* at 1344 (finding relevant Mr. Gaylord's licensing agreement on "various collectibles, such as miniatures and t-shirts" and the USPS's licensing agreements to third parties for us on retail goods). As *Gaylord* says, the relevant market is not, and cannot, be what the USPS prefers to pay.

### 3.     *The USPS's "lump-sum license agreements" are not comparable.*

For similar reasons, the USPS's position that its "lump-sum license agreements" are comparable to a hypothetical negotiation is unsupportable. The USPS concedes that attribution is often the reason "rights-holders eagerly negotiate" lump-sum licenses agreements with the USPS. In fact, as Mr. Bokhart conceded all of the purported "comparable" licensing agreements he relied upon involved the rights holder receiving that valuable attribution. *See* Tr. 1685:15-1686:2

(Bokhart). Here, of course, both experts agreed the hypothetical negotiation between the parties would have been based upon no attribution being given to Mr. Davidson for the use of his copyright. *See* Tr. 1209:13-25 (Timmins); Tr. 1671:11-1672:20 (Bokhart). Mr. Timmins explained he was unaware of any situation where a party took a nominal flat fee license and received no attribution. *See* Tr. 1210:1-15 (Timmins).

Nor did the USPS present any licensing agreement where a copyright holder agreed to take a nominal flat fee license and receive no attribution. Indeed, the evidence submitted actually shows that this sort of indirect economic benefit is one of the principal reasons a rights holder – who typically negotiates royalty rates – agrees to a lump-sum license. *See* Tr. 1671:11-25 (Bokhart). Because the hypothetical negotiation here is premised upon the lack of indirect economic benefit to Mr. Davidson, the hypothetical negotiation would have resulted in direct monetary royalty as the primary compensation for licensing. *See Gaylord v. United States*, 777 F.3d 1363, 1371 (Fed. Cir. 2015)(indicating that where indirect economic benefits are not a part of the hypothetical negotiation, direct monetary royalty is the primary form of compensation).

Not only are the lump-sum licenses incompatible because they fail to account for the lack of indirect economic benefit, they also deal with licensing for photography rather than the underlying copyrighted material. As Mr. Bokhart testified at trial, none of the purported comparable licenses he used in his analysis involved obtaining a license for the underlying copyrighted material. *See* Tr. 1730:17-1731:9 (Bokhart). Much like the *Gaylord* Court found, the evidence submitted at trial justifies a finding that these purported comparable licensing agreements reflecting a lump-sum fee are of "limited probative value." *Id*. The USPS failure to point to any past similar licensing situations is again revealing.

**4.    *The evidence shows the USPS had no reasonable alternatives.***

As the USPS concedes "alternatives available to a potential licensee provide an important constraint in a hypothetical negotiation." *Gaylord*, 777 F.3d at 1370. Yet, other than its after-the-fact statements that it could have selected another image, the USPS presented no actual evidence that any alternatives were available. Indeed, the actual evidence contradicted the USPS's self-serving assertion. As Mr. Gicker, and others from the USPS testified, at the time of the negotiations, the USPS had already went through its internal process to have the imaging of the stamp approved with no reasonable alternatives available to meet the impending issuance deadline for the holidays. *See* Tr. 963:9-964:24 (Gicker). For example, while the USPS says in its post-trial brief it could have simply continued using the Liberty Bell stamp, the evidence at trial showed that the USPS wanted to phase out the this stamps as the public wanted something new and the long run of this stamp was causing issues for the USPS finance department. *See* Tr. 847:22-848:3, 960:20-961:12 (Gicker); Tr. 735:7-736:24 (McCaffery).

Moreover, the USPS's assertion only confirms the USPS's belief as to the uniqueness of Davidson's work. According to the USPS it purportedly had a plethora of alternative images to choice from, yet as the evidence shows it ended up selecting Mr. Davidson's creation precisely because it was something attractive, different and unique. *See* Tr. 765:24-772:25 (McCaffery); PTX 85; PTX 37. Even after it had purportedly learned it was an image of Mr. Davidson's Statue, the USPS repeatedly stated that they loved Mr. Davidson's reinterpretation of the Statue of Liberty so much they would have selected it regardless. *See* PTX 85, PTX 37, PTX 244, Tr. 420:12-421:22 (Betts); PTX 109; PTX 110 ("We love this treatment of Lady Liberty. We wanted to do something differently."); PTX 121; PTX 131; PTX 133, PTX 104, PTX 151.  It even admitted that the stamp

depicting Mr. Davidson's creation was very popular. PTX 118. Only now that Mr. Davidson seeks the fair market value of the license covering the infringing use of this unique work does the USPS conveniently assert it would not have selected the image depicting Mr. Davidson's Statue. This assertion is nothing more than litigation posturing, one unsupported by evidence and contradicted by the USPS' pre-litigation admissions.

Next, the USPS implies that because it purportedly operates at a loss it could have not agreed to pay a running royalty.  Of course, the law refutes this notion as "the royalty the particular infringer could profitably pay by going about its business in its particular way does not set the market value that the hypothetical negotiation aims to identify." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 (Fed. Cir. 2014). Moreover, as the USPS's own expert admitted, "Mr. Davidson shouldn't be forced to accept a low royalty just because the Postal Office has said, I'm not making money." Tr. 1646:19-21 (Bokhart).

### 5.   *A properly constructed hypothetical negotiation should not exclude all revenue source.*

The USPS argues that if the Court concludes Mr. Davidson is entitled to a running royalty, it should exclude from the hypothetical negotiation stamps used to send mail and the conveyed Flag stamp. According to the USPS no amount - whether a one-time fee or ongoing royalty – should be included on these revenue sources.  Respectfully, the USPS' efforts to exclude significant revenue sources is unsupported by any evidence or actual law.  There is no basis to believe that a copyright holder would agree, as part of the hypothetical negotiations, to exclude major lines of revenue from the use of their copyright.

In advancing its theory on stamps used to send mail, the USPS contends that used stamps should be excluded because Mr. Davidson failed to submit evidence of "causation." Yet, contrary to the USPS's position, the *GaylordError! Bookmark not defined.* Court made no finding that a

14

plaintiff must submit "evidence of causation." Instead, the Court stated that in determining between an ongoing royalty or a one-time fee for stamps used for mail, the "court may consider evidence regarding whether people used the stamp at issue specifically because it featured" the image or "whether the stamp's value is primarily attributable to its ability to send mail rather than to the image it depicts." G*aylord v. United States*, 678 F.3d 1339, 1344 (Fed. Cir. 2012). Mr. Davidson was not required to put stamp purchasers on the stand to testify that they bought the stamps only because of Mr. Davidson's image. *See Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 797 (8th Cir. 2003). The Court should reject such an unsupported notion.

Nor is the USPS' reliance upon a Fourth Circuit opinion remotely compelling. In *Bouchat*, the Fourth Circuit was concerned about the holder of a copyright being able to recover from profit streams unrelated to the infringement. *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 523 (4th Cir. 2003). This sort of analysis is typically required when a copyright holder seeks "indirect profits," which is when plaintiff seeks a percentage of the entire profits from the infringer's operations, including operations unrelated to the infringement.  Here, Mr. Davidson is not seeking "indirect profits" in any sense of the word. Instead, he seeks a license upon only the revenue sources related to the infringement of his copyright, the very revenue sources that would have been addressed in the hypothetical negotiation.

For similar reasons, the Court should reject the USPS attempts to exclude half of the revenue source.  The USPS insinuates that Mr. Timmins doubled the royalty by including the Flag stamp because purportedly no evidence shows the image of Mr. Davidson's creation "drove consumer demand" for the Flag stamp.  As an initial matter, the USPS relies upon a patent law concept known as the "entire market value rule," which provides "patentees may not calculate damages based upon sales of a multi-component product unless the patentee shows that the

demand for the entire product is attributable to the patented feature." *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012). It provides an exception to the general rule that "[w]here small elements of multi-component products are accused of infringement," the royalty base is generally based upon "smallest salable patent-practicing unit." *Id*. at 67. The USPS' failure to cite any case law that applies this concept outside the patent context is notable.

Nonetheless, even in the patent context, the entire market value rule does not apply where, as here, the protected feature is coextensive with the product. *See Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1136 (S.D.N.Y.1970) (expressly refusing to apportion damages based on unpatented decorative elements because the patented functional features and the decorative elements were coupled in an indivisible union of form and function). Without obtaining a copyright in Mr. Davidson's creation, the USPS would have been unable to sell any of the stamps at issue, as the Lady Liberty stamp and the Flag stamp were sold in pairs. A consumer could not buy the Flag stamp without buying the stamp depicting Mr. Davidson's Statue. Accordingly, to obtain any of those revenues or profits legitimately, the USPS would have had to have a license with Mr. Davidson for his statue.

Mr. Davidson is entitled to the fair market value of a license covering the USPS's infringing use as discussed in his post-trial brief and the Court should reject the USPS attempts to exclude large portions of the revenue source from the hypothetical negotiation. There is no evidence that a copyright holder would have agreed to exclude major sources of revenue from the royalty.

## III.    CONCLUSION

Mr. Davidson has proven he is entitled to copyright protection, there is no dispute the USPS

infringed, its use was not fair use, and Mr. Davidson is entitled to damages in the amount set forth

in his post-trial brief.

DATED this 2nd day of March, 2018.

PISANELLI BICE PLLC


By:      /s/ James J. Pisanelli
        James J. Pisanelli, Esq., Bar No. 4027
        JJP@pisanellibice.com
        Todd L. Bice, Esq., Bar No. 4534
        TLB@pisanellibice.com
        Debra L. Spinelli, Esq., Bar No. 9695
        DLS@pisanellibice.com
        Dustun H. Holmes, Esq., Bar No. 12776
        DHH@pisanellibice.com
        PISANELLI BICE PLLC
        400 South 7th Street, Suite 300
        Las Vegas, Nevada   89101
        Telephone:  702.214.2100
        Facsimile:  702.214.2101

        *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am an employee of Pisanelli Bice PLLC, and that on this 2nd

day of March, 2018, I caused to be served through the Court's Electronic Filing System true and

correct copies of the foregoing **PLAINTIFF'S REPLY BRIEF** to the following:


CHAD A. READLER
Acting Assistant Attorney General

GARY L. HAUSKEN
Director, Intellectual Property Staff

SCOTT BOLDEN
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington, DC  20530

REDDING C. CATES
NAN K. McKENZIE
United States Postal Service
Washington, DC  20260-1101


                                                /s/ Kimberly Peets
                                 An employee of Pisanelli Bice PLLC