# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

No. 13-942C
(Filed: June 29, 2018)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| ROBERT S. DAVIDSON<br><br>                         Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>                         Defendant, | Copyright infringement; 28 U.S.C. § 1498(b)**;** Originality; Fair use; 17 U.S.C. § 107; Flat fee license; Running royalty; Mixed license. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*James J. Pisanelli* and *Todd L. Bice*, Las Vegas, Nevada, with whom were *Debra L. Spinelli* and *Dustun H. Holmes*, for plaintiff.

*Scott Bolden*, Deputy Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, with whom were *Chad A. Readler*, Acting Assistant Attorney General, and *Gary L. Hausken*, Director, for defendant. *Lee L. Perla* and *Alexa Hanna*, Department of Justice, and *Redding C. Cates*, United States Postal Service, of counsel.

## OPINION

BRUGGINK, *Judge*.

This is an action for copyright infringement brought by Robert Davidson, the sculptor of the Lady Liberty replica statue in front of the New York-New York Hotel & Casino in Las Vegas, Nevada, against the United States, acting through the United States Postal Service ("Postal Service," or "USPS"). A two week trial was held in September 2017. Post-trial briefing is now complete, and post-trial argument was held on May 1, 2018. Because we find that Mr. Davidson's work was original and because the Postal Service's use of it was not permitted by statute, he is entitled to compensation in the amount of $3,554,946.95, plus interest.

BACKGROUND

Plaintiff fabricated a replica of the Statue of Liberty on the grounds of the New York-New York Hotel & Casino in Las Vegas in 1996.  He applied for and obtained a copyright for the replica in 2013, too late for the statutory presumption of validity.  It is also undisputed that the Postal Service used a photograph of that work on a stamp released in December 2010 without permission or attribution ("Lady Liberty stamp").  Plaintiff now seeks compensation for that use under 28 U.S.C. § 1498(b) (2012).

Defendant answers that plaintiff's work is too similar to the original in New York Harbor and that the government's use copied nothing original to plaintiff.  Defendant also presents the defense of fair use under 17 U.S.C. § 107 (2012).  We rejected on summary judgment a defense under section 120(a), which exempts pictorial representations of architectural works. *Davidson v. United States*, No. 13-942C, 2017 WL 3033774 (Fed. Cl. July 18, 2017).  The questions for trial were thus whether the Las Vegas Lady Liberty is sufficiently original to be afforded copyright protection, whether the government's use was infringing, and, if so, whether it was otherwise excused as fair use under 17 U.S.C. § 107.  The final question, if there was originality, infringement, and no fair use, is the measure of compensation owed plaintiff.

Trial told the story of how Mr. Davidson was contracted to create the replica and then his actual process of creating the statue that sits on the corner of Las Vegas and Tropicana Boulevards in Las Vegas, Nevada.  The narrative then shifted to the Postal Service's selection and use of that image for its new 2011 "workhorse" Forever Stamp, followed by the events that happened after the use of Davidson's statue was discovered in 2011.  The third act consisted of the presentations of experts who offered opinions on the merits of the stamp among collectors and, most centrally, what the government would have paid for such a use of plaintiff's work had the parties negotiated beforehand at arm's length under normal market conditions.  We received testimony from the following witnesses:

1.  Plaintiff Robert Davidson primarily testified about his background in working with large-scale plaster work and sculpting, including his actual means and method when sculpting the Las Vegas Lady Liberty at issue.

2.  Roy Betts is a USPS senior public relations representative.  He testified regarding his public statements after the identity of the Lady Liberty

2

image was publically discovered, and other internal communications regarding that issue.

3.     Shawn Quinn is the USPS program manager for technology acquisition.  He testified regarding his experience at the Postal Service, the process of manufacturing the stamps at issue, USPS's decision to continue using the Lady Liberty stamp after the identity of the sculpture was discovered, and other background information.

4.     Joe Stratton is the Postal Service's manager of technical analysis, accounting, and finance.  He testified regarding his postal experience as it relates to the sale of stamps, USPS accounting procedures as they relate to the sale of stamps, and any profits derived therefrom.  He also testified more specifically about the sale of the stamps at issue in this case and how they were accounted for.

5.     Terry McCaffrey was the former manager of stamp development at USPS.  His testimony was heard via taped video deposition.  He testified about the Postal Service's process in selecting the image of Mr. Davidson's work as well as the approval and finalization of that image.  He was also asked why a flag-bearing stamp was married to the Lady Liberty stamp, about stamp classifications, and to provide other background information about relevant Postal Service processes and contractors.

6.     William Gicker is the Postal Service's current manager of stamp development and was, at the time of the events discussed during trial, the "creative director for stamps." Tr. 812.  He testified regarding the selection of the image of Mr. Davidson's statue, the process in finalizing that selection and placing it on the stamp, and the expected sales of such a stamp.  He was also asked about USPS policies and procedures regarding the intellectual property of the images that the Postal Service uses on its stamps and any resulting licenses.

7.     Amity Kirby is the USPS senior licensing specialist.  She testified regarding her experience licensing out stamp images for third party use.

8.     Jim Timmins is a business valuation expert with particular expertise in the valuation of intellectual property.  He testified as plaintiff's expert on the proper measure of damages, offering his prior experience in valuing the licensing of intellectual property and his valuation of a hypothetical license between plaintiff and USPS.

9.  Bruce Isaacson is an expert in market research and public surveys. He informed the court of the results of a 2016 survey that he conducted related to public customer behavior in retaining, or not, the Lady Liberty stamp.

10.  David Keller is the supervisory park ranger for the National Park Service at the National Mall in Washington, DC, and was a park ranger at the Statue of Liberty from 2004 to 2011.  He was offered as a records custodian for photographs of the New York statue.  Those photographs ultimately were not admitted into evidence.

11.  Daniel Piazza is an assistant curator of philately at the Smithsonian National Postal Museum.  He is an expert in stamp collecting and the use and history of stamps.  He testified about stamp collecting generally and his opinion regarding the popularity of the Lady Liberty stamp among collectors.

12.  Christopher Bokhart is an independent financial expert in accounting and damages relating to intellectual property.  He shared his opinions regarding the value of a hypothetical license between plaintiff and USPS, had one been agreed to before the events in question.

13.  Sarah Handwerger is general counsel to RightsAssist, LLC, a contractor for the Postal Service.  Her testimony was accepted into evidence by way of agreed-upon designations and counter-designations of deposition excerpts.  She testified regarding the selection of the image on the Lady Liberty stamp and her and RightsAssist's role in that process.  That testimony is in evidence as Joint Exhibit 12.

14.  Sidney Brown is the Executive Director of PhotoAssist, a Postal Service contractor.  She testified regarding her efforts for USPS in obtaining rights to images that it uses on stamps.  Her testimony was presented in the form of designated deposition transcript excerpts, which are in evidence as Joint Exhibit 13.

I.  Mr. Davidson And The Las Vegas Lady Liberty

Mr. Davidson began working with plaster in the early 1970s, initially in building construction, primarily on the outside of buildings being built in the Las Vegas area, where he has lived his entire life.  He started at a company called Valley Plastering as a water boy–hosing down stucco exteriors plastered the previous day.  He worked his way up the ranks over a 16 year period, reaching the rank of executive vice president before he left the

company in 1987.  He then started his own plastering business in 1988, called PlasterTech.

PlasterTech was at first primarily subcontracted on custom residential jobs.  As he gained skill and reputation, plaintiff was tasked with interior plaster work as well.  He recalled one home in which he finished 13 fireplaces, including one that had a lion's head design.  *See* PX 4 (picture of lion fireplace).[1]  Thus began his experience as a sculptor and designer of plaster work.

Plaintiff sold his business and equipment to Ford Contracting in 1993 and began working directly for that company.  Ford was a much bigger contractor, working on large-scale commercial projects such as hotels.  As his career progressed, Mr. Davidson shifted focus to the custom design and sculpting of plaster pieces.  He explained that he used foam to create the general contours of the finished pieces, which was easier to shape and refine with a high degree of precision.  Additional materials were placed on top of the foam, including the plaster or equivalent material for the top finished layer.

One large project on which plaintiff worked at Ford Contracting was the Luxor Hotel in Las Vegas.  Mr. Davidson described his role of using plaster and stucco, both on the interior and exterior, as "theming work." In that case, it involved finishing the plaster and stucco surfaces to match the Egyptian theme of the hotel.  Tr. 67.  He and his crew finished many of these walls to mimic giant precut limestone blocks.  In doing so, he built wire templates and cutters to make the lines uniform in appearance.  Also part of the theme at the Luxor was a 110-foot-tall replica of the Sphinx in Egypt.

Mr. Davidson testified that Ford Contracting's original Sphinx sculpting subcontractor was unable to complete the face of the statue, and so plaintiff volunteered to finish it.  No finishing had been done on the face when plaintiff took over that project; only the frame stood where the face would be.  He described his finishing process.  It began with another firm making a maquette[2] based on the face of the architect, Veldon Simpson, who designed the Luxor Hotel.  After establishing some reference points on the frame, Mr.

---

[1] "PX" stands for plaintiff's exhibit; "DX" stands for defendant's exhibit; and "JX" stands for joint exhibit.

[2] A maquette is a much reduced scale model of the eventual statue.

Davidson and his crew began adhering blocks of foam, precut to roughly match the dimensions that were needed to form the face. From there, the foam blocks were filed, rasped, shaped, and sculpted as best Mr. Davidson could to match the face of the Simpson maquette. When he was satisfied with one side of the face, he would take measurements to try to match the opposite side of the face as closely as possible. He changed the face somewhat, however, to avoid an unnatural symmetry in the face. After the form was correct, the plaster and other finish materials were layered on, and the statue was painted.

It took three months to finish the face of the Sphinx with the majority of the work being done at night. During the project Davidson became acquainted with the Western Architecture firm and an individual named Tracy Jones. Plaintiff testified that it was this relationship that led him to be selected as the sculptor of the Lady Liberty statue outside of the New York-New York Hotel in Las Vegas. Mr. Jones connected plaintiff with a company known as Recreation Development Company ("RDC"), which had need of a sculptor as a subcontractor to create the statue in front of the hotel and casino. After his success with the Sphinx, Mr. Davidson was eager to take on the even larger task of the Lady Liberty.

Plaintiff bid $385,000 to do the finish work on the Statue of Liberty replica. His was the winning bid. RDC was responsible for building the structure up until the point at which the foam would be applied by Mr. Davidson. Plaintiff testified that, per the contract, RDC was supposed to have supplied a scale model for plaintiff to follow. No such model was provided to plaintiff, however. Instead he was provided only some photographs of the original, a 12-inch curio, and the architect's outline of the general shape and form of the statue, which plaintiff used for rough dimensioning. The Las Vegas statue was intended to be approximately two-thirds of the size of the original Statue of Liberty.

Davidson took many trips to his local library to view pictures of the New York statue, but no picture he found provided "the three-dimensional feel of the statue." Tr. 130. The differences in shadow and vantage point meant that no one photograph was sufficient as a working guide. Plaintiff was thus left to construct his own maquette as a guide for the larger statue, which he did. *See* PX 234 at 83-86, 7-50, 56-57 (pictures of the plaintiff sculpting the maquette). He did so by making cross-sectional slices, stacking them up and gluing them together. The maquette was finished with the same cementitious acrylic-based coating as the final large statue. The maquette was built inside a jig, which allowed plaintiff to transfer the dimensions, scaled up, to the

larger statue.  Mr. Davidson also created a dimensioning graph to further aid in getting the dimensions right.

Plaintiff began the construction of the outside of the large statue before the maquette was finished.  Although the maquette was his guide, it could not be perfectly replicated, nor did he try to copy it precisely.  The process of forming the Lady Liberty was similar to that used in building the face of the Sphinx.  Large blocks of foam were cut to rough dimension.  Plaintiff then used finer tools to sculpt the form and image he desired.  The finish materials–plaster mud and the acrylic-based coating–were also to be used to give shape to the statue.  These could be layered to supply extra depth or used to fill in unwanted negative space.  The very finest details were added by using hand rasps.

Plaintiff described the process of finishing the 12-foot-high face in this manner:

> Then it comes to the point where I go in with those fine hand rasps . . . and start to rasp it down. That's when the face starts to get some life to it and it really starts to speak to you and kind of tells you which way it's got to go. And it tells you if you do it wrong.  It really does.  You just start getting to that point to where you are satisfied with the results and you just stop.

Tr. 160.  He went on to describe how the statue began to take life for him and to evoke an emotional response:

> But then you get to this point, this is where you start giving the eyes a little life, little subtle touches on the lips and every part of it. . . . Like I said, this is the part of the sculpture, really the only part of the sculpture, that . . . starts to speak to you.

Tr. 162.

He was asked what he had in mind when creating the face:

> Well, I felt since this was going to be for a new hotel in Las Vegas, I felt it just needed to be a little more appropriate for the hotel.  I knew that the facade of the hotel would look similar to the skyline of New York, but it wouldn't duplicate it. Everything is out of proportion. . . .  It was just a feel.  And I

> just thought that this needed a little more modern, a little more
> contemporary face, definitely more feminine, just something
> that I thought was more appropriate for Las Vegas.

Tr. 162-63.  He further testified that he looked for guidance at a picture of his mother-in-law every day and that her face was a large influence in the final form of his Lady Liberty's visage.  No direction was given to him nor did anyone sign off on his design decisions.  He was given free rein to sculpt the statue so long as the theme of the New York City skyline was maintained.  His final product was, in his own words, "a little more modern, a little more feminine."  Tr. 169.  He thought that the original statue's face was "a little harsher.  It wasn't as welcoming.  It was a little more masculine."  Tr. 175.  He wanted an end result that was "softer" and "more contemporary."  *Id.*  "It's hard for me to use adjectives.  It's one of those things, you sculpt it and you do it until you think you got it right."  *Id.*

He was asked whether he made these changes to differentiate his work from the original or whether they were "just a byproduct of your design."  Tr. 174.  He replied that it was a byproduct of his design and that the specific features—"more defined eyes and eyelids or a pronounced cupid's bow shape of an upper lip"—were not specifically intended.[3]  Tr. 173.

On October 4, 1996, Mr. Davidson completed his work.  He dedicated his achievement by placing a small plaque in memory of his mother-in-law on the crown of the statue.[4]  Tr. 179; PX 233 at 296 (photograph of plaque).  The parties stipulated that Mr. Davidson's material and labor costs to build the statue totaled about $152,000, leaving him an approximate profit of $233,000 ($385,000 bid minus the $152,000 in costs).  The $385,000 that plaintiff

---

[3] Those adjectival descriptions of the face of his statue were quoted from plaintiff's copyright application file (JX 7) and were not endorsed by him on the stand.  Defendant argues that these descriptions are not evidence because they constitute attorney advocacy.  In any event, we do not rely on those statements because plaintiff did not endorse them on the stand.

[4] It reads: "In loving memory of Lucille Schwartz . . . 'This one is for you, mom.'  Sculpting completed October 4, 1996, Robert Spencer Davidson."  Tr. 180.

received for the project is comparable to other large projects that Mr. Davidson completed subsequent to the Lady Liberty.[5]

## II.  The Postal Service's Use

The Postal Service introduced the first Forever Stamp in 2007, bearing the image of the Liberty Bell in Philadelphia.  A Forever Stamp is purchased at the price of first-class postage at the time of purchase, but its value in use is always equal to the current price of one-ounce first-class postage.  Upon introduction, it quickly became the main "workhorse" stamp for USPS.  A workhorse stamp is one printed by USPS and used by the public primarily to send first class mail.  It is a high volume stamp with a high percentage being redeemed for postage.

In 2008, the Postal Service began to work on updating the image of its Forever Stamp.  Terry McCaffrey, the manager of stamp development at the time, was in charge of selecting the new image.  Both he and William Gicker, McCaffrey's eventual replacement, testified that the public was tiring of the Liberty Bell image.  Tr. 735.  McCaffrey was looking for something "different and unique."  Tr. 764.  Because the new Forever Stamp was to be a workhorse stamp, the Postal Service and the Citizens' Stamp Advisory Committee intended it to be of another patriotic icon.[6]  Mr. McCaffrey testified that the committee liked the idea of a U.S. flag stamp but that such an image had been used so many times for workhorse stamps that the Postal Service and committee did not want to issue the flag stamp by itself.  Ultimately a flag stamp was issued contemporaneously with the Lady Liberty stamp, and they were sold together.

---

[5] Mr. Davidson testified that he also built the Joan of Arc at the Paris Hotel in Las Vegas and a Mount Rushmore-styled sculpture featuring Dudley Do-Right characters at Universal Studios in Orlando, Florida.  He stated that he received about $350,000 gross for these works.

[6] The Citizens' Stamp Advisory Committee is made up of a maximum of 12 non-USPS employed individuals who serve at the Postmaster General's pleasure to assist in selecting images and artwork for stamps.  *See* Tr. 679. Hundreds of ideas for stamp subjects are also submitted to the Postal Service by the general public.  Mr. McCaffrey also testified that it is an unwritten rule that there must be a patriotic icon in circulation at all times.  Tr. 676.

Mr. McCaffrey began the search for a new image by asking a contractor, PhotoAssist, to give him access to several photo repositories to look for images of the flag and the Statue of Liberty. He testified that, at the time, the Postal Service had already used at least 20 different images of the Statue of Liberty on different stamps in one form or another. He thus searched the sites himself because he was looking for something "different and unique." Tr. 764. Of all of those images, only two or three were isolated on the face, which is what he was drawn to for the focus of the stamp. *Id.* at 765.

McCaffrey initially narrowed his selection to 24 images of the statue and the flag. These were then narrowed to three images of each, one of which was of plaintiff's statue, a photograph of the face taken by Raimund Linke. Mr. McCaffrey made these selections and did the subsequent culling by himself over the course of a single afternoon. He then contacted Mike Owens at PhotoAssist and asked him to obtain digital image files that he could work with to make his final selection. The photograph of plaintiff's sculpture came from Getty Images ("Getty"). Mr. McCaffrey did not realize that it was not of the New York statue. The other two pictures, from other vendors, were of the original statue.

Mr. McCaffrey selected the photograph of plaintiff's creation for use on the new stamp. In June 2010, he purchased from Getty on behalf of the Postal Service a nonexclusive three-year license for Mr. Linke's photograph, which authorized USPS to print over one million copies of the image. PX 57 (Getty license agreement). USPS paid Getty $1,500 for the license.[7] Mr. McCaffrey stated that he would not have selected the image had he known it was not of the real Statue of Liberty. Tr. 805. That testimony was echoed by Sidney Brown, whose deposition testimony was admitted in written form. *See* JX 13 at 317-18.

---

[7] Mr. Gicker, the current head of stamp design testified that the stamp development group has an annual budget of approximately $3.3 million, $400,000 of which is designated for the purchase of art and images to be used on stamps. This budget has remained largely static for the past 10 years. Mr. Stratton testified regarding the overall financial picture of the Postal Service, stating that costs have exceeded revenue each year since 2006, meaning that USPS operates at a loss. *See* Tr. 647-48. Nevertheless, annual revenues have exceeded $60 billion since 2008. Pretrial Stips. of Fact ¶ 2. If USPS were a private firm, it would be a Fortune 500 company. Tr. 1003 (Gicker)

After receiving the rights and the image, Mr. McCaffrey sized and cropped the picture to make it appropriate for a first-class stamp. Other than the addition of the typical Forever Stamp text superimposed on the face of the stamp, no further alteration was made to the photograph. The design had been generally approved for use on a workhorse stamp by the advisory committee and the Postmaster General in 2008. The committee also approved the pairing of the Lady Liberty stamp with the newly designed flag stamp on which Mr. McCaffrey had been working.

With the rights to the image secured and finalized stamp designs approved, the Postal Service made the decision to issue the two new workhorse stamps on December 1, 2010. According to Mr. Gicker that schedule was accelerated from the normal practice. Tr. 828-29. USPS was anxious to move on from the Liberty Bell stamp because the several-year run of that stamp created accounting difficulties for the Postal Service. As the price of first-class postage rose over time, it became more difficult for the Postal Service to account for the value of stamps that were sold but unredeemed. A new issue allows the Postal Service to mark all outstanding new stamps at a minimum value on the new stamp issue date.[8] This internal pressure, in conjunction with the external demand for a new stamp design, drove the Postal Service to move quickly from the Liberty Bell stamp. In addition, the Postal Service hoped to put the new stamps in circulation in time for the holiday mailing season. The two new stamps, Lady Liberty and the flag stamp, were released for public sale on or about December 1, 2010, and went into full production as workhorse stamps. A press release was issued on that same day that attributed the photograph of the statue to Mr. Linke. PX 76. Plaintiff was given no attribution.

On March 18, 2011, USPS was made aware that the image on the stamp was that of plaintiff's work when an individual from a stock photography company, Sunipix, emailed the Postmaster General's inbox with that information. PX 37 at 3. The Postal Service and PhotoAssist quickly

---

[8] As Mr. Stratton explained, a postage stamp is evidence of payment for future services to be rendered by USPS. Therefore USPS cannot simply book unredeemed stamps as, in essence, profit, without accounting for the likelihood that some of those stamps will be called and the Postal Service required to provide service in exchange. *See* Tr. 634. As will be further explained, some amount of stamps sold by USPS will never be redeemed. These then can be accounted for as pure profit.

confirmed the facts and USPS began working internally on what its response would be. Layne Owens, the manager of stamp development, noted in an email to Stephen Kearney of USPS that, although PhotoAssist had failed to properly identify the subject of the photograph, after looking at it, "it's quite apparent that it had to be" of the Las Vegas replica. PX 85. In response to an inquiry from Mr. Kearney, Mr. Owens represented on March 21, 2011, that, had stamp development "known the origin of the photograph, we would have attributed the photograph as having been taken of the statue in Las Vegas; however, we would still have used this photo." PX 37 at 2. He went on to explain that the Statue of Liberty had appeared on 23 stamps prior to this one and that Mr. McCaffrey selected the image he did because it "was very different from anything we've done before. That was its appeal. . . . There are only so many ways to continue to reinterpret an iconic image." *Id.* Mr. Kearney then promised to pass along this information to Roy Betts, a USPS spokesperson, who had also received notice of the error from Sunipix. *Id.*

Mr. Owens confirmed that information to Roy Betts later that same day in a separate email: USPS "still love[s] the stamp design and would have selected this photograph anyway. We were looking for a different treatment of this icon that has been on 23 different stamps." PX 244 at 1. Mr. Owens further represented that corrections to future materials regarding the stamp would be made but that he did not think the Postal Service needed to issue a stand-alone correction. That was the public position Mr. Betts disseminated when asked by media and stamp collecting groups. He repeated the representation of Mr. Owens that the Postal Service loved the image, that it was looking for something different, and that it would have selected the image even if the facts had been known in 2010. *See* Tr. 420-21 (Betts); *see also* PX 109; PX 110. He made the same statements to other USPS personnel. PX 108; PX 121

In an internal memo dated March 23, 2011, Mr. Kearney detailed the error, stating that three billion of the paired stamps had been printed to date and that the legal department had been tasked with determining "what licenses must be executed." PX 95. The memo also reflected that USPS was examining what the contractual relationship between the sculptor of the Las Vegas statue and the New York-New York Hotel was, concluding that "it [was] too early to determine whether any liability exists or how much compensation may be required." *Id.* Mr. Owens informed the Citizens' Stamp Advisory Committee on April 14, 2011, that the stamp would continue to be used until supplies were exhausted and that the "image is a bold graphic that

works well at stamp size and is immediately recognizable as Lady Liberty." PX 104. He reported that the stamp was "very popular." *Id.*

Several months later, in response to an inquiry by a member of Congress, the Postal Service stated that it should have correctly attributed the image to Mr. Davidson and that new procedures had been put in place to avoid such errors in the future. PX 151 at 2 (June 8, 2011 letter from the Deputy Postmast General to Congressman Elliot Engel). The Postal Service's letter also indicates that $8 million had been invested in printing these stamps and that withdrawing and reissuing a new one would have been cost prohibitive. *Id.*

USPS continued to ship and sell the Lady Liberty stamp. As of June 2011, USPS had printed 10.5 billion of the stamps, 4.4 billion of which were already in the field for sale or had been sold. It was anticipated that the remaining stamps would ship later that year. *See* PX 148 (email from Charles Delaney to Roy Betts). Mr. Quinn testified that, as of September 2011, an additional 1.125 billion stamps were issued. Tr. 539-40. As Mr. Quinn explained, given the production already completed, it would have been impossible for USPS to have produced another one billion stamps to replace those already printed and ready for distribution. Tr. 529-32.

In January 2014, the Lady Liberty stamp was retired along with the paired flag stamp. Ultimately, 4.9 billion of the Lady Liberty stamps were sold, amounting to just over $2.1 billion in sales for that stamp alone. Equal figures were sold and collected for the paired or "convoyed" flag stamp.[9]

USPS employs a firm called Synovate to track and calculate how many stamps will not be used to send mail. This percentage is known as retention or breakage. Tr. 546-51 (Quinn). The Postal Service tracks these numbers because it accounts for stamps that will never be redeemed differently from those likely to be used as postage. Stamps retained by collectors or otherwise never redeemed represent virtually pure profit for USPS. Tr. 551. The higher the retention rate, the better for USPS, and Mr. Quinn stated that exploiting breakage and retention was always of interest to USPS management. Tr. 551, 611.

---

[9] It is not clear what happened to the remaining 4.5 billion stamps that were printed but not sold or distributed for retail sale.

To that end, Synovate provided quarterly surveys on retention of stamps to the Stamp Services Department at USPS, which tracks such information to glean which stamps consumers were attracted to.  Tr. 610-11.  Mr. Quinn created a spreadsheet in 2011 that reflected a retention rate for the Lady Liberty and flag stamps at nearly 4.69% for that year, which amounted to nearly $75 million in value to USPS.[10]  Tr. 577-78, 582; PX 154; PX 154A. Mr. Quinn further explained, that although that retention rate is not high, those figures represented a high degree of profitability since the volume of workhorse stamps is very high.[11]   The final official USPS estimate for retention of the two stamps was 3.24%.  Tr. 632-33 (Stratton).  That figure was adopted in the Postal Service's financial statements.  Tr. 633.  The Postal Service's final estimate for profitability from the Lady Liberty stamp is $70,969,419 with an equal number for the flag stamp.  *See* PX 212 (interrogatory answers).

III.  Legal History

After the successful and profitable completion of the Las Vegas Lady Liberty statue, Mr. Davidson took a photograph of the face of the statue and used it as a logo for his PlasterTech business and for a new concrete cutting business that he started.  Tr. 189-90; PX 233 at 313 (photograph).  He testified that beginning around 1997 or 1998 he used the image on letterhead, business cards, equipment, and on the side of trucks.  Tr. 189-90.

Plaintiff reports discovering the use of his statue by the Postal Service one day after his wife returned from a trip to a local post office.  She had purchased a book of Forever Stamps and excitedly notified her husband that "our statue is on the stamp."[12]  Tr. 192.  Some time thereafter, plaintiff

---

[10] Other lower rates were also offered at trial by defendant's expert Bruce Isaacson based on his own survey work conducted for trial.  We will discuss those numbers in greater detail below.

[11] He also stated that, by contrast, a commemorative stamp, which is usually of greater interest to collectors, might have a retention rate as high as 20 percent.  The gross numbers of total sales of commemorative stamps would be much lower, however.

[12] It is not clear from his testimony when precisely this occurred, but it must have been sometime prior to January 2012 given that an attorney filed a
(continued...)

contacted an attorney regarding copyrighting his work. She agreed to file a copyright application on his behalf and did so in January 2012. *See* JX 1 (copyright application). Mr. Davidson also contacted a litigation firm based in Minneapolis, Minnesota, concerning his rights in his work. According to plaintiff, after several years working with Mr. Davidson, that firm withdrew from representation based on an asserted conflict of interest. *See* Tr. 194. Plaintiff then found local counsel who performed some additional work regarding the copyright registration. Mr. Davidson's copyright eventually was issued with an effective date of November 15, 2013. *See* JX 2 (Copyright Registration No. VA 1-882-070).

Mr. Davidson has never sought to license or otherwise monetize his copyright in the Las Vegas statue nor has he attempted to enforce his copyright against any party other than the United States. He was asked why he sought compensation from the government in this lawsuit:

> I don't know how they would acknowledge me. I don't believe after the fact that they would put my name on the stamp. If my name was on the stamp, then everybody would immediately recognize that it was me. And it was just a very tough, very demanding project. And I'm very proud of her, and it's just something I didn't think lightly of.

Tr. 200. He was also asked what he would have done had the Postal Service approached him prior to producing the stamp and asked permission to use an image. He responded that he would have sought advice on what the value of an image of his statue would have been. Tr. 200.

Plaintiff filed suit here in November 2013. After three years of discovery, the parties filed cross-motions for summary judgment in March and April 2017. Plaintiff sought a ruling that his work was original and protected and that the government was liable for infringing his copyright; defendant asserted the defenses of non-originality, fair use, and that plaintiff's statue was not eligible for copyright protection because it was an architectural work for which pictorial representations are exempted from copyright protection. We denied both parties' motions by an order dated July 17, 2018, in which we rejected defendant's argument regarding the pictorial representation of

---

[12](...continued)
copyright application on his behalf at that time.

architectural works exception.  We set the matter for trial on all unresolved issues.

## DISCUSSION

There is no dispute that defendant used an image of plaintiff's statue without permission.  Although the Postal Service paid for a license from Getty Images for the photograph, Getty had no rights to the underlying subject of the photograph.  28 U.S.C. § 1498(b) waives sovereign immunity for claims of copyright infringement against the federal government "for the recovery of his reasonable and entire compensation as damages for such infringement."  *Id.*

The Copyright Act specifically protects "pictorial, graphic, and sculptural works."  17 U.S.C. § 102(a)(5) (2012).  These works must be original.  *Id.* § 102(b).  We previously held that Mr. Davidson's statue was a sculpture rather than a building but did not reach the question of originality.  *Davidson v. United States*, No. 13-942C, 2017 WL 3033774, *3 (Fed. Cl. July 18, 2017).  The Copyright Act protects the "the form but not [the] mechanical or utilitarian aspects" of "artistic craftsmanship."  *Id.* § 101.  Plaintiff must prove a valid copyright, that it was infringed, and his damages.

Defendant has asserted that the statue is a replica and contains no truly original work, meaning that plaintiff's copyright is invalid and the government owes nothing for its use of an image of plaintiff's statue.  As a related argument, defendant contends that it copied no original elements.  Defendant also pleads the statutory defense of fair use under 17 U.S.C. § 107, which excuses certain uses of copyrighted work.   Defendant bears the burden of proof on the statutory defense.

We begin with the question of whether Mr. Davidson's statue is entitled to copyright protection.  If it is, we must decide whether defendant's use was infringing and, if so, excused as fair under the statue.  If not, we turn to what damages are owed.  We answer the first three questions in favor of plaintiff and thus must also consider damages.  We take each issue in turn.

I. Infringement

The infringement issue presents the court with two questions: 1) is Mr. Davidson's copyright valid and, if so, 2) was it infringed?  The parties disagree as to the correct answer to each.

16

There is no question that plaintiff was tasked with creating a replica of the Statue of Liberty in New York Harbor, but plaintiff testified that he was given artistic license and that he both intended and achieved a more contemporary and feminine face in the end.  Defendant argues that there is insufficient evidence to establish that he accomplished his aim and that the idea of a softer and feminine appearance is not subject to copyright protection.  Defendant also avers that it did not infringe because nothing it copied was original.  It is the face, which plaintiff points to as the discriminator between the two statues, that was copied by defendant.

### A.  Mr. Davidson's Statue Is Original

Plaintiff's copyright registration was not within five years of the public availability of his work, and thus his work is not entitled to a statutory presumption of eligibility.  *See* 17 U.S.C. § 410(c) (2012).  He therefore bears the burden of proving that his copyright is valid, which is to say that he must prove his work to be original.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,, 499 U.S. 340, 345 (1991) ("The *sine qua non* of copyright is originality.").  This requires only a showing of "some minimal degree of creativity" and that it was his own independent creation of those original elements.  *Id.*  The Supreme Court described this level of required creativity as "extremely low" and stated that "even a slight amount will suffice."  *Id.*  The focus is on the expression of an original idea and not the idea itself.  *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1354 (Fed. Cir. 2014).  It is thus the case that a work of art need not be wholly original to be copyrightable; it need only be a new and original expression of some previous work or idea.  *See Feist*, 499 U.S. at 345 (stating that "originality does not signify novelty" in discussing the protection afforded to compilations).  Derivative works and compilations are specifically afforded protection by the act.  17 U.S.C. § 103(a) (2012).  The protection applies, however, "only to material contributed by the author of such work, as distinguished from the preexisting material employed in the work."  *Id.* § 103(b).  As the Seventh Circuit stated, plaintiff must show "nontrivial expressive variation" between the original and the derived work and that any such differences "distinguish from the underlying work in some meaningful way."  *Shrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 521 (7th Cir. 2009).  This is not meant to be a different or higher standard; the court need only find the same level of "originality . . . in a derivative work . . . as

that required for copyright in any other work.[13] *Id.* at 520.  Here, we find that burden met.

Mr. Davidson's testimony establishes that his intent was not to merely copy the Statue of Liberty.  Although he was hired to clearly invoke the iconic New York image, it was his testimony that he intended to give the face a "fresh" look, updating and making her appearance more feminine.  He contrasted his result with the "harsher" and "more masculine" look of the original.  He also testified that he envisioned his mother-in-law as inspiration for the new look and viewed her picture every night during the construction of the face of the statue.  Though he could not give detail as to specific elements of the face, such as the lips or eyes, that he set out to change, he believed that he achieved a "softer" and more feminine final appearance.

Defendant makes much of the lack of contemporaneous statements made by Mr. Davidson to media or elsewhere of this currently-expressed intent.[14]  Defendant also argues that plaintiff's statements about the feminine and contemporary appearance that he sought to evoke are mere ideas unprotected by the Copyright Act.  In the absence of definable features alien

---

[13] The Ninth Circuit has cautioned, however, that when the derivative work is "instantly identifiable" as embodying the "underlying copyrighted [material] in "'yet another form," the conclusion that nontrivial differences exist could not be reached by a jury.  *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1223 (9th Cir. 1997) (quoting *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980)).  In that case, the claimed copyright was in inflatable costumes of separately copyrighted cartoon characters.  The circuit  affirmed the district court's finding that the only differences between the two were attributable to the form as an inflatable costume rather than some new original expression of creativity.  *Id.* at 1222. It was thus only utilitarian aspects of rendering a two-dimensional image into a three dimension inflatable plastic costume that constituted any difference. *Id.* at 1223.  Utilitarian aspects are not copyrightable.  *Id.*; 17 U.S.C. § 101.

[14] Defendant also attempted to introduce at trial an article from a trade publication, Walls & Ceilings, in which out of court statements from Mr. Davidson were referenced.  Plaintiff's hearsay objection was sustained and the article was not admitted.  We note now, even if it had been admitted, it would not change our analysis.

to the original, defendant finds the necessary modicum of originality missing. Defendant also makes much of the fact that plaintiff could not identify the specific features that he intended to change in order to render his statue's face more feminine and softer.  We find no such requirement in the law, however. The finder of fact need only be able to observe a nontrivial expression of artistic creativity.

We are satisfied that plaintiff succeeded in making the statue his own creation, particularly the face.  A comparison of the two faces unmistakably shows that they are different.  Although the record does not contain many pictures of the original, the magazine cover provided by plaintiff which bears a picture of the original Statue of Liberty's face is sufficient.  The differences are plainly visually observable, can be articulated, and are not merely "ideas." *Compare* PX 233-301 *with* PX 231-17.  We agree that Mr. Davidson's statue evokes a softer and more feminine appeal.  The eyes are different, the jaw line is less massive and the whole face is more rounded.  It was these characteristics that drew Mr. McCaffrey to the image. *See Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34-35 (2d Cir. 1982) (finding that minor changes in the illustration of Paddington Bear, described as giving the bear a "different, cleaner look," were nontrivial).  We note as well that Layne Owens, the manager of stamp development, was of the view that "it's quite apparent that it had to be" of the Las Vegas replica.  PX 85.   His statement that "[w]e were looking for a different treatment of this icon that has been on 23 different stamps," PX 244 at 1, along with Mr. Betts' similar comments, indicate that there are evident differences from the original.

Defendant argues that such apparent differences are but the result of camera angle, lighting, shadowing, and weathering and should be ignored for the purposes of the originality inquiry.  We disagree.  To the court, the differences in the faces are meaningful and not trivial.  Nor do we find any secondary evidence to support defendant's assertion.  In contrast, the record is replete with statements from the actors involved reaching the opposite conclusion: the two faces are distinct and these new facial features were appealing enough to have induced Mr. McCaffrey to select the image of plaintiff's statue and for the Postal Service to have publically affirmed its decision to feature Mr. Davidson's statue as a new take on a classic icon.  We view such statements and testimony as secondary evidence of what our own comparison reveals.  Mr. Davidson's statue, although invoking an existing world-famous statue, is an original, creative work, and as such is the subject of a valid copyright registration.

19

B.  The Postal Service Copied Original Elements

Having determined that the face of plaintiff's sculpture is distinct, original, and protected, we find that defendant's use was infringing.  A necessary element to any infringement claim is not just that the work as a whole is original but also that the part copied by the defendant actually be original.  *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 548 (1985).  Defendant argues that infringement cannot be assumed simply because the two works are found to be different.  The government points to the fact that the Postal Service did not notice the difference between the two faces itself until notified months after producing many millions of stamps.  The conclusion for defendant is that nothing original must have been copied.  This is nonsense.

It is the face of the Las Vegas statue that is displayed on the offending stamp.  It is the face that distinguishes the two statues.  All of the testimony revolves around the two faces and whether the Las Vegas lady's face is different.  Having found that it is, the conclusion that defendant's use infringed is inescapable.  Mr. McCaffrey did no editing to the image other than sizing it for display on a stamp and adding the normal stamp copy.  We find that the Postal Service's use of the image copied all of the original elements described above.  We next turn to the question of whether defendant's infringing use was otherwise allowed as fair use under the statue.

II.  Fair Use

Some copying of protected material is characterized by the Copyright Act as being fair use and thus excepted from the definition of infringement.  This defense is laid out in 17 U.S.C. § 107 (2012):

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

There is no generally applicable definition of fair use, and therefore each case must be decided on its own facts and unique circumstances. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994). The courts have generally considered each of the four elements listed in the statue as applicable in any particular case, and our review of the case law reveals that the law has not strayed far from those four considerations. In any event, the parties have limited themselves to arguing the four enumerated factors, and we are not aware of any other unique considerations to apply here.

A.  Purpose and Character of the Use

The purpose and character of the use is often the dispositive factor in the fair use analysis. This factor embraces both how the work is used and to what end, i.e., whether the work is somehow transformed by the new use and what is the user of the work doing with it. If the work is transformed by the new use, the law will generally allow it under the fair use doctrine. *See Campbell*, 510 U.S. at 579 ("the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works"). The Court posed the question as "whether the new work merely supersede[s] the objects of the original creation or instead adds something new, with a further purpose or different character, altering first with new expression, meaning, or message." *Id.* Further, the statute requires courts to consider whether the end use of the new work is "of a commercial nature or is for nonprofit or educational purposes." 17 U.S.C. § 107. The former suggesting that the use is not protected by the statute.

The government does not argue that nature of its use was transformative. Instead it argues that the nature and character of its use favors a finding of fair use "because, as a workhorse stamp, the vast majority of the revenues to the Postal Service represent payment of postage for the universal required service of mail" and "not as payment for the art shown on the stamp." Def.'s Post-Trial Br. 23.

Plaintiff disagrees, pointing to the fact that USPS sold over $4 billion worth of the stamps bearing plaintiff's work. Even using defendant's expert's numbers, the Postal Service made $140 million in pure profit from breakage from the Lady Liberty stamp and the flag stamp combined sales. This, in plaintiff's view, is a purely commercial use not intended to be protected by section 107's fair use defense.

21

We agree. As the Federal Circuit found in the *Gaylord* decision, where the Postal Service had sold $17 million in stamps, $5.4 million of which were retained by collectors and represented pure profit to the government, "the stamp clearly has a commercial purpose." *Gaylord v. United States*, 595 F.3d 1364, 1374 (Fed. Cir. 2010). The fact that a smaller percentage of the overall sales total represented breakage or retainage does not make the use noncommercial. Despite the fact that it regularly operates at a loss, the Postal Service is in business and seeks to operate at a profit, or at least seeks to fully fund its operations through its own revenues received from sales. It offers the service of delivering mail, which is, in a broad sense, in competition with private vendors offering similar services. The testimony of the Postal Service's own employees made clear that the attractiveness of the image played a key role in selecting it in hopes of attracting both overall higher sales and higher retention rates. The first factor strongly favors a finding of infringement.

### B. Nature of the Copyrighted Work

The nature of the copyrighted work factor considers, to borrow a phrase from Justice Story, "the value of the materials used" to decide whether copyright protection should be extended despite a claim of fair use. *Folsom v. Marsh*, 9 F. Cas. 342, 348 (Cir. Court, D. Mass. 1841) (cited by the Supreme court when considering this factor in *Campbell*, 510 U.S. at 586). Some copyrighted works will receive less protection in the face of a fair use claim than others, such as when a work is derivative, as it is here. *See Campbell*, 510 U.S. at 586 ("some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied"). The courts consider questions such as "'(1) whether the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower.'" *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006) (quoting Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)). If a work is expressive or creative, a use by another is less likely to be considered fair. *See Gaylord*, 595 F.3d at 1374 (citing *Blanch*, 467 F.3d at 257).

Here, defendant claims that the derivative nature of Mr. Davidson's replica statue means that it is afforded only a "thin copyright." Def.'s Post-Trial Br. 23. Defendant points to the fact that the Postal Service was itself confused and did not recognize that plaintiff's work was not the original New York statue and that the public did not immediately recognize the difference.

The suggestion that the image added nothing to the postage aspect of the stamp is not credible, however. If that were the case the Postal Service would simply issue characterless stamps with nothing but the amount of postage. Nor would the Postal Service invest so much effort in the images it utilizes. More particularly, in this case, it is clear that the creative elements of plaintiff's work are precisely what attracted the Postal Service's interest.

Plaintiff counters that the creative elements employed by Davidson that we cited above in finding originality are precisely what mitigate against fair use here. Plaintiff also suggests that the fact that statue has been a publicly displayed monument since 1996, i.e., has been widely published, cuts against fair use.

This factor favors neither party. Although we did find that the original elements of plaintiff's statue were creative and expressive, its intended use as a replica mitigates in favor of defendant. Further, plaintiff's argument that his work had been publically displayed for over 10 years before the use is not well founded. When a work is published, a subsequent use is more likely to be considered fair use. *See Blanch*, 467 F.3d at 256. In sum, we find this factor favors neither party.[15]

C. The Portion Used

Also relevant to this inquiry is the substantiality and portion of the original work used. This is self explanatory. The more of the original work copied, the less likely the new use will be considered fair, and, if the portion copied is of the critical core of expressive material, that use will not be fair. *See, e.g.*, *Harper & Row Publishers, Inc. v. Nation Enters*, 471 U.S. 539, 564-66 (1985) (affirming that copying 300 words from President Ford's memoirs was infringing because those words went to "the heart of the book").

Here we find that this factor favors plaintiff. The original and expressive portion of plaintiff's statue was the face, which was almost entirely captured (at least as from the vantage of the photograph) by the stamp. This factor mitigates against the government's asserted defense.

---

[15] In the *Gaylord* case, the Federal Circuit affirmed this court's holding that the use of an image of the Korean War Memorial was not fair use. Both courts found for plaintiff on the second factor. The case is distinguishable, however, because Mr. Gaylord's monument was not a derivative work.

D.  The Effect of the Use

The fourth inquiry looks at the "effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  Plaintiff admits that this factor tilts in the government's favor as plaintiff could cite no harm to Mr. Davidson's business from the Postal Service's use, and he has shown no other interest in exploiting the work.  We find this factor favors defendant.

E.  The Use Was not Fair

On balance, we find that defendant has not proven its use to have been fair.  The Postal Service's use of the image on its "ship of the line" or workhorse stamp, printing billions of copies and selling them to the public as part of a business enterprise—whether for use to send mail or to be retained in collections—so overwhelmingly favors a finding of infringement that no fair use can be found.  The government's citation to the fact that it only used the image on its workhorse stamp is ironic given that, although proportionally the profit is low as compared to that cited in *Gaylord*, the overall numbers are vastly higher.  Defendant collected over $4 billion in revenue (both stamps, Lady Liberty and flag) from the use of Mr. Davidson's statue, and, even though a very low portion of the revenue represents profit, that number is over $70 million for the Lady Liberty stamp alone.  Some portion of that is owed to plaintiff as damages.  Further, the portion used was entirely of what we consider to have been the original work contributed by Mr. Davidson.  The government's only real defense is that its use did not particularly harm plaintiff's business as an industrial sculptor.  That may be true, but we also note that it certainly did not benefit him.  The Postal Service offered neither public attribution nor apology.[16]

III.  Damages

Having reached the conclusions above, we consider the extent of compensation owed Mr. Davidson under 28 U.S.C. §1498(b).  The statute states that, when the court finds infringement, it should award "reasonable and

---

[16] The Postal Service issues public information notices when a new stamp is offered to the public with information about the art used on the stamp.  Even after the error was found, USPS declined to update its informational bulletin with Mr. Davidson's name.

entire compensation as damages for such infringement." The Federal Circuit explained in its second *Gaylord* opinion that this measure is the same as under the Copyright Act's provision for actual damages, 17 U.S.C. § 405.[17] 678 F.3d 1339, 1343 (2012). The court found in that case that the measure of damages was the fair market value of a license to use plaintiff's work as defendant did. *Id.* This assumes a willing buyer and a willing seller negotiating at arm's length. *Id.* Assuming this framework, the matter is left to the trial court's discretion to craft an appropriate remedy. *Gaylord v. United States*, 777 F.3d 1363, 1369 (Fed. Cir. 2015).

Much of the trial testimony consisted of the respective experts' opinions on the value of a non-exclusive license for work such as the sculpture infringed here, as well as testimony of fact witnesses as to what the Postal Service's practice was in valuing, paying and selling licenses when it did so properly. Defendant also offered a survey expert whose work sought to dim the impact of the retention numbers (those stamps representing pure profit to USPS). We begin with the relevant fact testimony and then consider that of the experts.

A. USPS's Own Licensing Practices

The Postal Service has both an art department for acquiring the rights to images used on its stamps ("in-licensing") and a separate department for selling the rights to use the image of stamps (out-licensing). Both are relevant to our inquiry.

1. What USPS Pays for Art

Defendant's overall approach to a hypothetical negotiation was that, because it has never paid more than token amounts for the use of images, the court should cap damages at the most the Postal Service ever voluntarily pays, i.e., $5,000. The testimony of Mr. Gicker, Ms. Brown, and Ms. Handwerger was unequivocal that USPS never paid more than $5,000 for an image to be used on stamp. The amount was typically in the $1,000 to $2,000 range. Mr. McCaffrey testified that in 2008 the average was $3,000 if an artist was commissioned to illustrate an image for use on a stamp, and the cap was $5,000. Tr. 751-52. And it is the case that some entities will give USPS a no-

---

[17] Other types of damages, such as punitive, are not available against the government.

fee license for use of their art on stamps. Two such examples given at trial were that of the Walt Disney Corporation and the estate of Andy Warhol. As plaintiff points out, however, such use comes with attribution, which amounts to free publicity. Mr. Gicker explained that most artists consider it an honor to have their work used on a stamp and view the visibility and publicity to be a highly valuable intangible benefit. Tr. 908-909; *see also* JX 13 at 217 (Sidney Brown's testimony). Plaintiff, of course, was not given that option.

Ms. Brown testified that the market for art and photos available to the Postal Service is ample. *See* JX 13 at 111-12. This is especially so for patriotic images because they are widely available from stock photography companies. Tr. 980 (Gicker). This presumably helps keep the price down for any single image desired by USPS. Even if the Postal Service cannot find the exact image it desires, it can commission photographers to produce the image. These arrangements also do not exceed $5,000. Tr. 761-63 (McCaffrey); Tr. 904-906 (Gicker). All the relevant USPS witnesses stated that a running royalty rate was unheard of and a "non-starter." JX 12 at 857 (stating that such an arrangement was a non-starter).

### 2.   What USPS Demands to License Its Own Art

We heard the testimony of Amity Kirby, who is the senior licensing specialist at USPS. She has worked there for approximately 10 years, of which two or three have been as the senior licensing specialist. She currently is responsible for all of the licensing that the Postal Service does of its intellectual property. Prior to this position she worked in licensing for the Smithsonian Institute. She told the court about her experience out-licensing images of stamps for commercial usage by other entities and testified that it is USPS practice to copyright its stamps and stamp booklet covers. When an entity approaches USPS wanting to use the image of a stamp commercially, the Postal Service requires a license agreement, either fixing a flat fee or a running royalty. *See* Tr. 1036. If, for example, an author or group wanted to use the image of a stamp in a textbook and the run was limited to 100,000 copies, the Postal Service would likely ask for a flat fee. Tr. 1037. On the other hand, if a company approached Ms. Amity with a request to use a stamp on one million tee shirts for sale to the public, she would seek a running

royalty.[18]  Tr. 1037-38.  The higher the distribution, both as to total units and channels of distribution, the likelier that USPS would demand a running royalty.[19]  She also testified that nonprofit uses have in the past resulted in non-fee agreements.  Tr. 1042.  Her department considers stamp images to be art.  Tr. 1047.

It was her testimony that, during the relevant time period, USPS practice was to license out its own intellectual property at a rate of 8% of total gross sales by the manufacturer of the product.[20]  Tr. 1057 (referencing 2006).  Today that number is 10%. Tr. 1060-61. USPS might deviate from that number, but 10% is the rate that it tries to achieve today.

Ms. Kirby also explained that companies frequently seek to buy a package of images from USPS to use on what she called a "program" organized around some theme.  For example, Ms. Kirby stated that one frequent subject of out-licensing is the Postal Service's popular "love" stamps with romantically themed images.  A license covering several images would typically involve a running royalty.  Tr. 1063.  She further testified that a license for a single image was more likely to result in a flat fee agreement.  *Id.*  The example she used was again a textbook displaying the image of a single stamp.  That sort of a license would, however, be calculated on the total anticipated images being produced by the licensee.  Tr. 1068.  In that sense, it is an attempt to reverse engineer the result of what a running royalty rate might ultimately produce.  It was her general observation that the Postal Service

_____

[18]  She also testified that, if a group wanted to print a small run of tee shirts bearing the image of a stamp for an event, that would result in a flat fee arrangement.  Tr. 1039 (stating that the average was $3,000 to $5,000).

[19]  As Ms. Amity explained, a "running royalty" refers to a per-use royalty and is employed for extended periods of use.  Tr. 1054.

[20]  PX 157 is an example of just one such license agreement with an 8% running royalty fee based on total gross sales of vintage metal signs bearing images of USPS stamps.  Plaintiff also introduced an example of an agreement with a puzzle manufacturer in which USPS negotiated a 5% running royalty on images of its own work and 3% if the image included someone else's intellectual property; the example being a stamp bearing the image of a Disney character.  PX 158.  PX 159 was an example of a license for the manufacture of gold foil stamp replicas.  The rate was again 5%, but the contract included a minimum guarantee of $50,000 to the Postal Service.

would try to "negotiate the best that we can get," because her job is to make the Postal Service money.  Tr. 1070.

B.  Expert Testimony on the Value of a Hypothetical License

Both parties presented testimony from business valuation experts whose expertise is in the valuation of intellectual property.  Plaintiff's expert considered the market for artwork broadly speaking, while defendant's expert centered on USPS's own history in buying the rights to art.  Predictably, the results are disparate.  Defendant also presented testimony from an expert on public surveys.  This individual conducted such a survey regarding the retention of the Lady Liberty stamp and attached flag stamp, inquiring as to the numbers retained and the reasons for retention.  We outline each expert's testimony below.[21]

1.  Mr. Timmins

Plaintiff presented the testimony of Jim Timmins, an expert in valuing intellectual property, including copyrights.  He is currently the owner and managing partner of Teknos Associates, a Silicon Valley business valuation and financial advisory firm.  His firm's primary work is to "provide . . . business valuation services to companies, venture capital firms and others interested in the field for tax compliance, financial reporting, transaction support, and occasionally litigation support."  Tr. 1138.  His firm specializes in "technology-driven companies," valuing their securities and other intangible assets, such as patents, copyrights, and trademarks.  He has provided opinions in roughly 60 court cases around the country.

---

[21] Defendant also offered the testimony of Daniel Piazza, a curator of philately at the Smithsonian National Postal Museum, his "dream job." Although he is extremely knowledgeable and a fascinating expert in the history of postage and stamp collecting in general, we did not find his testimony particularly helpful in reaching a conclusion as to what the market value of a license would have been for Mr. Davidson's copyright in 2010.  Mr. Piazza's most relevant testimony was that the Lady Liberty stamp was not highly sought after as a collectible.  That fact was not seriously disputed, and plaintiff's expert made no attempt at specially capturing dollars associated with collectors other than by assigning a royalty rate to unredeemed stamps generally, of which the number of stamps retained in collections is but a subset.

Prior to nine years with his own company, Mr. Timmins worked for 10 years on Wall Street doing investment banking. It was at these firms that he began valuing businesses. He then moved to Silicon Valley, where he spent the next 15 years at a venture capital firm, working on bringing companies to initial public offering. In this position, he again valued business assets, including intellectual property and was involved in negotiating the purchase and sale of such rights. Tr. 1142. Included in that experience was the licensing of copyrights. Tr. 1143. He holds a bachelors degree from the University of Toronto and a masters of business administration ("MBA") from Stanford University. He does not have any prior experience valuing a copyright for art.

His ultimate conclusion was that the license for Mr. Davidson's statue should have generated a running royalty rate of 1.5% for the Lady Liberty stamps used to send mail and a 5% rate for stamps retained and not redeemed as postage. He also opined that the convoyed sales of the flag stamp should be covered by a 0.75% rate for flag stamps used to send mail and 2.5% for those not redeemed as postage. Philatelic products, sold strictly for collectors, according to Mr. Timmins, were entitled to a 10% royalty rate.[22] He applied these rates against USPS's own recorded sales and estimated retention/breakage figures. The end result of which was a license valued at approximately $53,013,154.[23]

In reaching these conclusions, Mr. Timmins considered the factors influencing both sides' positions, such as timing, duration, exclusivity, and territory. It was his opinion that the Postal Service in 2010 was under pressure to release a new Forever workhorse stamp and that viable alternatives, considering both time and cost, were not available to USPS. See Tr. 1177-83. Mr. Timmins then considered comparable licenses in the marketplace to inform his opinion, centering on licenses for artwork. That search revealed

---

[22] Philatelic products are collectible items produced for sale other than for use as stamps. The parties agreed that $29,515 of such products had been sold by USPS associated with the two stamps at issue.

[23] As an alternative, plaintiff's post-trial brief suggests a mixed license of $1,000,000 for mail use stamps, a running royalty of 10% for unredeemed stamps, and 5% for the flat stamps not redeemed. Plaintiff offered $11,645,411 as the sum that those numbers would generate. See Pl.'s Post-Trial Br. 35.

running royalty rates ranging from 2.5% to 10%, with an average of 6.5%. Tr. 1211-21.

Mr. Timmins did not consider USPS's own policy of not paying more than $5,000 to be a relevant fact and did not view it as a reflection of the bargaining positions of the parties. Tr. 1207. He thus did not factor it into his conclusion other than to reject it as a comparator in his basket of similar transactions. He did, however, consider Mr. Davidson's lack of history licensing his artwork. This, he concluded, put plaintiff in a weaker negotiating position, Tr. 1261, although it would not preclude Mr. Davidson from insisting on a running royalty. It simply drove down the rates Mr. Davidson might have achieved to below the market averages he found in his research. Mr. Timmins also assumed that the license agreement would provide no attribution to Mr. Davidson, which presumably would be worth something to Mr. Davidson.

## 2. Mr. Bokhart

Defendant offered the opinions of Christopher Bokhart. He was offered and accepted as an expert in the valuation of intellectual property. He holds a bachelor of science degree in management, with an emphasis in accounting from Purdue University. He is currently a certified public accountant and is also certified in financial forensics and fraud examining. He began his career in 1982 doing business valuation and litigation support at a firm called Peterson Consulting, a spin-off from Arthur Anderson. He quickly became the "IP go-to" at his firm as he gained experience valuing intellectual property. Tr. 1548. He stayed at Peterson for six years, after which he and several others from the firm started their own business, the IPC Group. The IPC Group grew over the years and eventually merged with former partners of Peterson Consulting to form InteCap, which employed about 200 people. Mr. Bokhart's work at both firms focused on valuing intellectual property as part of business valuation and financial consulting.

InteCap has since been acquired by another larger consulting conglomerate, Charles Rivers Associates, where Mr. Bokhart is currently a vice president. He continues to work in valuing intellectual property, including copyrights, trademarks, trade secrets, and patents. His work involves both litigation support and negotiation of license agreements and negotiations for purchase or sale of intellectual property. He testified that he has provided hundreds of opinions of valuation in litigation. Tr. 1551. He characterized his negotiation experience as "more than a handful of times." *Id.* His work valuing copyrights has been primarily outside of court. As an

exception, he provided opinion and expert testimony for the government in the Gaylord case in this court.

Mr. Bokhart's conclusion was that Mr. Davidson's hypothetical license would have been worth no more than $10,000. This conclusion was informed by the facts that plaintiff has no history of making commercial use of his artwork and that the Postal Service's comparable licenses were all below $5,000. He testified that he examined hundreds of such licenses. He also thought that USPS had viable alternatives if an agreement for less than $10,000 could not be reached. In essence, he thought the comparable market was only what USPS paid for similar licenses and that Mr. Davidson had suffered little harm because "he never made an attempt to earn a profit on or commercialize himself." Tr. 1657.

### 3. Dr. Isaacson

Defendant also offered the testimony of Dr. Bruce Isaacson, an expert in the field of consumer surveys. Dr. Isaacson has a bachelor of science degree in engineering from Northwestern University, a MBA from Harvard Business School, and a doctor of business administration also from Harvard Business School. Dr. Isaacson's career has focused on marketing research regarding consumer behavior. His tool is the consumer survey. He has provided surveys and testimony for litigation in various federal and state courts and the Trademark Trial and Appeal Board. He has also testified before the Federal Trade Commission and the Better Business Bureau. He is currently the president of MMR Strategy Group, a marketing research and consulting firm. He has been with MMR for 12 years. One of this firm's specialities is providing litigation surveys. He estimated that his firm has conducted close to 500 surveys while he has been with the company, "the vast majority of which [he] would have been either involved with either directly managing or supervising those who were managing the survey." Tr. 1273.

After familiarizing himself with the particulars of this case, reading court documents, deposition transcripts, and doing some research on the business of USPS generally, he conducted a survey. His survey looked at three different areas of inquiry: 1) whether a respondent had ever purchased the Lady Liberty stamp; 2) what percentage of those who had purchased a stamp intended to retain the stamp (i.e., not use it to send mail) and how many they intended to retain; and 3) why they intended to keep it and not redeem it for postage. Tr. 1294. He testified that he was unsatisfied with the Postal Service's own research as to retention rates because it either did not look

specifically at this stamp "or it was conducted in ways that were not necessarily consistent with those for a litigation survey." Tr. 1295.  He did not explain the inconsistency other than that USPS retention figures often represent retention across all stamps for a single year.[24]  *Id.*

There were 1,790 respondents who responded to Dr. Isaacson's survey. He testified that he used a "control stamp" to weed out people who might have been mis-remembering the particular stamp referenced by the survey, Tr. 1302-03, the results of which were to remove 3% to 4% of the responses from the final tally.  After controlling for the false positives, the results were: 43% of respondents reported purchasing the Lady Liberty stamp; 18.5% of that group have retained some of these stamps; 15.4% of respondents said that they still planned to use those stamps to send mail; 3.6% said that they intended to collect them; and approximately just over 1% intended to give them away, sell them, or make other use of the stamps.  Tr. 1318-20.  He did not provide any data as to the flag stamp.

These figures were examined in some detail on cross-examination. Using the same survey results but employing a method suggested by plaintiff's counsel on cross-examination resulted in 46% of respondents still holding the Lady Liberty stamp.  *See* Tr. 1350-52.  That result was reached by comparing the number of respondents who indicated that they had purchased the stamp and the number of persons who indicated that they still retained at least one of the stamps.  Tr. 1351.  Dr. Isaacson stated that "you could do that" and that he did not dispute that percentage.  *Id.*  That figure was then applied to the total United States stamp-buying population to estimate the number of people still holding this stamp: just under 50 million.  Tr. 1351-52 (Dr. Isaacson in response to plaintiff's counsel posting approximately 50 million: "That would be right . . . .").  The total number of stamps still retained was on average 10.1 per person.  Tr. 1352.  Multiplying those two numbers resulted in about 494 million of these stamps still outstanding (still retained by purchasers and not redeemed) after five years.  *Id.*  Taking that figure and comparing it to the total of the Lady Liberty stamps sold, resulted in a retention rate of about 10%.  Tr. 1355-56 ("Do you agree with that? . . . . The Witness: Yes.").

---

[24] It is unclear whether Dr. Isaacson was asserting that USPS had no figures regarding only this stamp's retention rates.  He did state that he checked his own work against the Postal Service's figures as a general check on the reasonableness of his results.

C. Plaintiff Has Proven Entitlement to Damages

The court is left to craft a remedy that best reflects what the fair market value of a nonexclusive license for plaintiff's artwork would have been in 2010. The Federal Circuit has endorsed the use of patent law tools to value licenses in the copyright context. *See Gaylord*, 777 F.3d at 1367. These include the factors enumerated in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120-21 (S.D.N.Y. 1970). Courts are encouraged to consider objective indicia of the value of similar work in the market. *See, e.g.*, *Jarvis v. K2 Inc.*, 486 F.3d 526, 533-34 (9th Cir. 2007) (also cited in the third Federal Circuit *Gaylord* decision). These considerations may be informed by the licensor's and licensee's own history in similar transactions, but these will not be employed as an artificial inflator nor deflator of the fair market value at the time the negotiation would have taken place. *Gaylord*, 777 F.3d at 1368 (citing *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014)). The court is not foreclosed, however, from considering information that comes to light after the hypothetical negotiation. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1331 (Fed. Cir. 2009). These facts are what the Supreme Court long-ago dubbed the "book of wisdom." *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).

The value reached by the court must assume a willing buyer and a willing seller. *Gaylord*, 678 F.3d at 1343. The Federal Circuit applied this axiom in affirming this court's damages award after remand in *Gaylord*, explaining that "the basic premise of the hypothetical negotiation . . . would have been the opportunity for making substantial profits if the two sides were willing to join forces, which we must assume that they were." 777 F.3d at 1368. We find that principle particularly apt in this case where the government, just as it did in *Gaylord*, relies on its unique history in paying only $5,000 for the rights to images on its stamps. As the Federal Circuit stated in the second *Gaylord* decision and then later explained in its third decision, such a holding would ignore the other side of the bargain: plaintiff's evidence of the value of such a license. Having infringed the copyright billions of times, defendant cannot now shield itself from liability by claiming that it would have walked away from the deal. *Gaylord*, 678 F.3d at 1343. We have to assume a *willing* buyer as well as a willing seller. This means that the government cannot avoid accountability by arbitrarily imposing limits on what it would have been willing to pay. *Id.* (citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995) ([W]hat an infringer would prefer to

pay is not the measure of damages.")).  The rule is rationality in view of the evidence presented.  *See Gaylord*, 777 F.3d at 1368.

We conclude that the most appropriate measure of damages is a mixed license which employees a flat fee for the Lady Liberty stamps used to send mail and a running royalty for retained stamps and philatelic products.  *See id.* at 1344 ("The trial court's analysis of a hypothetical negotiation between [plaintiff] and the Postal Service may lead it to conclude that different license fees are appropriate for the three categories of infringing goods . . . .").

Given the sheer weight of the number of these stamps anticipated to be produced and used as postage, it would have made no economic sense for the Postal Service to have paid a running royalty for such use, nor do we think Mr. Davidson would have been in a position to demand one.  As Mr. Stratton explained, the Postal Service's revenues do not meet its expenditures.  The cost of carrying mail and maintaining the workforce to do so exceeds the stamp sales and other revenue earned.  In essence, each stamp redeemed for service is a small contract on which USPS will lose money.  We thus conclude that paying a running royalty on top of the loss already baked into each stamp redeemed for service is economically unreasonable and that fact would have been obvious to both parties at the time of the hypothetical negotiation.  In this respect we think it relevant that other images could have readily been obtained that would perform the basic function of producing a workhorse stamp for actual postal use.  Thus we find the nominal and historically accurate sum paid by the Postal Service, namely $5,000, to be an appropriate flat rate for this use.

There is, however, a portion of stamps sold on which the Postal Service makes money.  The law presumes, as noted above, that both parties would have entered the negotiation looking to maximize profit.  USPS makes almost entirely pure profit from stamps never redeemed for postage.  It was USPS employee testimony that maximizing retainage and breakage was always a goal.  It was also the testimony of USPS employees that the public expected new stamps and desired attractive images.  To that end, Mr. McCaffrey selected the image of Mr. Davidson's work because it was just that: new, fresh, and attractive and thus likely to attract buyer interest.  Although a bevy of patriotic images was available, market considerations drew Mr. McCaffrey to use Mr. Davidson's image.  USPS was using his image to maximize its own profit, and it is not unreasonable to conclude that plaintiff would have demanded some percentage of those stamps, and other philatelic products, representing profit to defendant.  It is also reasonable to conclude that the Postal Service would have been willing to pay such a percentage since it

reflects no real additional risk. The royalty only attaches to purchases of stamps that would not engender additional cost. As in *Gaylord*, the market incentives were aligned on both sides of the deal to agree on a running royalty on retained stamps. *Gaylord*, 777 F.3d at 1370. Other than the Postal Service itself, neither party presented evidence of a similar transaction where billions of copies of an image were produced for commercial sale without a per-use royalty. We thus conclude that a running royalty is appropriate for these items because it balances the risks and rewards for both parties. *Id.* at 1369.

We find that a 5% running royalty on unredeemed and philatelic products is the correct figure. That figure is supported by Mr. Timmins' work in researching comparable art licenses, Ms. Kirby's testimony of the rates charged by USPS when it out-licenses its own art, and the USPS licenses introduced into evidence. Although Mr. Timmins opined that, if the base was made smaller by excluding stamps against which a running royalty would be applied, the rate would be higher, we find that Mr. Davidson would not likely have achieved a higher rate given his lack of experience in selling his own intellectual property. 5% is a reasonable figure supported by the average rates presented by Mr. Timmins and USPS's own out-licensing.

We do not, however, find that it is appropriate to apply this rate against the attached flag stamps. We heard no evidence as to why those stamps should be included in the base of stamps against which the royalty should be applied nor did we hear any legal reason why they need be included. In the patent context, convoyed sales are often included in the base, but the test is generally whether the convoyed item is functionally part of the same assembly or machine as the patented item. *See generally Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995). Here, the stamps are printed and sold side by side in a single booklet of stamps, but they are in essence entirely separate entities. The factors leading to the desirability of the Lady Liberty image do not automatically translate into retention of the flag stamp and we were presented with no evidence of such a phenomenon. We thus do not include the flag stamps in the base.

We are thus left with only the question of the quantum of base for the retainage and breakage rate to be applied against. We choose the Postal Service's own 2015 estimates as the most reasonable measure for total sales and its estimate for breakage rates. The parties stipulated that 4,948,761,166 of the Lady Liberty stamps were sold. The final year of sales was 2014. Total amount collected for those sales is $2,190,414,155. Stip. of Facts ¶ 28. The Postal Service estimated the breakage rate for all workhorse stamps during this

time period to be 3.24%. *Id.* ¶ 29. Thus plaintiff applies 3.24% against $2,190,414,155 to arrive at a figure of $70,969,419 for breakage and retention. This is similar to, and actually lower than, the figures that Dr. Isaacson's survey data might suggest.[25] We find that to be a conservative estimate and appropriate for use here. We thus apply a 5% royalty rate against that figure, which results in a $3,548,470.95 sum.

The parties agreed that the total revenue of philatelic products sold amounted to $29,515. Applying a 5% rate, the royalty for those products equals $1,476. That number is added to the $3,548,470.95 along with the $5,000 flat fee for redeemed stamps, for a total unadjusted damages figure of $3,554,946.95.

We note that plaintiff cites various contemporaneous or *post facto* circumstances as "book of wisdom" indicators that the government would have paid at least $10,000,000 for this license. They are primarily the cost to produce these stamps and the need to rush them into print in time for the 2010 Christmas mailing season. Defendant counters with its own example of a 9/11 commemorative stamp that was rushed to production as suggesting that Mr. Davidson would not have had USPS over the barrel, and thus the Postal Service would have had viable alternatives given the large selection of patriotic images available at stock photography repositories. We do not find the cost to produce the stamps or the concern about rushing production as telling on what USPS would have paid. That cost, in the hypothetical world of the negotiation, would have been incurred after an agreement would have been reached. As to the need to hurry the production, given defendant's own counterexample of viable alternatives available in short order, we find that these circumstances do not suggest a license fee higher than the one we have adopted. Nor, however, do we find that the government's viable alternatives scenario necessitates a finding that it would not have paid more than $5,000

---

[25] It is unclear from the record precisely how defendant wished the court to have used Dr. Isaacson's retention rate estimate. The 3.6% figure he posited is higher than USPS's own breakage rate (3.24%) across all workhorse stamps for the years at issue, which was the figure used by Mr. Timmins in crafting his damages figure. Presumably the government does not wish us to apply the 3.6% rate against the $70 million in unredeemed stamps. To be fair, we assume this testimony was offered as a more general way of disputing any claim that Mr. Davidson's work drove above-normal collection of the stamp. That ultimately did not end up playing into plaintiff's damage theory.

in total for all usage.  The economic incentives and realities cited above would have driven both parties towards a running royalty in the range that we have found.

<u>CONCLUSION</u>

Plaintiff has proven its entitlement to actual damages of $3,554,946.95, plus interest.  The parties are directed to consult regarding the quantum of interest and to file a joint status report on or before July 27, 2018, informing the court of their agreed-upon amount or their respective positions as to that figure.

s/Eric G. Bruggink_____
ERIC G. BRUGGINK
Judge